# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

|  |  |
|---|---|
| HUMANA INC. *and* AMERICANS FOR BENEFICIARY CHOICE, <br><br>     *Plaintiffs*, <br><br> *v.* <br><br> U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br>     *Defendants*. | Case No. 24-cv-01004-O |

# MEMORANDUM IN SUPPORT OF
# MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

Introduction ........................................................................................................... 1

Background ............................................................................................................. 5

    A.    Statutory and regulatory background .................................................... 5

        1.    The Medicare Advantage and Medicare Part D programs ........................... 5

        2.    The Star Ratings system ....................................................................... 8

        3.    The Foreign Language Interpreter and TTY Availability measure ............. 13

        4.    Plan sponsor participation in Star Ratings (plan preview periods) ............. 15

    B.    Factual background ............................................................................. 16

        1.    The disconnected calls (D1100955 and D0900533) ................................. 16

        2.    The silent call (C0701002) ..................................................................... 18

Argument ............................................................................................................. 19

    A.    The unsuccessful ratings for the two disconnected calls are unlawful .............. 20

        1.    There is no evidence that the call disconnections were the result of factors under Humana's control ............................................................. 21

        2.    The no-call-back policy adds conditions to CMS's regulations without notice-and-comment rulemaking .................................................. 23

        3.    CMS unlawfully delegated its governmental authority to decide Humana's objections concerning calls D1100955 and D0900533 and failed to explain its ultimate decisions ............................................... 28

    B.    The unsuccessful rating for call C0701002 was unlawful ................................. 32

        1.    The decision not to invalidate call C0701002 violated CMS's regulations and guidance .......................................................................... 32

        2.    CMS unlawfully delegated its governmental authority to decide Humana's objections concerning call C0701002 ..................................... 35

Conclusion ........................................................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allina Health Services v. Price*,
  863 F.3d 937 (D.C. Cir. 2017), *aff'd*, 139 S. Ct. 1804 (2019) ................................... 25

*Azar v. Allina Health Services*,
  139 S. Ct. 1804 (2019) ................................................................................................. 25

*Book People, Inc. v. Wong*,
  91 F.4th 318 (5th Cir. 2024) ....................................................................................... 30

*Caris MPI v. UnitedHealthcare, Inc.*,
  108 F.4th 340 (5th Cir. 2024) ....................................................................................... 6

*Consumers' Research v. FCC*,
  109 F.4th 743 (5th Cir. 2024) ...................................................................... 28, 29, 31, 36

*Data Marketing Partnership v. U.S. Department of Labor*,
  45 F.4th 846 (5th Cir. 2022) ....................................................................................... 21

*Elevance Health, Inc. v. Becerra*,
  736 F. Supp. 3d 1 (D.D.C. 2024) .......................................................................... 7, 9, 11

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ...................................................................................................... 32

*Flight Training International v. FAA*,
  58 F.4th 234 (5th Cir. 2023) ....................................................................................... 26

*MaxMed Healthcare, Inc. v. Price*,
  860 F.3d 335 (5th Cir. 2017) ......................................................................................... 6

*Medicaid & Medicare Advantage Products Association of Puerto Rico v.
  Emanuelli Hernández*,
  58 F.4th 5 (1st Cir. 2023) .............................................................................................. 7

*Mexican Gulf Fishing Co. v. U.S. Department of Commerce*,
  60 F.4th 956 (5th Cir. 2023) ....................................................................................... 27

*Mock v. Garland*,
  75 F.4th 563 (5th Cir. 2023) ....................................................................................... 25

*National Cable & Telecommunications Association v. Brand X Internet
  Services*,
  545 U.S. 967 (2005) ...................................................................................................... 23

*National Environmental Development Associations Clean Air Project v. EPA*,
  752 F.3d 999 (D.C. Cir. 2014) ..................................................................................... 23

**Cases—continued**

*Niz-Chavez v. Garland,*
    593 U.S. 155 (2021) ................................................................................ 4

*Ohio v. EPA,*
    144 S. Ct. 2040 (2024) ......................................................................... 31

*Texas v. EPA,*
    91 F.4th 280 (5th Cir. 2024) ............................................................... 23

*Texas v. Rettig,*
    987 F.3d 518 (5th Cir. 2021) ............................................................... 28

*Town of Barnstable v. FAA,*
    659 F.3d 28 (D.C. Cir. 2011) ............................................................... 24

*UnitedHealthcare Benefits of Texas v. CMS,*
    2024 WL 4870771 (E.D. Tex. Nov. 22, 2024) ...................................*passim*

*UnitedHealthcare Insurance Co. v. Becerra,*
    16 F.4th 867 (D.C. Cir. 2021) ........................................................... 5, 6

*University of Texas M.D. Anderson Cancer Center v. HHS,*
    985 F.3d 472 (5th Cir. 2021) .......................................................... 21, 23

**Statutes**

42 U.S.C.

§ 1395c ................................................................................................. 5

§ 1395hh(a) .................................................................................. 25, 26

§ 1395hh(a)(2) ..................................................................................... 8

§ 1395w-21(h)(4)(D) .......................................................................... 7

§ 1395w-21(j)(2)(D) ........................................................................... 7

§ 1395w-22(a) .................................................................................... 6

§ 1395w-22(a)(1) ................................................................................ 5

§ 1395w-22(e)(1) .............................................................................. 10

§ 1395w-22(e)(3) .............................................................................. 10

§ 1395w-23(a) .................................................................................... 6

§ 1395w-23(a)(1)(A) ........................................................................... 6

§ 1395w-23(a)(1)(B)(i) ........................................................................ 7

§ 1395w-23(a)(1)(B)(ii) ....................................................................... 7

§ 1395w-23(a)(1)(E) ............................................................................ 7

§ 1395w-23(b)(1)(B) ........................................................................... 6

§ 1395w-23(n) .................................................................................... 6

§ 1395w-23(o)(1) ......................................................................... 12, 26

§ 1395w-23(o)(3)(A) .................................................................... 12, 26

§ 1395w-23(o)(4)(A) .....................................................................10, 12

§ 1395w-24(a) .................................................................................... 6

§ 1395w-24(b)(1)(C) ........................................................................... 7

§ 1395w-24(b)(1)(C)(v) ..................................................................... 12

§ 1395w-24(b)(1)(C)(v) ..................................................................... 26

§ 1395w-24(b)(2)(A) ........................................................................... 7

§ 1395w-101(a)(1) .............................................................................. 7

§ 1395w-101(a)(3)(C) .......................................................................... 7

§ 1395w-151(b) ................................................................................ 10

Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L.
No. 108-173, 117 Stat. 2066 (2003) ......................................................... 6

**Rules and Regulations**

42 C.F.R.

§ 422.62(b)(15) ..................................................................................11, 26

§ 422.111(h)(1) ................................................................................ 13, 29

§ 422.111(h)(1)(ii) ................................................................................. 13

§ 422.111(h)(1)(iii) ................................................................... 13, 24, 26

§ 422.111(h)(1)(iii)(B) ....................................................................... 26, 33

§ 422.160(b)(1) ...................................................................................... 10

§ 422.160(b)(2) ...................................................................................... 12

§ 422.160(b)(3) ......................................................................................11

§ 422.162(a) ..............................................................................................9

§ 422.162(b)(1) ....................................................................................8, 9

§ 422.166(a)(4) .........................................................................................9

§ 422.166(c)(1) .........................................................................................9

§ 422.166(c)(3) .........................................................................................9

§ 422.166(d)(2)(iv) ...................................................................................9

§ 422.166(h) ...........................................................................................11

§ 422.166(h)(1)(ii) ..................................................................................11

§ 422.166(h)(2) ...................................................................................... 16

§ 422.266(a)(2)(ii) .................................................................................. 12

§ 422.502(b)(1)(i)(D) ........................................................................11, 26

§ 423.128(d)(1) ...................................................................................... 29

§ 423.128(d)(1)(iii) .................................................................... 13, 24, 26

§ 423.128(d)(1)(iii)(B) ........................................................................ 26, 33

§ 423.180(b)(1) ...................................................................................... 10

§ 423.180(b)(3) ......................................................................................11

§ 423.182(a) ..............................................................................................9

§ 423.182(b)(1) ....................................................................................8, 9

§ 423.186(a)(4) .........................................................................................9

§ 423.186(c)(1) .........................................................................................9

§ 423.186(c)(3) .........................................................................................9

§ 423.186(d)(2)(iv) ...................................................................................9

§ 423.186(h) ...........................................................................................11

§ 423.186(h)(1)(ii) ..................................................................................11

§ 423.186(h)(2) .................................................................. 16, 17, 18, 19

§ 423.503(b)(1)(i)(D) .........................................................................11, 26

*Contract Year 2019 Policy & Technical Changes to the Medicare Advantage Program*, 83 Fed. Reg. 16440 (Apr. 16, 2018) ....................................................*passim*

*Medicare Program; Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Program for Contract Year 2024*, 89 Fed. Reg. 30448 (Apr. 23, 2024) .............................................................................. 7

**Rules and Regulations—continued**

*Medicare Program; Establishment of the Medicare Advantage Program*, 70 Fed. Reg. 4588 (Jan. 28, 2005) ................................................................. 6

*Medicare Program; Proposed Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs for Contract Year 2012 and Other Proposed Changes*, 75 Fed. Reg. 71190 (Nov. 22, 2010) ................................... 12

**Other Authorities**

CMS, *Medicare Managed Care Contract (MMCC) Plans Monthly Report* .......................... 8

Nancy Ochieng, et al., *Medicare Advantage in 2023: Enrollment Update and Key Trends* (Aug. 9, 2023) ........................................................................ 8

*New Oxford American Dictionary* (2001) ........................................................ 33

*Webster's Third New International Dictionary* (1986) .................................... 33

## INTRODUCTION

This case challenges the Center for Medicare and Medicaid Services' (CMS) arbitrary and capricious administration of the 2025 Star Ratings system under the Medicare Advantage and Part D benefit programs. At its core are arbitrary and capricious agency actions of the clearest kind. CMS has failed to follow its own regulations. It has disregarded its own guidance. It has subjected Humana and other Medicare Advantage organizations to unlawful extra-regulatory policies that were not adopted according to required notice-and-comment procedures and are arbitrary on their own terms. It has treated similarly situated plans differently without explanation. And it has unconstitutionally delegated its vast—and vastly consequential—governmental authority to an unaccountable private party. Agency missteps are rarely so clear as this.

The stakes could not be higher. The technical details of the three seemingly trivial customer-service calls on which this case turns carry colossal weight for Humana—more than *1 billion* in program revenue, which Humana would be required by law to reinvest into enrollee benefits or cost reductions for its more than six million Medicare beneficiaries. The stakes are equally high (albeit more diffuse) for ABC's members—specifically the agents and brokers who depend for their livelihoods on the accuracy and reliability of the Star Ratings program. And neither of those considerations is to say anything of the millions of Medicare Advantage enrollees who, as a result of CMS's illegal conduct, are enrolled in plans that now must offer less generous benefits.

Medicare is a federal health insurance program for seniors and people with disabilities. Enrollees in the program can choose coverage under either "traditional" Medicare or the semi-privatized Medicare Advantage (MA) program. CMS is the federal agency responsible for administering Medicare. In that capacity, it calculates and publishes a Star Rating

1

(on a scale of one to five Stars) for each MA and Part D plan. The Rating is meant to reflect plan quality and performance based on a range of dozens of underlying quality measures.

The Star Ratings system is centrally important to the MA and Part D programs. First, it provides health insurance agents and brokers, and the Medicare beneficiaries they serve, with information about a plan's quality, enabling them to compare plans when shopping during the annual enrollment period. In addition, CMS must provide quality bonus payments (QBPs)—in amounts that can reach hundreds of millions or billions of dollars annually—to plans with better Star Ratings. Plans must then use those payments either to lower costs for their enrollees or to provide them with additional benefits. Star Ratings drive additional regulatory benefits (like the ability to enroll new beneficiaries mid-season) and penalties (like discontinuation of a contract after multiple years of low Stars).

Humana is one of the nation's largest MA organizations (MAOs). It is committed to putting health first by designing and administering MA plans of the highest quality. Indeed, high-quality healthcare and high-quality service have been the primary drivers of the company's success over its three decades participating in the Medicare programs for private health plans. The high quality of the plans sponsored by Humana is reflected in the industry-leading Star Ratings CMS has assigned them over the past six years.

Americans for Beneficiary Choice (ABC) is a non-profit trade association whose members include the agents and brokers who use the Star Ratings system to make informed recommendations, as well as the beneficiaries to whom they sell MA and Part D plans. All of the participants in the complex Medicare Advantage industry, including ABC's members, are guided by Star Ratings and depend on their reliability and accuracy.

On October 10, 2024, CMS finalized and released the 2025 Star Ratings. The number of MA plans with high Star Ratings decreased across the industry, year-over-year.

Under the 2023 Star Ratings, 21.87% of MA participants had been enrolled in 5.0 Star plans. In the 2024 Ratings, that number decreased markedly, to 7.64%. And this year, for the 2025 Star Ratings, the number plummeted even further, to a vanishingly small 1.79%. Meanwhile, the number of enrollees in 3.5 Star plans ballooned from 18.71% in 2023 and 15.89% in 2024, to 27.71% in 2025.

Humana was not spared from the industry-wide drop. Under the 2024 Ratings, 94% of Humana's MA enrollees were in a plan with 4.0 Stars or higher. As a result of the unexplained swings in the most recent Star Ratings calculations by CMS, now only 25% of its enrollees are in plans rated 4.0 Stars and above for 2025.

The decline in Humana's Star Ratings resulted in large part from CMS's improper treatment of three customer-service calls. By regulation, an MA plan must make a foreign language interpreter available to non-English-speaking individuals who call the plan's customer service center, and it must do so within eight minutes of the initial call connection. To evaluate compliance with this requirement, CMS conducts a "secret shopper" monitoring program. The results of the monitoring program underlie one of the "measures" that factor into the Star Ratings system. Here, CMS—through its private contractor—concluded that Humana failed to meet the interpreter-availability requirement in just *three calls*, at call centers serving *millions* of prospective enrollees. Those three calls were independently sufficient to cause Humana's Star Ratings for its largest contracts to fall to 3.5 stars and for Humana to lose an astonishing sum of program funding from CMS.

While CMS effectively requires perfection from MA plans with respect to call-center performance, it demands far less of itself. Two of the three calls at issue here dropped due to unknown technical issues, for which there is no evidence Humana bears any fault. In the past, CMS has rightly invalidated calls under similar circumstances, but it arbitrarily

3

declined to do so here. Moreover, Humana could have remedied the call disconnections and placed the callers in touch with an interpreter in under eight minutes by simply calling back—which would have been consistent with CMS's regulations and guidance, as well as real-world practice. But CMS refuses to allow this common-sense solution, imposing an irrational no-callback rule on top of its duly promulgated regulations.

Concerning the third call at issue here, the CMS test caller remained completely silent for the duration of the call. CMS's regulations are clear, however, that a call does not "connect" (a customer service representative is not "reached") unless and until the secret caller actually says something to the customer service representative in a foreign language. That did not happen here—and yet, CMS effectively faulted Humana for the caller's silence. That decision, too, was contrary to the agency's regulations and guidance, and it was therefore arbitrary and capricious. "If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021).

Humana requested that CMS invalidate all three calls. But CMS summarily denied Humana's requests with terse explanations. As the record now lays bare, those explanations (such as they were) were not even CMS's own—they instead came from a private third-party contractor to which CMS unconstitutionally delegated its regulatory authority. CMS merely rubber stamped the private party's analysis, repeating it back to Humana in cut-and-paste emails that passed off the contractor's words as CMS's. This unlawful delegation of government authority to private parties is another ground on which to set aside Humana's 2025 Star Ratings.

Relief is urgently needed from this Court by the first week of April 2025, when CMS will release the Announcement of Calendar Year 2026 Medicare Advantage (MA) Capita-

tion Rates and Part C and Part D Payment Policies. Following publication of that announcement, all health plans will have to submit bids to CMS by the first week of June 2025 to participate in the 2026 Medicare Advantage program, and MA organizations' Star Ratings critically inform the bids that they submit. Humana has already begun preparing its 2026 bids, which is a tremendously labor-intensive task. Relief later than early April 2025 will make meeting the early June 2025 deadline exceptionally challenging, bordering on impossible. In lieu of preliminary injunction proceedings, the parties have therefore stipulated to an expedited summary-judgment briefing schedule in advance of the early April deadline (Dkt. 30), which the Court has entered (Dkt. 31).

In the end, the Court should grant summary judgment to Humana and ABC, set aside CMS's determination of Humana's 2025 Star Ratings, and remand for recalculation of Humana's 2025 Star Ratings and quality bonus payments. The Court should further declare that the policies challenged in this case, including the delegation of regulatory power to a private third party, are unlawful.

## BACKGROUND

### A.    Statutory and regulatory background

#### 1.    *The Medicare Advantage and Medicare Part D programs*

Established in 1965 as an amendment to the Social Security Act, the Medicare program is the federal health insurance program for people aged 65 or older and people with certain disabilities or end-stage renal disease. *See* 42 U.S.C. § 1395c. It comprises four parts: Parts A, B, C, and D. Medicare Part A (which covers inpatient hospital treatment) and Part B (which covers outpatient services) are together known as "traditional" Medicare, which uses a fee-for-service payment model. *See UnitedHealthcare Insurance Co. v. Becerra*, 16 F.4th 867, 872 (D.C. Cir. 2021); 42 U.S.C. § 1395w-22(a)(1). That is, CMS

5

reimburses providers directly for the services they provide to traditional Medicare beneficiaries. *See MaxMed Healthcare, Inc. v. Price*, 860 F.3d 335, 337 (5th Cir. 2017).

Medicare Part C, also known as Medicare Advantage or MA, uses a different model. *See generally* Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. No. 108-173, 117 Stat. 2066 (2003) (codified at 42 U.S.C. §§ 1395w-21 to 1395w-28); *Medicare Program; Establishment of the Medicare Advantage Program*, 70 Fed. Reg. 4588 (Jan. 28, 2005). The program avoids the pitfalls of traditional Medicare and its single-payer, one-size-fits-all approach by offering plans sponsored by private companies called Medicare Advantage organizations, or MAOs. These companies must cover at least the same services that Medicare beneficiaries would receive through traditional Medicare. 42 U.S.C. § 1395w-22(a). To attract enrollees, MA plans typically offer additional benefits not covered by traditional Medicare, such as dental and vision insurance. *UnitedHealthcare*, 16 F.4th at 872.

Under this public-private model, MAOs do not receive fee-for-service reimbursements from CMS for the healthcare services their enrollees receive. *See generally* 42 U.S.C. § 1395w-23(a). Instead, they receive a per-enrollee monthly payment to provide coverage for all Medicare-covered benefits to the beneficiaries enrolled in their plan. *Id.* § 1395w-23(a)(1)(A). In turn, MAOs pay healthcare providers for the services they provide to MA enrollees. *See UnitedHealthcare*, 16 F.4th at 874; *see Caris MPI v. UnitedHealthcare, Inc.*, 108 F.4th 340, 343-344 (5th Cir. 2024).

CMS determines a plan's monthly payment by comparing the plan's "bid" (its estimated cost of providing Medicare-covered services to a particular patient population) (42 U.S.C. § 1395w-24(a)), to a "benchmark" (the maximum amount the federal government will pay to provide coverage in the plan's service area) (*id.* § 1395w-23(b)(1)(B), (n)). If the

6

MAO's bid is below the benchmark, CMS pays the MAO its bid rate, while also returning a specified percentage of the difference between the benchmark and the bid as a "rebate," which must be used to provide additional benefits or otherwise returned to plan participants through lower premiums or cost sharing. 42 U.S.C. §§ 1395w-23(a)(1)(B)(i), (E), 1395w-24(b)(1)(C). If, in contrast, an MAO's plan bid is at or above the benchmark, the MAO receives monthly payments at the benchmark rate, and the MAO must charge enrollees an additional premium to cover the amount by which the bid exceeds the benchmark. *Id.* §§ 1395w-23(a)(1)(B)(ii), 1395w-24(b)(2)(A). *See also Medicaid & Medicare Advantage Products Association of Puerto Rico v. Emanuelli Hernández*, 58 F.4th 5, 8 n.1 (1st Cir. 2023); *Elevance Health, Inc. v. Becerra*, 736 F. Supp. 3d 1, 5-6 (D.D.C. 2024).

In addition to inpatient treatment and outpatient services, MA beneficiaries may obtain prescription drug coverage through Medicare Part D. Like Medicare Advantage, the Part D prescription drug benefit provides coverage through a public-private partnership with plan sponsors. 42 U.S.C. § 1395w–101(a)(1), (3)(C).

The enriched range of consumer options introduced by the MA program has produced commensurate decision-making complexity for Medicare beneficiaries who are considering enrolling in an MA plan. Congress intended for insurance brokers and agents to assist Medicare beneficiaries with their decision-making in this space. *See id.* § 1395w-21(h)(4)(D), (j)(2)(D). Indeed, agents and brokers help "millions of Medicare beneficiaries to learn about and enroll in" MA plans "by providing expert guidance on plan options in their local area, while assisting with everything from comparing costs and coverage to applying for financial assistance." *Medicare Program; Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Program for Contract Year 2024*, 89 Fed. Reg. 30448, 30617 (Apr. 23, 2024).

Since its adoption by the Bush administration in 2003, the MA and Part D programs have grown steadily. Americans prefer the choices that these plans provide compared with traditional Medicare. The immediate predecessor to Medicare Advantage and Part D, called Medicare + Choice, had approximately two million enrollees in 1992. *See* CMS, *Medicare Managed Care Contract (MMCC) Plans Monthly Report*, https://perma.cc/YPK6-DDEW (click Live View). By 2023, that figure had increased to more than 30 million enrollees, surpassing for the first time the number of beneficiaries opting for traditional Medicare. Nancy Ochieng, et al., *Medicare Advantage in 2023: Enrollment Update and Key Trends* (Aug. 9, 2023), https://perma.cc/EYE2-4UHR. And the Congressional Budget Office recently projected that 62% of Medicare beneficiaries would be enrolled in Medicare Advantage by 2033. *Id.*

Recognizing the importance of public participation in the rules and policies governing the MA and Part D programs, Congress specified by statute that "[n]o rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation" using notice and comment. 42 U.S.C. § 1395hh(a)(2). This includes rules governing the Star Ratings methodologies.

### 2.    *The Star Ratings system*

**a.**    To assist agents and brokers and inform would-be enrollees, CMS established the Quality Star Ratings system early in the MA program's existence. Star Ratings measure the quality of health and drug services received by plan participants enrolled in MA and Part D. *See* 42 C.F.R. §§ 422.162(b)(1), 423.182(b)(1); *see also Contract Year 2019 Policy &*

*Technical Changes to the Medicare Advantage Program*, 83 Fed. Reg. 16440, 16520 (Apr. 16, 2018).

CMS evaluates MA and Part D plans along a range of quality, compliance, and other measures, and develops ratings on a five-star scale based on these measures. *See* 42 C.F.R. §§ 422.166(a)(4), 423.186(a)(4). A 1.0 Star Rating is the worst rating, and 5.0 Star Rating is the best. *Id.* §§ 422.166(a)(4), (c)(3), (d)(2)(iv), 423.186(a)(4), (c)(3), (d)(2)(iv). The system is intended to reflect the quality and performance of each plan. 42 C.F.R. §§ 422.162(b)(1), 423.182(b)(1); *see also Elevance*, 736 F. Supp. 3d at 5.

To that end, the Star Ratings are based on the scores that these plans earn on various quality and performance "measure[s]." *See* 42 C.F.R. §§ 422.162(a), 423.182(a). CMS looks at measures within five broad categories: (1) outcome measures, which cover improvements in beneficiaries' health; (2) intermediate outcome measures, which cover actions taken to assist in improving a beneficiary's health status; (3) patient experience measures, which cover beneficiaries' perspectives of the care they received; (4) access measures, which cover how easily beneficiaries are able to obtain needed care; and (5) process measures, which capture the services provided to beneficiaries to assist them in maintaining, monitoring, or improving their health status. *See* AR263; 83 Fed. Reg. at 16532.

**b.** Each plan receives a numerical score on its applicable measures, which CMS converts into a "measure-level" Star Rating. Each measure level rating uses four thresholds, or "cut points," to divide the distribution of measure scores into five "whole star increments." 42 C.F.R. §§ 422.166(a)(4), 423.186(a)(4). From the measure-level Star Ratings, CMS calculates Part C and Part D "summary" ratings, which reflect the weighted mean of a plan's measure-level Star Ratings. *Id.* §§ 422.166(c)(1), 423.186(c)(1). CMS further

9

calculates an overall rating for each MA-PD contract, which reflects the weighted mean of that contract's Part C and Part D measure-level Star Ratings.

By statute, the Star Ratings that CMS assigns to a plan must be based on the data collected in connection to the "ongoing quality improvement program[s]" that each MAO is required to establish. 42 U.S.C. §§ 1395w-22(e)(1), (3); 1395w-23(o)(4)(A); 1395w-151(b). These data sources include quality-of-care performance measures, which Medicare-managed care organizations are required to report annually through the Healthcare Effectiveness Data and Information Set (HEDIS) scheme; measures of beneficiaries' experiences with their health plans drawn from the Consumer Assessment of Healthcare Providers and Systems (CAHPS) survey; and measures of changes in the physical and mental health of MA enrollees captured through the Health Outcomes Survey. *See* 83 Fed. Reg. at 16531. In addition to measures from these data sources, MA plan Star Ratings are also based on performance measures that "address telephone customer service, members' complaints, disenrollment rates, and appeals." *Id.*

**c.** The Star Ratings system is integral to the MA and Part D programs. It serves three primary functions, each of which requires the ratings to "accurately . . . reflect true performance." *Id.* at 16519.

*First*, the system is designed to provide Medicare beneficiaries with "comparative information on plan quality and performance," allowing them to make "knowledgeable enrollment and coverage decisions in the Medicare program." 42 C.F.R. §§ 422.160(b)(1), 423.180(b)(1). As CMS has explained, "[t]he MA and Part D Star Ratings system is designed to provide information to the beneficiary that is a true reflection of the plan's quality and encompasses multiple dimensions of high quality care," with the goal of "inform[ing] plan choice" by beneficiaries. 83 Fed. Reg. at 16520. To this end, CMS maintains the

Medicare Plan Finder website, which displays information about available plans, including each plan's Star Rating. *Elevance*, 736 F. Supp. 3d at 5. CMS prominently displays Star Ratings in its online and print resources concerning available MA plans. *See* 42 C.F.R. §§ 422.166(h); 423.186(h). Specifically, through the online Medicare Plan Finder tool, CMS displays MA plans to prospective enrollees in order of highest to lowest Star Ratings to guide beneficiaries to higher-rated plans first.

Star Ratings thus influence each plan's position in the marketplace by affecting how prospective enrollees, and the agents and brokers who advise them, perceive the comparative quality of various plans. For instance, MA-only plans with a 5.0 Star Part C summary rating, Part D plans with a 5.0 Star summary rating, and MA-PD contracts with a 5.0 Star overall rating are displayed with a high-performing icon, while a plan that had any combination of Part C or Part D summary ratings of 2.5 Stars or lower in the most recent three consecutive years is marked with a "low performance" icon. *See* 42 C.F.R. §§ 422.166(h)(1)(ii), 423.186(h)(1)(ii).

*Second*, the system is designed to help CMS perform "oversight, evaluation, and monitoring of MA and Part D plans" and compliance with regulatory and contract requirements. 83 Fed. Reg. at 16520-16521; *see also* 42 C.F.R. §§ 422.160(b)(3), 423.180(b)(3). For that reason, CMS conditions certain aspects of a plan's status within the MA program on its Star Rating. For example, only plans with a Star Rating of 5.0 Stars may market to and enroll existing beneficiaries outside of open enrollment. 42 C.F.R. § 422.62(b)(15). And CMS may treat low-performing MA plans as "hav[ing] failed to comply with a contract," and thus deny a Medicare Part C or D application, if it "[r]eceived any combination of Part C or D summary ratings of 2.5 or less in both of the two most recent Star Rating periods." *Id.* §§ 422.502(b)(1)(*i*)(D), 423.503(b)(1)(*i*)(D).

11

The Star Ratings program's third, more recent, purpose is to provide "quality ratings on a 5-star rating system" to be used in administering the scheme of additional payments for high quality MA plans, known as quality bonus payments (QBPs). *Id.* § 422.160(b)(2). These payments were established in 2010 by the Patient Protection and Affordable Care Act (ACA). *See Medicare Program; Proposed Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs for Contract Year 2012 and Other Proposed Changes*, 75 Fed. Reg. 71190, 71218 (Nov. 22, 2010). The ACA provides that an MA plan is entitled to QBPs from CMS depending on the "quality rating" of the plan, which "shall be determined according to a 5-star rating system." 42 U.S.C. § 1395w-23(o)(4)(A). Thus, if an MA plan receives a Star Rating of 4.0 Stars or higher, its benchmark amount is increased, in turn increasing the rebates that CMS will pay by increasing the difference between the plan sponsor's benchmark and its bid. *Id.* § 1395w-23(o)(1), (3)(A).

Star Ratings also determine the percentage of the difference that is returned as a rebate. Plans with a 4.5 Star Rating or higher receive 70% of the difference between the benchmark and the bid; plans with a Rating between 3.5 and 4.5 Stars receive a 65% rebate, and plans with a rating under 3.5 Stars receive a 50% rebate. *Id.* § 1395w-24(b)(1)(C)(v); 42 C.F.R. § 422.266(a)(2)(ii). In light of the increased benchmark and increased rebate share, Star Ratings can impact payments to larger MAOs by *hundreds of millions* or *billions* of dollars annually.

In short, Star Ratings thus have a tremendous impact on how prospective beneficiaries perceive MA plans; plans' ability to acquire new beneficiaries and maintain Part C and D eligibility; and the compensation plans receive from the Medicare program.

### 3.   The Foreign Language Interpreter and TTY Availability measure

Each MAO is required by regulation to provide specific information on a timely basis to current and prospective enrollees upon request, including through a toll-free customer service call center. 42 C.F.R. § 422.111(h)(1). By regulation, call centers must limit average hold times to no more than two minutes, answer 80 percent of incoming calls within 30 seconds, and limit the disconnect rate of all incoming calls to no more than five percent, among other requirements. *Id*. §§ 422.111(h)(1)(ii); 423.128(d)(1)(ii).

MAO call centers also must provide teletypewriter (TTY) services and foreign-language interpretation to prospective enrollees speaking a language other than English. The center must make foreign language interpreters available, at no cost to the caller, for "80 percent of incoming calls requiring an interpreter within 8 minutes of reaching the customer service representative," or CSR. *Id*. §§ 422.111(h)(1)(iii), 423.128(d)(1)(iii). The regulation does not specify that the eight-minute requirement must be met in a single call and is silent on the permissibility of call backs in the event of a disconnected call.

CMS uses the "Foreign Language Interpreter and TTY Availability" measures to evaluate compliance with these requirements as part of the Star Ratings system. *See* AR340-343 (discussing measures C30 (for Part C ratings) and D01 (for Part D ratings)). As relevant here, CMS conducts the Accuracy & Accessibility Study to evaluate plan performance. The study uses surveyors to place anonymous test calls to plans' customer-service call centers. *See* AR38-39. Surveyors (sometimes called "secret shoppers") provide reports on plan performance to CMS through a subcontractor.

CMS uses a straightforward metric to assess foreign language interpreter availability: It divides the number of "completed" interpreter contacts by the number of attempted interpreter contacts in "connected" calls. *See* AR39. Consistent with sections 422.111-

(h)(1)(iii) and 423.128(d)(1)(iii), a contact with an interpreter is considered "completed" when the caller "establish[es] contact with an interpreter and confirm[s] that the customer service representative can answer questions" about the plan's Medicare Part C or Part D benefits "within eight minutes." AR340, 342; *see also* AR39.

CMS provides detailed guidelines for the Accuracy & Accessibility Study. A secret shopper call must proceed in four phases: (1) dial, (2) connect, (3) introductory question, and (4) accuracy measure. AR81. Only the first three phases are relevant here. *See generally UnitedHealthcare Benefits of Texas v. CMS*, 2024 WL 4870771, at *3-5 (E.D. Tex. Nov. 22, 2024). These phases proceed as follows:

- At phase 1 ("dial"), secret shoppers must dial the center's toll-free or alternative toll-free calling information. AR81.

- At phase 2 ("connect"), secret shoppers must "determine if [they] can reach a live CSR at the plan who can assist [them] with [their] questions." *Id.* A call will be marked unsuccessful at this phase if the call center is closed when it should be open, if a "technology barrier" such as a busy signal prevents the connection, if the wait time exceeds 10 minutes, and for any "other reasons caused by the plan or the plan's phone carrier." AR81-82.

- At phase 3 ("introductory question"), the secret shopper must "place the call in a foreign language and wait for the CSR to bring an interpreter to the phone." AR82. Once the interpreter is on the phone, the caller must pose an introductory question and "the CSR, via an interpreter, [must provide] an affirmative response to the introductory question." *Id.* Phase 3 must be completed within eight minutes of the initial connection with the CSR.

"A call is considered **connected** when the caller confirms that the call connects" verbally to the customer service representative, and "[t]he measure is considered **completed** when contact has been established with an interpreter and the introductory question has been correctly answered within eight minutes of reaching [the] CSR." AR87. As another court in this Circuit has recently recognized, the burden is on the caller to ask the

introductory question—if the secret shopper does not ask the question, a plan's "call center [can]not fail to answer it." *UnitedHealthcare*, 2024 WL 4870771, at *4.

The results of the Accuracy & Accessibility Study place a secret shopper call into one of three categories: (1) calls successfully completed after having been connected; (2) calls not successfully completed after having been connected; or (3) invalidated calls. *See* AR81-82; *UnitedHealthcare*, 2024 WL 4870771, at *2. Invalidated calls are those that CMS excludes from the study and does not consider for purposes of the Star Ratings scores. *See, e.g.*, AR95, AR105. Invalidating calls is not unusual. CMS has previously invalidated calls when, among other circumstances, there is no evidence that the plan was at fault for an unsuccessful connection or unsuccessful completion. *See UnitedHealthcare,* 2024 WL 4870771, at *2, *3; Amended Complaint at ¶ 4 (Dkt. No. 13), *Elevance*, 736 F. Supp. 3d 1 (No. 1:23-cv-3902-RDM) (*Elevance* Amended Complaint). For 2025, CMS invalidated four of Humana's calls, meaning that they did not factor into Humana's 2025 measure score. *See* AR244.

To receive 5.0 Stars on the "Foreign Language Interpreter and TTY Availability" measure in the 2025 Star Ratings, CMS required 100% of non-invalidated foreign language calls to be scored as successful after having been connected. AR410. Given the demand for perfection to receive 5.0 Stars on the call center measure, CMS's decisions regarding whether and how to score just a single call had an enormous impact on a plan's overall Star Rating, and consequently an outsized impact on a plan's ability to offer competitive benefits and premiums for enrollees.

### 4.    *Plan sponsor participation in Star Ratings (plan preview periods)*

Given the importance of Star Ratings to the MA program, and the sensitivity of the system to erroneous or unreliable data, CMS's regulations establish an administrative

process through which MAOs and other plan sponsors can review, comment on, and challenge the adequacy of the agency's preliminary measure-level data and calculations.

The regulations call this administrative process the "plan preview" periods: "CMS will have plan preview periods before each Star Ratings release during which MA organizations can preview their Star Ratings data in HPMS prior to display on the Medicare Plan Finder." 42 C.F.R. §§ 422.166(h)(2), 423.186(h)(2).

HPMS is CMS's Health Plan Management System, a website used to facilitate communications between CMS and MAOs. *See Health Plan Management System*, https://hpms.cms.gov/app/ng/home/. The plan preview process, which proceeds in two parts, is the only administrative process available to a plan that permits it to comment on and participate in the Star Ratings process before Star Ratings are finalized and published by CMS.

### B.    Factual background

At issue in this motion are three calls CMS wrongly classified as "unsuccessful" during the CY 2025 Accuracy & Accessibility Study. These errors negatively impacted Humana's Star Ratings for several of its largest contracts.

#### 1.    *The disconnected calls (D1100955 and D0900533)*

CMS initially identified two of the calls placed to Humana customer service representatives at issue in in this case (D1100955 and D0900533) as "incomplete" because the calls disconnected. *See* AR15-16. The two calls disconnected "due to technical errors" while the customer service representatives "*were actively connecting with an interpreter to join the call.*" AR16. There was (and still is) no evidence that Humana, as opposed to the caller, was at fault for the technical difficulties. Together, these calls reduced the overall Star Ratings for many of Humana's largest contracts.

Humana challenged the calls in the plan preview period, contending the calls did not arise from "performance failures on [its] part." AR15. Humana explained that it "was unable to complete these calls due to technical limitations imposed by the CMS study that do not exist when Humana CSRs engage with actual Medicare beneficiaries." AR16. In particular, "Humana's standard calling system and process for prospective members allows for Humana to call a prospective member back in the event of a dropped call" or other disconnection. *Id.* Yet "CMS would not accept a call back attempt." *Id.* Humana explained that this no-callback rule was inconsistent with CMS's Star Rating Technical Notes and CMS guidance on the 2024 Call Center Monitoring program, which provide only that "the interpreter and the CSR [must be] able to answer questions about the plan *within eight minutes*." *Id.*

Humana also argued that, in any event, the study should exclude calls dropped due to technical difficulties because the Call Center Monitoring Program's Timeliness Study already monitors call disconnect rates. *See id.* Categorizing disconnected calls as "incomplete" in the Accuracy and Accessibility Study, which, per CMS guidance, is designed to "determine (1) the availability of interpreters for individuals, (2) teletypewriter (TTY) functionality, and (3) the accuracy of plan information provided by customer service representatives . . . in all languages," effectively "double count[s] technical call drop issues." *Id.*

Rather than evaluate Humana's position for itself, CMS forwarded Humana's protest to a private contractor that it had retained to monitor plan call center performance, Hendall Inc. AR19; *see* AR60 (identifying Hendall and its subcontractor, American Institutes for Research (AIR)). Speaking for itself, the contractor stated, "we do not allow callbacks from the plan as all questions should be answered in a single call." AR23. It

therefore "recommend[ed] keeping [the] outcome as is." *Id*. With no independent analysis of the issue, CMS "agree[d] with keeping" the calls "as is." AR28.

In subsequent correspondence with Humana, CMS copied-and-pasted the contractors' analysis, but replacing "CMS" for "we": "*CMS does not allow callbacks from the plan as all questions should be answered in a single call*." AR33 (emphasis added). CMS did not cite to any source as support for the asserted policy. Nor did it otherwise engage with the substance of Humana's arguments.

### 2.    *The silent call (C0701002)*

CMS identified a third call (C0701002) as "incomplete" during the CY 2025 Accuracy & Accessibility Study, which also adversely impacted the Star Ratings calculations for Humana's largest contracts. During this test call to Humana's call center, neither the Humana representative nor the CMS call surveyor spoke; each remained silent and did not speak a word. *See* AR1. The secret caller's notes suggest that he mistakenly believed he was on a "silent" hold and therefore did not speak. *Id*. After an extended period of silence with no communication, the call was disconnected. *Id*.

Humana challenged CMS's determination that the call was incomplete. It explained that "[t]he CMS caller remained silent throughout the duration of the call," which is not representative of "a typical exchange between a prospective enrollee and a call center agent." *Id*. It noted that CMS guidance provides that "[a] call is considered *connected* when the caller confirms that the call connects to the CSR" verbally. *Id*. But the CMS caller here "did not attempt any communication whatsoever, and thus never confirmed that the call was connected to the CSR." *Id*. This "strongly indicates a mistake was made by the CMS caller or the vendor CMS used to perform the call." *Id*. Humana thus argued the call should

18

not "be considered connected" and should instead be "excluded" from the Star Ratings calculation. *Id.*

CMS again forwarded Humana's request to its contractor (AR3), which replied:

> The CMS caller dialed the correct number and connected with the plan, however before the CMS caller could make contact with the CSR the call disconnected. Reviewing the CMS call log shows that the disconnect was not initiated by the CMS caller. **Recommend keeping outcome as is.**

AR6. Again, CMS "agree[d] with keeping the call as is." AR9. CMS then once more copied-and-pasted the contractor's response to Humana, adding only that "it is not unusual for the interviewer to remain silent while waiting for a CSR as they would not understand anything being presented in English." AR12.

Humana repeated its objections to the treatment of calls C0701002, D1100955, and D0900533 in later correspondence with the agency during later stages of the plan preview period, elaborating on the arguments previously made. *See* AR242-244. CMS responded only that it had "reviewed closely with the team" and would "not be making any changes that would impact the Stars that will be released [sic] on or around 10/10." AR246. The agency again declined to provide its own independent analysis.

## ARGUMENT

Calls D1100955, D0900533, and C0701002, should have been invalidated in the calculation of Humana's 2025 Star Ratings. CMS's refusal to invalidate these calls contradicted its governing regulations and industry guidance, and its decisions were otherwise arbitrary and capricious. Among other things, CMS declined to meaningfully address Humana's objections, and it treated Humana differently from similarly situated MAOs. Beyond that, CMS unconstitutionally delegated its regulatory authority to private, third-party contractors who rejected Humana's challenges based upon their own extra-regulatory

policies. For any one of these reasons or all of them, Humana's 2025 Star Ratings for the affected contracts must be set aside.

### A.    The unsuccessful ratings for the two disconnected calls are unlawful

Two of the calls that CMS classified as "unsuccessful" dropped due to unknown technical issues while Humana's customer service representative was in the process of connecting the caller to an interpreter. CMS furnished no evidence that the call disconnections were the result of factors under Humana's control. CMS has invalidated test calls when other plans have had call drops resulting from similar technical difficulties beyond their control. Yet it refused to do so here. Moreover, Humana would have been able to complete the calls within the allotted time frame had it simply been allowed to call back. But because CMS (really, its contractor) employs an extra-regulatory policy that it "does not allow callbacks from the plan" in the event a test call disconnects, the agency refused to invalidate the calls. AR33. On all scores, CMS's refusal to invalidate these calls was contrary to law and arbitrary and capricious.

The adverse impact to Humana has been tremendous. If CMS had correctly invalidated calls D1100955 and D0900533, it appears that contracts H0292 and H7617 would have received 5.0 Stars instead of 4.5 Stars; contracts H1951 and H8145 would have received 4.5 Stars rather than 4.0 Stars; contracts H4623, H5216, H6622, H0028, R0110, and R5361 would have received 4.0 Stars rather than 3.5 Stars; and contract H8908 would have received 3.5 Stars instead of 3.0 Stars. These contracts combined serve millions of MA beneficiaries. Meanwhile, ABC's members—beneficiaries who have long been accustomed to Humana's consistently high past ratings and have experienced high satisfaction with Humana's plans, and agents and brokers who advise them—have been left to guess

whether the Star Ratings for these contracts actually and accurately represent their respective levels of quality.

### 1. *There is no evidence that the call disconnections were the result of factors under Humana's control*

In keeping with the Star Ratings program's basic aim to offer "a true reflection of [a] plan's quality," CMS regulations require the agency to evaluate plans "fairly and equally" based only on matters that are "under the [plan's] control." 83 Fed. Reg. at 16560, 16584. That accords with the "bedrock principle of administrative law that an agency must 'treat like cases alike.'" *University of Texas M.D. Anderson Cancer Center v. HHS*, 985 F.3d 472, 479 (5th Cir. 2021) (quoting 32 Charles Alan Wright & Charles H. Koch, Federal Practice & Procedure § 8248, at 431 (2006)). An "'an unexplained inconsistency' [is] the hallmark of 'an arbitrary and capricious change from agency practice.'" *Data Marketing Partnership v. U.S. Department of Labor*, 45 F.4th 846, 857 (5th Cir. 2022) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)).

Here, CMS has denied Humana an astounding sum of additional funding—which would have been used to benefit Humana's MA enrollees—over nothing more than three customer-service phone calls, despite that it cited no evidence that disconnections in two of the calls were even within Humana's control. It thus treated Humana's call centers differently from those of a similarly situated MAO in the same study, Elevance Health. CMS invalidated Elevance's calls, which never connected because of a technical failure, while nonetheless including Humana's.

In 2023, CMS evaluated Elevance's call center for the same "Foreign Language Interpreter and TTY Availability" measure at issue here. CMS concluded that Elevance had "missed a single call, despite Defendants' own evidence that the call never even connected

to Plaintiffs' phone lines through no fault of Plaintiffs." *See* Complaint at ¶ 3 (Dkt. No. 1), *Elevance*, 736 F. Supp. 3d 1 (No. 1:23-cv-3902-RDM) (*Elevance* Complaint). This missed call resulted in a drop in Elevance's measure-level Star Rating. *Id.* ¶ 66. After filing its complaint, Elevance pursued administrative reconsideration with CMS. CMS ultimately agreed with Elevance and invalidated the call. As Elevance explained in an amended complaint, CMS "found that there was no evidence the call at issue failed due to actions by Elevance," and that therefore it "should not have counted against Elevance." *Elevance* Amended Complaint at ¶ 4; *see also* 83 Fed. Reg. at 16560 (Star Ratings is intended to evaluate MAOs based on factors "under [their] control"); AR81 (calls should be marked "unsuccessful" for "reasons caused by the plan").

That same reasoning should have resulted in the invalidation of calls D1100955 and D0900533. Just as in Elevance's case, CMS has not pointed to any evidence that the call disconnections were due to actions by Humana. The administrative record shows only that calls D1100955 and D0900533 were "disconnected due to [unidentified] technical errors while Humana's CSRs were actively connecting with an interpreter to join the call." AR15-16. CMS did not conclude that Humana was responsible for the disconnections, and there is no indication in the record that the call drops were the result of factors under Humana's control. The evidence is only that the calls "unexpectedly disconnected" while on hold. AR15. According to the logic the agency applied in Elevance's case, the calls therefore should not have counted against Humana.

To be sure, Elevance's call failed for a distinct reason: The Elevance CSR "missed" the call because of an unidentified connection failure (*see* Elevance Complaint ¶ 3) rather than dropping the call due to a similar technical issue while the caller was on hold. But that is a distinction without a difference. The question is whether CMS had evidence that the

call failures were due to circumstances within Humana's control. That is the decisional standard that drove CMS to invalidate Elevance's call. In Humana's case, it declined to apply the same standard.

While the facts underlying the connection failures are slightly different, "an administrative agency cannot hide behind the fact-intensive nature of" an adjudication "to ignore irrational distinctions between like cases." *M.D. Anderson*, 985 F.3d at 480. "Unexplained inconsistency is . . . a reason for holding [agency action] to be . . . arbitrary and capricious." *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967, 981 (2005). CMS's dissimilar treatment of the two MAOs—invalidating Elevance's call while keeping Humana's in the study—was arbitrary and capricious.

### 2. *The no-call-back policy adds conditions to CMS's regulations without notice-and-comment rulemaking*

Even if there were evidence that the call drops were due to actions by Humana, the calls still should be invalidated. If Humana were allowed to call back following an inadvertent call-drop, it could have completed Phase 3 of the Accuracy & Accessibility Study within the eight-minute limit. But CMS (and really its private contractor) applies an extra-regulatory no-callback rule that contradicts the agency's existing guidance and was unlawfully adopted without notice-and-comment rulemaking.

**a.** The no-callback rule contradicts the applicable regulations and related industry guidance. It should go without saying that, "[i]n taking final action, an agency must comply with its own regulations." *Texas v. EPA*, 91 F.4th 280, 291 (5th Cir. 2024). "[T]he failure of an agency to follow its regulations renders its decision invalid." *Id.* (quoting *Gulf States Manufacturers v. NLRB*, 579 F.2d 1298, 1308 (5th Cir. 1978)); *accord, e.g.*, *National Environmental Development Associations Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C.

Cir. 2014) ("[A]n agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.'" (quoting *Environmental, LLC v. FCC*, 661 F.3d 80, 85 (D.C. Cir. 2011)); *Town of Barnstable v. FAA*, 659 F.3d 28, 34 (D.C. Cir. 2011) (similar for internal guidelines).

By regulation, MA and Part D plans must maintain a toll-free customer service call center that "[p]rovides interpreters for non-English speaking and limited English proficient (LEP) individuals." 42 C.F.R. §§ 422.111(h)(1)(iii), 423.128(d)(1)(iii). According to the same regulations, "interpreters must be available for 80 percent of incoming calls requiring an interpreter *within 8 minutes* of reaching the customer service representative and be made available at no cost to the caller." *Id.* (emphasis added).

CMS guidance describing the Accuracy & Accessibility Study—which is designed to measure compliance with these regulations—reflects the same. It provides that a foreign-language call is considered "completed" for purposes of the Study when the caller, having reached a CSR, "establish[es] contact with an interpreter and confirm[s] that the customer service representative can answer questions" about the plan's Medicare Part C or Part D benefits "within eight minutes" of first connecting with the CSR. AR340; *see also* AR39, 86.

That is all. The only condition to successfully complete the foreign-language-interpreter measure is (1) an initial connection with a CSR and (2) obtaining an answer to a question about the plan's benefits "within 8 minutes" of the connection. There is no requirement in either the regulation or guidance specifying that the eight-minute requirement must be met in a single call; both the regulations and guidance are silent on callbacks.

As Humana explained in the plan preview period (AR16), its representatives could have completed the measure within eight minutes had its agents been permitted to call back

after the calls disconnected, which is its normal practice. Only because it imposed an un-lawful extra-regulatory no-callback rule did CMS rate the disconnected calls "unsuccess-ful."

**b.** The no-callback rule is unlawful and unenforceable absent notice-and-comment rulemaking, which did not take place. CMS's disposition of calls D1100955 and D0900533 accordingly should be set aside inasmuch as they relied on the rule.

In an ordinary APA case, the Court would begin by asking whether the no-callback rule is a legislative rule (as to which notice-and-comment requirements apply) or an inter-pretive one (as to which they do not). *See, e.g.*, *Mock v. Garland*, 75 F.4th 563, 578-579 (5th Cir. 2023) (explaining the difference between legislative rules and interpretive rules). But because this case concerns the MA and Part D programs, the APA's distinction between legislative and interpretive rules does not apply. Instead, 42 U.S.C. § 1395hh(a) controls. And as the Supreme Court recently held, that provision eschews any distinction between legislative and interpretive rules. *See Azar v. Allina Health Services*, 139 S. Ct. 1804, 1810-1816 (2019).

Under 42 U.S.C. § 1395hh(a), any "substantive legal standard" that governs "pay-ment for services" or the eligibility of MAOs or beneficiaries "to furnish or receive services or benefits" under MA or Part D must proceed through notice-and-comment—even rules that might be classified under the APA as interpretive policy statements. The no-callback rule is precisely the kind of substantive standard for which 42 U.S.C. § 1395hh(a) requires notice and comment. "A 'substantive legal standard' at a minimum includes a standard that 'creates, defines, and regulates the rights, duties, and powers of parties.'" *Allina Health Services v. Price*, 863 F.3d 937, 943 (D.C. Cir. 2017), *aff'd*, 139 S. Ct. 1804 (2019) (quoting Black's Law Dictionary (10th ed. 2014)).

25

The no-callback rule meets that description: It defines the duty of an MAO's call center to comply with 42 C.F.R. §§ 422.111(h)(1)(iii) and 423.128(d)(1)(iii) in a single call, and not using a callback, even within the prescribed time period.

The no-callback rule also affects payment for services or the eligibility of MAOs to furnish services or benefits under MA or Part D. As a constituent rule within the Star Ratings system, the no-callback rule governs MAOs' quality bonus payments and rebates (42 U.S.C. §§ 1395w-23(o)(1), (3)(A), 1395w-24(b)(1)(C)(v)); higher-performing MAOs' eligibility to enroll beneficiaries outside of open enrollment (42 C.F.R. § 422.62(b)(15)); and lower-performing MAOs' eligibility to participate in the MA and Part D programs at all (42 C.F.R. §§ 422.502(b)(1)(*i*)(D), 423.503(b)(1)(*i*)(D)).

CMS's promulgation of other call-center requirements through notice-and-comment rulemaking (*see* 42 C.F.R. §§ 422.111(h)(1)(iii), 423.128(d)(1)(iii)) reflects the agency's own understanding that such requirements are "substantive legal standards" covered by section 1395hh(a). *Cf. Flight Training International v. FAA*, 58 F.4th 234, 241 (5th Cir. 2023) (in the traditional APA context, "the hallmark of a legislative rule is that it modifies or adds to a legal norm," "effectively amending a prior legislative rule" (cleaned up)).

Here, the regulations requiring plans to "[p]rovide[] interpreters for non-English speaking and limited English proficient (LEP) individuals" mandate only that "interpreters must be available for 80 percent of incoming calls requiring an interpreter *within 8 minutes* of reaching the customer service representative and be made available at no cost to the caller." 42 C.F.R. §§ 422.111(h)(1)(iii)(B), 423.128(d)(1)(iii)(B). CMS subjected Humana to an additional mandate: that the interpreter answer "all questions . . . in a single call" without any callbacks. AR33. Because CMS did not follow the required notice-and-

comment procedures in adopting the no-callback rule, the rule is unlawful and unenforceable, and each decision based upon it must be set aside.

**c.** The no-callback rule is also arbitrary on its own terms because it has no "rational connection" to the Accuracy & Accessibility Study's objectives. *See Mexican Gulf Fishing Co. v. U.S. Department of Commerce*, 60 F.4th 956, 971 (5th Cir. 2023).

First, the no-callback rule effectively adds a consideration that the Accuracy & Accessibility Study was not designed to measure. Because of the no-callback rule, a dropped call necessarily results in an unsuccessful rating. But for foreign language calls, the Accuracy & Accessibility Study is intended to measure only "the availability of interpreters for individuals" who do not speak English. AR38. A dropped call does not necessarily render an interpreter unavailable, because in an ordinary case Humana's call center would simply call the prospective member back. *See* AR16. The no-callback rule thus corrupts the Accuracy & Accessibility Study, producing results that do not reflect the performance measures it is intended to assess.

Related, CMS already takes dropped calls into account in the Timeliness Study, a separate call center monitoring sub-measure. *See* AR38 ("The Timeliness Study measures Part C and Part D current enrollee call center telephone lines and pharmacy technical help desk telephone lines to determine average hold times and disconnect rates."). By factoring technical call drops into the Accuracy & Accessibility Study, CMS is irrationally and unfairly double counting disconnects in foreign-language phone calls, arbitrarily depressing CMS's assessment of a plan's call center performance.[1]

---

[1]    Humana raised each of these concerns discussed above with the agency during the plan preview period (AR16-17), but CMS did not address these arguments head on, disregarding them as a challenge to methodology rather than data analysis (AR33).

### 3.    *CMS unlawfully delegated its governmental authority to decide Humana's objections concerning calls D1100955 and D0900533 and failed to explain its ultimate decisions*

CMS's resolutions on Humana's objections with respect to calls D1100955 and D0900533 are further unlawful because they were not CMS's decisions at all. CMS delegated its regulatory authority to resolve Humana's objections to third-party contractors. The result is an unconstitutional delegation of governmental authority, as well as unexplained and irrational agency action.

**a.**  The ground rules are familiar. "A federal agency may not 'abdicate its statutory duties' by delegating them to a private entity." *Texas v. Rettig*, 987 F.3d 518, 531 (5th Cir. 2021) (quoting *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974)). Although Congress retains "broad discretion to empower executive agencies to 'execute' the law," "there is not even a fig leaf of constitutional justification" for private entities to wield legislative or executive power. *Consumers' Research v. FCC*, 109 F.4th 743, 768 (5th Cir. 2024) (quoting *Department of Transportation v. Association of American Railroads*, 575 U.S. 43, 62 (2015) (Alito, J., concurring)).

Consistent with the "cardinal constitutional principle" that "federal power can be wielded only by the federal government," "[p]rivate delegations are thus constitutional [under Article I's Vesting Clause] only on three conditions": (1) "government officials must have final decision-making authority"; (2) "agencies must *actually exercise* their authority rather than reflexively rubber stamp work product prepared by others"; and (3) "private actors must always remain subject to the pervasive surveillance and authority of some person or entity lawfully vested with government power." *Id.* at 769-770 (cleaned up).

28

Moreover, whatever limited constitutional room there is for delegations of governmental power to private parties, the power to authorize them lies with Congress alone. While Congress may "formalize" a limited role for private parties "in executing its laws, . . . agencies may not." *Id.* (quoting *Association of Railroads v. U.S. Department of Transportation*, 721 F.3d 666, 671 (D.C. Cir. 2013)). Absent express Congressional authorization, agencies may delegate only "ministerial" or "trivial, fact-gathering" duties to private parties. *Id.* at 773, 775.

**b. Congress did not authorize the delegation, which is not ministerial.** In conducting the 2025 Accuracy & Accessibility Study, CMS unlawfully delegated authority to private contractors, not just the task of conducting and recording the secret shopper calls, but also the authority to resolve administrative challenges and determine regulatory compliance. Congress did not authorize the delegation here. *See UnitedHealthcare*, 2024 WL 4870771, at *8 ("CMS failed to cite any statutory provision authorizing the agency to subdelegate the power at issue here. And its counsel acknowledged at oral argument that no such authorization exists."). CMS's conduct is thus unlawful unless the delegation can fairly be described as trivially ministerial. It cannot.

The record is clear about this. CMS engaged Hendall and its subcontractor, AIR, "to monitor the performance of plan sponsors' call centers with respect to the standards at 42 C.F.R. § 422.111(h)(1) and 42 C.F.R. § 423.128(d)(1)." AR60. This delegation of governmental power included the authority to evaluate test calls and determine whether any calls should be invalidated. *See* AR23; *compare UnitedHealthcare*, 2024 WL 4870771, at *8. Hendall and AIR were tasked also with reviewing and resolving plans' objections to calls during the plan preview period. AR38; *see also* AR6, 9, 23, 28-29.

29

These tasks were not ministerial. "An act is ministerial '[w]here the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment.'" *Book People, Inc. v. Wong*, 91 F.4th 318, 337-338 (5th Cir. 2024) (quoting *Morris v. Dearborne*, 181 F.3d 657, 674 (5th Cir. 1999)). Thus, "[m]inisterial tasks' are those that require no discretion or judgment." *UnitedHealthcare*, 2024 WL 4870771, at *7. But as the record lays plain, CMS relied on Hendall and AIR to exercise their own "discretion and judgment" to evaluate test calls. *Id.* Simply put, CMS's contractors "ma[de] choices—and the power to make a choice is a discretionary one." *Id.*

The administrative record in this case proves the point. CMS directed its contractors here to review Humana's objections to calls D1100955 and D0900533. *See* AR19. The contractors evaluated the calls and recommended that CMS should "keep[] [the] outcome as is" for both calls. AR23. CMS then rubber-stamped the contractors' recommendation without further analysis, simply cutting-and-pasting Hendall's email in a denial of Humana's challenge. AR28, 33. In short, the record shows that "the private contractors not only gathered facts for CMS, but also evaluated those facts and exercised discretion and judgment to recommend that the call[s] not be invalidated." *UnitedHealthcare*, 2024 WL 4870771, at *8. Such acts plainly exceed what might fairly be characterized as "ministerial."

Not only did Hendall and AIR make discretionary judgments about plans' call centers, but it established its own substantive rules for the study—the no-callback rule—impacting plans' ability to succeed in the study. In refusing to invalidate the dropped calls, CMS adopted the no-callback rule as its own, despite the absence of any such requirement from controlling regulations or even CMS guidance.

30

**c. CMS did not exercise adequate oversight or independently explain itself.** Even supposing Congress had authorized CMS to delegate its authority to Hendall and AIR, the delegation still would be unconstitutional here. The record shows that CMS did not "*actually exercise*" any final decision-making authority over whether or not to invalidate Humana's dropped calls. *See Consumers' Research*, 109 F.4th at 770. Instead, it "reflexively rubber stamp[ed]" the contractors' recommendations, repeating them back to Humana almost verbatim with no further analysis. *See id.* CMS simply "agree[d] with keeping" each call "as is." AR28. Even when Humana re-raised its objections with CMS down the road, affording the agency another opportunity to reasonably explain itself, it repeated without analysis that it would "not be making any changes that would impact the Stars." AR246.

"That is a *de facto* abdication." *Consumers' Research*, 109 F.4th at 771. An agency's "*de jure* approval" power over private actors' decisions "is not enough" if the power is not exercised *de facto*. *Id.* The agency "must at the very least do something to demonstrate that it applied its independent judgment." *Id.* CMS has not done so here. *See UnitedHealthcare*, 2024 WL 4870771, at *8 (finding CMS's argument that "it retained final decision-making authority in evaluating the test call" "unpersuasive" because "that fact alone does not render a private delegation to be lawful").

CMS's abdication of its job to a private party introduced yet another administrative error: The agency failed to offer any rational explanation of its own for its decisions. It is axiomatic that "[a]n agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 144 S. Ct. 2040, 2053 (2024) (quoting *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021)). Here, CMS has not independently explained why it applied Hendall's no-callback rule, nor why—apart from the rule—calls D1100955 and D0900533 were marked unsuccessful. Again, it simply rubber-

stamped Hendall's response to Humana's objections and held out Hendall's policy as its own. *See* AR33. Perhaps the most basic rule of administrative law is "the requirement that an agency provide reasoned explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009). None was provided here.

### B.    The unsuccessful rating for call C0701002 was unlawful

CMS refused to invalidate another call (C0701002) in which the secret shopper remained silent throughout the entire call. This decision was likewise contrary to CMS regulations and arbitrary and capricious. CMS contradicted its own guidance on how it evaluates test calls and failed to adequately consider Humana's meaningful objections. Moreover, as to this call as well, CMS unlawfully delegated its authority to private parties. This unlawful resolution of call C0701002 adversely impacted the Star Ratings calculations for contracts H5216, H6622, H0028, H0292, H7617, H1951, H8145, H4623, H8908, R0110, and R5361. And once again, it has broken trust with the ABC's members, who are unable to count on the Star Ratings system accurately to reflect plans' true quality.

#### 1.    *The decision not to invalidate call C0701002 violated CMS's regulations and guidance*

During call C0701002, the secret shopper remained silent for a prolonged period of time. AR1. The secret caller's notes suggest that he mistakenly believed he was on a "silent" hold and therefore did not speak. AR9. After an extended period of silence with no communication, the call was disconnected. *Id.*

This call should have been invalidated rather than marked "unsuccessful." A secret shopper must actually speak—and he must do so in a foreign language—before a plan can be penalized for not making an interpreter available. That follows from regulations, agency guidance, and common sense alike.

Take first the regulations. They specify that "interpreters must be available for 80 percent of incoming calls requiring an interpreter within 8 minutes of reaching the customer service representative and be made available at no cost to the caller." 42 C.F.R. § 422.111(h)(1)(iii)(b); *accord id.* § 423.128(d)(1)(iii)(b). Accordingly, a call center's obligation to provide an interpreter can be triggered only if a caller "reaches" a CSR.

In the context of a telephone call, the word "reach" means *communicate with. See New Oxford American Dictionary* 1415 (2001) (defining "reach" as to "communicate with (someone) by telephone or other means"); *Webster's Third New International Dictionary* 1888 (1986) (defining "reach" as to "communicate with . . . by phone"). When a secret shopper dials the line but then remains perfectly silent, he has not "reached" the plan's representative. Under a plain reading of the regulations, then, a secret shopper that remains dead silent for an extended period of time before the call is terminated does not trigger a plan's obligation to make an interpreter available.

Take next CMS's guidance. As we explained above, the Accuracy & Accessibility Study proceeds in three relevant phases for foreign language calls: dial, connect, and introductory question. AR81. At the connect phase, the caller "determine[s] if [they] can reach a live CSR at the plan who can assist [them] with [their] questions." *Id.* According to CMS guidance, "[a] call is considered connected *when the caller confirms that the call connects to the CSR*." AR87 (emphasis added). Consistent with that position, CMS has explained that if a secret shopper "establish[es] contact with your CSR *while speaking in a foreign language*, the call is connected." AR94 (emphasis added). Moreover, the secret shopper's verbal confirmation of a connection with the CSR must take place prior to and is distinct from the third evaluation phase (initial question), which is what triggers the regulatory duty to bring an interpreter into the call within eight minutes. AR82, 92-93.

33

Finally, take common sense. The point of secret shopper calls is to test the reliability with which a plan's call center makes interpreters available for non-English speaking prospective enrollees. It is irrational for an agency to hold an MAO to task for not making an interpreter available to a caller who has not established contact while speaking in a foreign language. A secret shopper who calls the line and remains silent has not actually tested what he is supposed to be testing: the call center's ability to assist non-English speakers with interpreters. To count such a failure—a failure that, by the caller's own notes, arose from his mistaken belief that he was on a silent hold—against the plan simply makes no sense. That is why CMS regulations and guidance plainly contemplate that the caller will actually *speak* in a foreign language before a plan has an obligation to respond.

Here, the secret shopper never "confirmed" that the call connected with the CSR, and he did not establish a connection with (or reach) the CSR "while speaking in a foreign language." AR87, 94. The caller instead stayed quiet. The call accordingly never connected within the meaning of the guidelines, and the caller never reached the CSR within the meaning of the regulations.

CMS disagreed, asserting without support that "it is not unusual for [an] interviewer to remain silent while waiting for a CSR." AR12. The agency offered no further explanation and demonstrated a closed mind. When Humana asked, "how the plan CSR [would] know what language the interviewer was testing if the interviewer never said anything at all" (AR243), it responded simply, "we will not be making any changes that would impact the Stars" (AR246).

That decision is arbitrary and capricious and must be set aside. As the Eastern District of Texas recently held in ruling for another MAO on analytically identical facts, CMS's position "effectively shifts the burden to the CSR to engage with the test caller *before*" the

34

caller speaks despite that neither the regulations nor the "guidelines impose such a burden." *UnitedHealthcare*, 2024 WL 4870771, at *4.

Nor will CMS do itself any favors by insisting that the call actually did connect. Even for a connected call, CMS cannot rate a call "unsuccessful" where "the test caller never ask[s] the introductory question contemplated at phase three of the call." *Id.* "Because the introductory question was not asked, [Humana's] call center did not fail to answer it." *Id.* CMS thus "acted inconsistently with its own guidelines by evaluating the call as 'unsuccessful.'" *Id.*

At bottom, CMS's guidelines are designed to "provide notice to [MAOs] about how [CMS] evaluates performance of test calls and explain how the study will be conducted and how CMS will use the results to calculate each plan contract's raw score. . . . CMS cannot later use a different metric system to evaluate a plan's performance by, for example, requiring a call center to engage with the test caller before hearing an introductory question." *Id.* (citing *M.D. Anderson*, 985 F.3d at 478) (cleaned up). Changing the rules after the game ends is arbitrary and capricious.

### 2.    *CMS unlawfully delegated its governmental authority to decide Humana's objections concerning call C0701002*

That is not all. For call C0701002—like calls D1100955 and D0900533—CMS once again failed to engage with Humana's objections on their merits, instead delegating its decision-making authority to private contractors.

Humana objected to CMS's inclusion of call C0701002 in the Accuracy & Accessibility Study. In particular, it reminded CMS that its guidance advises that "[a] call is considered *connected when the caller confirms* that the call connects to the CSR." AR1 (emphasis added). It argued that "the CMS caller did not attempt any communication whatsoever,

and thus never confirmed that the call was connected to the CSR, which strongly indicates a mistake was made by the CMS caller." *Id.* CMS had no substantive response, insisting only that it was not "unusual" that the caller did not speak while failing to acknowledge or reconcile its contrary guidance. AR12.

But again, CMS did not review these objections itself. The agency instead referred Humana's challenge to Hendall. *See* AR3. Hendall and AIR again recommended that CMS "keep[] [the] outcome as is." AR6. And again, CMS adopted the recommendation without independent analysis, simply "agree[ing] with keeping" call C0701002 "as is." AR9, 12. CMS did not "actually exercise" any final decision-making authority over whether to invalidate call C0701002, instead "reflexively rubber stamp[ing]" Hendall's recommendation without further analysis. *See Consumers' Research*, 109 F.4th at 770. This "*de facto* abdication*"* of government authority to private parties is unlawful. *Id.* at 771; *see also United-edHealthcare*, 2024 WL 4870771, at *8.

As before, CMS did not offer its own explanation for refusing to invalidate call C0701002. In later correspondence, CMS maintained that the foreign-language callers "are trained to only respond when they hear something in their test language," and CMS data "show[ed] that the interviewer believed they were in a silent hold as they didn't hear anything." AR244. In response, Humana *again* cited CMS's own guidance advising that a call is considered "connected" only once the caller "establish[es] contact with [the] CSR *while speaking in a foreign language*," and once connected, the *caller* must ask an introductory question. AR243 (emphasis added). Humana emphasized that "[i]n this case, the interviewer did not ask an introductory question, let alone *say anything* in the language being tested," which meant Humana was not provided "with the appropriate opportunity to respond to the interviewer and identify that an interpreter was needed." *Id.* The agency

did not engage with this argument at all, again stating only that it would "not be making any changes to the Stars." AR246.

As we explained above, CMS's "guidelines are a *very* important aspect of any dispute over whether a call was properly deemed 'unsuccessful.'" *UnitedHealthcare*, 2024 WL 4870771, at *6. Yet the agency's "response failed to address its own guidelines whatsoever." *Id.* Its refusal to engage with Humana's arguments and its own guidelines renders its decision not to invalidate call C0701002 arbitrary and capricious.

## CONCLUSION

The Court should grant plaintiffs' motion for summary judgment, set aside Humana's 2025 Star Ratings for all contracts adversely impacted by calls D0900533, D1100955, and C0701002, and remand the matter to CMS for recalculation of Humana's 2025 Star Ratings and quality bonus payments. The Court should further declare that the policies challenged in this case, including the delegation of regulatory power to a private third party, are unlawful.[2]

---

[2]    Following review of the amended administrative record, plaintiffs have elected not to seek summary judgment on Count I of the Amended Complaint, which alleged CMS committed errors in its technical calculation of the 2025 cut points.

Dated: January 21, 2025          Respectfully submitted,

*/s/ Michael B. Kimberly*

Michael B. Kimberly* (D.C. No. 991549)
Kate McDonald* (D.C. No. 998233)
Caleb H. Yong* (D.C. No. 1780922)
Nicole E. Wittstein* (D.C. No. 1725217)
    McDermott Will & Emery LLP
    500 North Capitol Street NW
    Washington, D.C. 20001
    (202) 756-8901
    mkimberly@mwe.com
    kmcdonald@mwe.com
    cyong@mwe.com
    nwittstein@mwe.com

Richard Salgado (Texas No. 24060548)
    McDermott Will & Emery LLP
    2501 North Harwood Street, Suite 1900
    Dallas, TX 75201-1664
    (214) 210-2797
    richard.salgado@mwe.com

*\* pro hac vice*

*Counsel for Plaintiffs*

38

**CERTIFICATE OF SERVICE**

Undersigned counsel certifies that a true and correct copy of this document was served via CM/ECF on all counsel of record pursuant to the Federal Rules of Civil Procedure on January 21, 2025.

*/s/ Michael B. Kimberly*

Michael B. Kimberly