IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

_____

|  |  |
|---|---|
| HUMANA INC., and AMERICANS FOR BENEFICIARY CHOICE, | |
| Plaintiffs, | |
| v. | Civil Action No. 4:24-cv-01004-O |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; CENTERS FOR MEDICARE & MEDICAID SERVICES; DOROTHY FINK, in her official capacity as Acting Secretary of Health and Human Services; and STEPHANIE CARLTON, in her official capacity as Acting Administrator of the Centers for Medicare & Medicaid Services, | |
| Defendants.[1] | |

**DEFENDANTS' CONSOLIDATED BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS, RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND CROSS-MOTION FOR SUMMARY JUDGMENT**

---

[1] Xavier Becerra has been substituted with Dorothy Fink as Acting Secretary of the United States Department of Health and Human Services, and Chiquita Brooks-LaSure has been substituted with Stephanie Carlton as Acting Administrator of the Centers for Medicare & Medicaid Services, pursuant to Federal Rule of Civil Procedure 25(d).

CHAD E. MEACHAM
ACTING UNITED STATES ATTORNEY

*/s/ Andrea Hyatt*
Andrea Hyatt
Assistant United States Attorney
Texas Bar No. 24007419
Burnett Plaza, Suite 1700
801 Cherry Street, Unit #4
Fort Worth, Texas 76102-6882
Telephone: 817.252.5230
Fax: 817.252.5458
Andrea.Hyatt@usdoj.gov

*Attorneys for Defendants*

# Table of Contents

I.  Summary ................................................................................................. 1

II.  Background ............................................................................................ 4

    A.  Medicare Advantage Program ......................................................... 4

    B.  Medicare Part C and D Quality Star Rating System ...................... 6

    C.  Call Center Foreign-Language Interpreter and TTY Availability
        Measure .......................................................................................... 9

    D.  Appeals Process for Star Ratings ................................................. 12

    E.  The Test Calls .............................................................................. 13

        1.  The So-Called "Silent Hold" Call ...................................... 13

        2.  The Three Disconnected Calls ........................................... 13

    F.  Humana Challenges CMS's Classification of the Test Calls ...... 14

    G.  Procedural Context ....................................................................... 15

III.  Legal Standards ................................................................................... 16

    A.  Legal Standard for a Motion to Dismiss ..................................... 16

    B.  Legal Standard for an APA Challenge of an Agency's Fact Finding ........ 17

IV.  Argument and Authorities ................................................................... 18

    A.  This Court Should Dismiss the Claims that Humana Has Raised, and
        Has Not Yet Exhausted, Through the Agency QBP Appeals Process. ....... 18

    B.  CMS's Decisions on the Challenged Calls During the Plan Preview
        Period Were Not Arbitrary and Capricious. ................................. 22

        1.  CMS Properly Categorized the Disconnected Calls as
            "Unsuccessful," and Plaintiffs' Methodological Challenges
            are Meritless. ...................................................................... 22

            a.  CMS treated like calls alike; the call Humana
                analogizes to is dissimilar. ...................................... 22

b.    The record does not support Humana's "no callback" argument. .................................................................. 24

c.    Plaintiffs' notice-and-comment argument rests on a misreading of the statute. ...................................................... 28

d.    CMS's no-callback policy is rationally connected to the purpose of the Star Ratings. ............................................. 29

2.    CMS's Decision to Classify the So-Called "Silent Call" as "Unsuccessful" was Neither Arbitrary nor Capricious. .................. 31

C.    CMS Did Not Unlawfully Subdelegate Its Authority to Contractors. ........ 35

1.    Dismissal Is Appropriate, and Prudential Concerns Justify Awaiting Supreme Court Guidance. ................................. 35

2.    Even *Consumers' Research* Does Not Support Humana's Position. ........................................................................... 37

D.    This Court Should Grant Summary Judgment on Count I to the Government. ...................................................................... 39

V.    Conclusion ...................................................................................... 40

# Table of Authorities

## Cases

*Azar v. Allina Health Servs.*,
   587 U.S. 566 (2019) ................................................................... 28

*Black v. N. Panola Sch. Dist.*,
   461 F.3d 584 (5th Cir. 2006) ...................................................... 39

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) ................................................................... 18

*Consumers' Research v. FCC*,
   109 F.4th 743 (5th Cir. 2024) ........................................ 36, 37, 38

*Dresser v. Ohio Hempery, Inc.*,
   No. 98-2425, 2010 WL 3720420 (E.D. La. Sept. 13, 2010) ......... 21

*Girling Health Care, Inc. v. Shalala*,
   85 F.3d 211 (5th Cir. 1996) ........................................................ 17

*Heckler v. Ringer*,
   466 U.S. 602 (1984) ................................................................... 18

*Indeplus Grp. of Cos., Inc. v. Sebelius*,
   No. 3:10-CV-0557-O, 2010 WL 1372488 (N.D. Tex. Apr. 7, 2010) .......... 20

*Kisor v. Wilkie*,
   588 U.S. 558 (2019) ................................................................... 27

*Larson v. Geren*,
   No. SA-08-CA-722, 2010 WL 11542078 (W.D. Tex. Apr. 14, 2010) .......... 17

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ................................................................... 19

*Mediterranean Enters., Inc. v. Ssangyong Corp.*,
   708 F.2d 1458 (9th Cir. 1983) .................................................... 21

*Menchaca v. Chrysler Credit Corp.*,
   613 F.2d 507 (5th Cir. 1980) ................................................ 16-17

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto Ins. Co.*,
   463 U.S. 29 (1983) ..................................................................... 18

*Ramming v. United States*,
   281 F.3d 158 (5th Cir. 2001) ...................................................... 16

*Schilling v. Rogers*,
   363 U.S. 666 (1960) ................................................................... 36

*Shalala v. Illinois Council on Long Term Care, Inc.,*
    529 U.S. 1 (2000) ......................................................................................... 19

*Smith v. Berryhill,*
    587 U.S. 471 (2019) .................................................................................... 19

*UnitedHealthcare Benefits of Tex., Inc. v. Ctrs. for Medicare & Medicaid Servs.,*
    No. 6:24-cv-357, 2024 WL 4870771 (E.D. Tex. Nov. 22, 2024) .......................... 31, 32

*Weinberger v. Salfi,*
    422 U.S. 749 (1975) .................................................................................... 20

*Williamson v. Tucker,*
    645 F.2d 404 (5th Cir. 1981) ................................................................... 16, 17

## Statutes

5 U.S.C.

    § 706 ................................................................................................. 17

    § 706(2) ............................................................................................ 17

42 U.S.C.

    § 405(g) ....................................................................................... 18, 19

    § 405(h) ....................................................................................... 18, 19

    § 1395 *et seq.* ..................................................................................... 4

    § 1395c ............................................................................................. 4

    §1395d ......................................................................................... 4, 13

    § 1395hh(a) ....................................................................................... 28

    § 1395hh(a)(2) ............................................................................... 28, 29

    § 1395ii ........................................................................................... 18

    § 1395j .............................................................................................. 4

    § 1395k .............................................................................................. 4

    §1395*l* .............................................................................................. 4

    § 1395w-21 *et seq* ................................................................................. 4

    § 1395w-22(a) ...................................................................................... 5

    § 1395w-23(a)(1)(B)(ii) .......................................................................... 6

    § 1395w-23(b) ..................................................................................... 29

    § 1395w-23(b)(2) ............................................................................... 9, 29

    § 1395w-23(n) ...................................................................................... 5

§ 1395w-23(o)(3)(A)(i) ............................................................................... 8

§ 1395w-23(o)(4)(A) ................................................................................... 6

§ 1395w-24(b)(1)(C) ............................................................................. 6, 8

§ 1395w-24(b)(1)(C)(v) .............................................................................. 9

§ 1395w-24(b)(2)(A) ................................................................................... 6

§ 1395w-101 *et seq.* ................................................................................... 5

§ 1395x(q) ................................................................................................ 28

§ 1395x(s) ................................................................................................ 28

## Regulatory

42 C.F.R.

§ 422.162(b) .............................................................................................. 8

§ 422.164 ............................................................................................ 29, 33

§ 422.164(c) .............................................................................................. 9

§ 422.164(d) .............................................................................................. 9

§ 422.166 .................................................................................................. 8

§ 422.166(h)(2) ........................................................................................ 12

§ 422.254 .................................................................................................. 5

§ 422.258 .................................................................................................. 5

§ 422.260 .......................................................................................... 6, 8, 19

§ 422.260(a) ............................................................................................ 12

§ 422.260(c)(1)(i) ..................................................................................... 12

§ 422.260(c)(1)(ii) .................................................................................... 22

§ 422.260(c)(2) ........................................................................................ 12

§ 422.260(c)(2)(vi) ................................................................................... 12

§ 422.260(c)(2)(vii) ............................................................................. 13, 21

§ 422.266(a)(2)(ii) ..................................................................................... 9

§ 423.182(b) .............................................................................................. 8

§ 423.186 .................................................................................................. 8

Contract Year 2019 Policy & Technical Changes to the MA Program, 83 Fed. Reg. 16,440 (Apr. 16, 2018) ........................................................................................*passim*

## Rules

Federal Rule of Civil Procedure 12(b)(1) ................................................................... 17, 40

Federal Rule of Civil Procedure 56 .................................................................................. 40

Northern District of Texas Civil Local Rule 56.2(a) ......................................................... 39

## Other Authorities

10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2733 (1983) ................................................................................ 17

CMS, Advance Notice of Methodological Changes for Calendar Year ("CY") 2025 for MA Capitation Rates and Part C and Part D Payment Policies (Jan. 31, 2024) ...................................................................................................................... 8

CMS, Fact Sheet - 2025 Medicare Advantage and Part D Star Ratings (Oct. 10, 2024) .... 8

## I.    Summary

This lawsuit arises from three phone calls that the Government rated as "unsuccessful" during a 2024 administrative review of Plaintiff Humana Inc.'s Medicare Advantage plans. As part of its operation of Medicare Advantage plans, Humana runs a call center that provides customer service to Medicare beneficiaries, including foreign-language speakers. Each year, the Centers for Medicare & Medicaid Services (CMS) notifies Medicare Advantage Organizations (MAOs) like Humana that it will use test callers to check the experience of Medicare beneficiaries who call its plans. CMS notifies MAOs in advance when the study will run, what languages will be tested, and what criteria the MAOs must satisfy to have test calls marked "successful." The results of this Call Center Study are part of the data CMS uses to calculate the Star Ratings for each Medicare Advantage contract on a congressionally mandated scale of one to five stars. Congress also requires CMS to base certain financial incentives on a plan's Star Rating. Every MAO knew well in advance that its performance on the Call Center Study would affect its Star Rating and knew the financial incentives associated with that rating.

In this litigation, Humana challenges three calls that CMS marked "unsuccessful" in 2024.[2] But the undisputed facts show that the calls that Humana challenges were unsuccessful. In two of them, a caller was placed on hold to await an interpreter and had the line abruptly disconnect through no fault of the caller. In the third, a caller heard

---

[2] The fact that Humana challenges only these three calls does not mean that every other call Humana's call center received in 2024 was "successful." Rather, it reflects Humana's identification of the challenges it chose to pursue. Indeed, Humana asked the Agency to revise the grade on a fourth unsuccessful call but has not pursued that challenge in litigation.

*nothing* after the Interactive Voice Response system—the automated answering system—completed its menu of options. That caller continued to hear nothing until once again the line—through no fault of the caller—went dead. Although Humana does not dispute these facts about the calls, it nevertheless seeks a judicial declaration overturning CMS's rating of these calls as "unsuccessful."

This Court should dismiss Humana's claims for two principal reasons. First, this Court lacks jurisdiction over Humana's claim because Humana continues to press a claim for identical relief through the Agency administrative process. It is black-letter law that claims arising under the Medicare statute must first be presented and exhausted through agency administrative review channels before federal courts have subject-matter jurisdiction over them. Humana is currently proceeding on identical claims in two forums at once. The law does not allow this—it requires Humana to exhaust its claims before the Agency before suing in court. Dismissal for lack of subject-matter jurisdiction is thus warranted.

Second, even if this Court proceeds to decide the parties' cross-motions for summary judgment, it should rule in Defendants' favor because Plaintiffs have not carried their burden of showing that CMS's actions were unsupported by substantial evidence on the record taken as a whole. To the contrary, there is substantial evidence in the record supporting CMS's classification of each call "unsuccessful," and Humana (despite having the opportunity to do so) has not introduced any evidence supporting its theories of why the calls should be invalidated. Instead, Humana claims that CMS acted arbitrarily and capriciously by allegedly treating Humana differently from peer MAOs.

Unlike Humana, however, those other companies *did* provide CMS with evidence showing that the Agency mistakenly classified their calls "unsuccessful." In one instance, a district court reviewed that evidence and sided with the MAO. But the evidence presented by the other MAOs—and absent here—reveals that the Humana calls are starkly different.

Next, Humana blames a "no-callback policy" for two of its unsuccessful calls, asserting that CMS invented the policy in response to Humana's request to change the calls' classification. The record does not support this claim. The Agency guidance provided to Humana and every other MAO clearly states that disconnected calls will be marked "unsuccessful." But even if Humana was somehow caught off guard by its ability to satisfy the Call Center Study requirements by making a callback, it offers no evidence that it even attempted a callback for either of the two unsuccessful calls. Instead, Humana simply speculates it "would have" passed the test had it been allowed to call back—an optimistic assertion given Humana's failure to show that it even tried to do so.

Humana also asserts that communications between CMS and its contractors about the challenged calls constitute an unlawful subdelegation by the Agency. This argument is subject to dismissal for lack of jurisdiction for the reasons already described, and is also meritless. The Fifth Circuit opinion on which Plaintiffs rely did not hold that an agency may not accept recommendations from contractors.

Finally, Humana has abandoned the first count of its Complaint. Having once alleged that the cut points—essentially, the Star Ratings grading rubric for every MAO contract—were calculated inaccurately, Humana is now only seeking relief based on

three calls where its call center hung up on someone attempting to get a question answered. And, as discussed above, Humana is seeking the same relief simultaneously from the Agency and this Court. Dismissal is warranted, but in the absence of dismissal, this Court should grant summary judgment to Defendants and deny Plaintiffs' cross-motion.

## II.    Background

### A.    Medicare Advantage Program

Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* (the "Medicare statute"), establishes the Medicare program, a federally funded and administered health insurance program for eligible elderly and disabled persons and certain individuals with end-stage renal disease. *See* 42 U.S.C. § 1395c. The Secretary administers the Medicare program through CMS, a component agency of the United States Department of Health and Human Services.

The Medicare program is divided into four major components.

1. *Part A*, the hospital insurance benefit program, provides health insurance coverage for certain inpatient hospital care, post-hospital care in a skilled facility, post-hospital home care services, and other related services. *See* 42 U.S.C. §§ 1395c, 1395d.

2. *Part B*, the supplemental medical insurance benefit program, generally pays for a percentage of certain medical and other health services, including physician services, supplemental to the benefits provided by Part A. *See* 42 U.S.C. §§ 1395j, 1395k, 1395*l*.

3. *Under Part C*, the Medicare Advantage program, a Medicare beneficiary can elect to receive his or her Medicare benefits through a public or private healthcare plan. *See* 42 U.S.C. § 1395w-21 *et seq.*

4. *Part D* is the voluntary prescription drug benefit program.

This case primarily concerns two programs under which the federal government pays health-insurance companies to provide coverage to participating beneficiaries. Under Medicare Advantage or Medicare Part C, private insurers provide coverage that beneficiaries would otherwise receive through Parts A and B (sometimes known, collectively, as "traditional" Medicare). *Id.* § 1395w-22(a). These insurers, known as Medicare Advantage Organizations ("MAOs"), contract with the Government to provide coverage in a particular geographic area. Beneficiaries can then choose among the plans available where they reside. *Id.* § 1395w-21(b). The Government pays MAOs a predetermined sum for providing coverage to each beneficiary, based in part on the demographic and health characteristics of that beneficiary. *Id.* § 1395w-23(a)(1)(A), (C). Under Medicare Part D, the federal government contracts with insurance companies (called "sponsors"), which provide subsidized prescription drug coverage to beneficiaries. *See id.* at § 1395w-101 *et seq.* Many insurers operate plans under Parts C and D, and the differences between the programs are not material to this litigation. The Government's brief will therefore refer to insurers who provide Medicare coverage as "MAOs."

To calculate payments to MAOs, CMS first determines a "benchmark," based on the per capita cost of covering Medicare beneficiaries under Parts A and B in the relevant geographic area. *Id.* § 1395w-23(n); 42 C.F.R. § 422.258. Each MAO then submits a "bid," telling CMS what payment the MAO will accept to cover a beneficiary with an average risk profile in that area. 42 C.F.R. § 422.254. If the insurer's bid is less than the benchmark, the bid becomes the insurer's "base payment"—the amount it is paid for

covering a beneficiary of average risk—and the insurer also receives a portion of the amount by which its bid is lower than the benchmark as a "rebate" that the MAO can use to fund supplemental benefits for beneficiaries or reduce plan premiums. 42 U.S.C. § 1395w-24(b)(1)(C); 42 C.F.R. § 422.260. If the MAO's bid is greater than the benchmark, then the benchmark becomes the insurer's base payment, and the insurer must charge beneficiaries a premium to make up the difference. *See* 42 U.S.C. §§ 1395w-23(a)(1)(B)(ii), 1395w-24(b)(2)(A).[3]

## B.    Medicare Part C and D Quality Star Rating System

Congress has instructed that "[t]he quality rating for a [Medicare Advantage] plan shall be determined according to a 5-star rating system (based on the data collected under section 1395w-22(e) of this title)." 42 U.S.C. § 1395w-23(o)(4)(A). To provide beneficiaries with information on the quality of Medicare Advantage plans and consistent with the statute, CMS uses a Star Ratings system that rates each plan on a scale from 1 to 5 "stars" based on 30 or 42 quality measures, depending on whether the plan is Medicare Advantage-only or also includes Part D coverage. *See* AR255 (2025 Part C & D Star Ratings Technical Notes). These quality measures assess different aspects of health outcomes, patient experience, and care quality within the following five broad categories:

1.    Outcome measures that reflect improvements in a beneficiary's health and that are central to assessing quality of care;

2.    Intermediate outcomes that reflect actions taken which can assist in improving a beneficiary's health status, such as control of blood sugar in diabetes care

---

[3] This bidding process is similar for Part D plans.

where the related outcome of interest would be better health status for
beneficiaries with diabetes;

3. Patient experience measures that reflect beneficiaries' perspectives on the care
they receive from a plan;

4. Access measures that reflect processes and issues that could create barriers to
receiving needed care, such as whether a plan makes timely decisions about
benefit appeals; and

5. Process measures that capture the health care services provided to beneficiaries
that can assist in maintaining, monitoring, or improving their health status.

AR263.

To calculate these ratings measures, CMS uses a variety of different data sources.

These data sources include:

- administrative and medical record review data collected as part of the
Healthcare Effectiveness Data and Information Set ("HEDIS");

- survey-based data from the Health Outcomes Survey and from the Consumer
Assessment of Healthcare Providers and Systems ("CAHPS"); and

- CMS performance measures, such as the call center measures.

*See* Contract Year 2019 Policy & Technical Changes to the Medicare Advantage

Program, 83 Fed. Reg. 16,440, 16,520, 16,525 (Apr. 16, 2018). For measures not based

on information from CAHPS, CMS uses a clustering algorithm that creates four "cut

points" in the data to separate plans into five different "star" levels. *See* AR271-72. CMS

determines each plan's overall rating by calculating a weighted average of the plan's Star

Ratings on each of the different individual measures. *Id*. at 273-75.

CMS began releasing Star Ratings for Medicare Advantage contracts in 2008. *See*

83 Fed. Reg. at 16,520. CMS publishes the Star Ratings each October for the upcoming

year at the contract level, with each plan offered under that contract assigned the

contract's rating. *See* 42 C.F.R. §§ 422.162(b); 422.166; 423.182(b); and 423.186. This case concerns the 2025 Star Ratings issued in October 2024. CMS, Fact Sheet - 2025 Medicare Advantage and Part D Star Ratings (Oct. 10, 2024) *available at* https://www.cms.gov/medicare/health-drug-plans/part-c-d-performance-data.

The Star Ratings system is intended to assist beneficiaries in finding the best Medicare Advantage and Part D plans for their needs by providing information "that is a true reflection of the plan's quality and encompasses multiple dimensions of high quality care." 83 Fed. Reg. at 16,520; *see also* CMS, Advance Notice of Methodological Changes for Calendar Year ("CY") 2025 for Medicare Advantage Capitation Rates and Part C and Part D Payment Policies, at 111 (Jan. 31, 2024), *available at* www.cms.gov/ Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Announcements-and-Documents.

Star Ratings do more than provide valuable information to beneficiaries when selecting an MAO. Congress has provided that a plan contract's overall Star Rating should also affect payments to the MAO in two ways. First, plans that earn an overall rating of 4 stars or higher qualify for Medicare Advantage Quality Bonus Payments in the form of an increased benchmark for the contract year following the ratings year (*e.g.*, the 2025 Star Ratings can increase the Medicare Advantage bidding benchmarks for contract year 2026). *See* 42 U.S.C. § 1395w-23(o)(1) (increasing, for qualifying plans, the applicable percentage that calculates the benchmark); § 1395w-23(o)(3)(A)(i) (a qualifying plan is one that earns a rating of 4 stars or higher). This increased benchmark in turn can allow a Medicare Advantage plan to increase its bid, receive higher rebates, or lower premiums. *See id.* § 1395w-24(b)(1)(C); 42 C.F.R. § 422.260.

Second, Star Ratings affect the level of rebate received by plans that bid below their benchmarks for the contract year following the ratings year (*e.g.*, the 2025 Star Ratings are used to set plans' rebate percentages for contract year 2026). Plans that earn an overall rating of 4.5 stars or higher receive a rebate of 70% of the amount by which their bid is lower than the benchmark, while plans that earn 3.5 or 4 stars receive a rebate of 65% of that amount, and plans that earn less than 3.5 stars are eligible for a rebate of 50% of that amount. 42 U.S.C. § 1395w-24(b)(1)(C)(v) (listing the "final applicable rebate percentage[s]" by rating); 42 C.F.R. § 422.266(a)(2)(ii) (same).

Each year, CMS circulates to plans (and displays on its website) Technical Notes that provide details about the current year's Part C & D Star Ratings. *See* 2025 Star Ratings Technical Notes, AR255. Among other things, these Technical Notes include details about the measures that comprise the Star Ratings, how those measures will be weighted, what the cut points for each measure are, and how CMS assesses each measure. *See generally id*. Before each year's Technical Notes are finalized, plans are informed and have the opportunity to comment about the measures in upcoming Star Ratings through the rulemaking process and the Advanced Notice process. *See* 42 C.F.R. § 422.164(c), (d); *see also* 42 U.S.C. § 1395w-23(b)(2) ("Secretary shall provide for notice . . . of proposed changes to be made in the methodology . . . and shall provide [MAOs] an opportunity . . . to comment on such proposed changes.").

## C.    Call Center Foreign-Language Interpreter and TTY Availability Measure

Since 2016, CMS has included among the performance measures in its Star Ratings a measure of how well health plan call centers process calls from beneficiaries

with limited English language proficiency or a hearing or speech disability. CMS provides notice to MAOs about how it evaluates performance on this measure for purposes of the Star Ratings. For example, CMS publishes the Medicare Part C & D Call Center Monitoring Accuracy and Accessibility Study Technical Notes (hereinafter, "Technical Notes"), which explain how the study was conducted and how CMS used the results to calculate each plan contract's raw score on the measure. *See* Administrative Record, ECF No. 32-1 (hereinafter "AR") at 77. The 2025 Technical Notes were published in June 2024, after the conclusion of the study. AR78. CMS includes a "change log" showing differences from previous iterations of the study.

The Technical Notes explain that the study was conducted through a random sample of anonymous calls made to each health plan's designated call center where the test caller has no advance knowledge of the call center's Limited English Proficiency (LEP) or TTY services. AR79. The Technical Notes also describe the protocol for conducting and measuring calls testing foreign language interpreter accessibility:

> The interpreter availability/LEP measure may have a connected, complete, or unsuccessful outcome. If we are testing interpreter availability, we place the call in a foreign language and wait for the CSR [customer service representative] to bring an interpreter to the phone to assist the CSR in answering our introductory question. We permit eight minutes for the CSR to connect to an interpreter and answer our introductory question. An example of an introductory question is, "Are you the right person to answer questions about [Plan name's] health benefits?" The call is considered connected when the caller connects with the CSR. The interpreter availability/LEP measure is considered completed when the CSR, via an interpreter, provides an affirmative response to the introductory question . . . within eight minutes. Alternatively, if a CSR happens to speak the foreign language we are testing, and that representative is able to answer the questions without an interpreter's assistance, this too would count as a completed interpreter availability/LEP measure outcome. In order for the

interpreter availability/LEP measure to be complete, there must be true communication, meaning the CSR must answer the introductory question and be able to converse in the foreign language we are testing with or without an interpreter's assistance.

AR82. A call "will be scored as unsuccessful if we are not able to connect to a live CSR at the plan during that scheduled call or if the CSR cannot assist us with our questions or cannot forward our call to someone who can assist." AR81.

The Technical Notes explain that scores on interpreter availability are combined with scores on TTY functionality for Star Ratings purposes. AR80. The raw score is calculated as "the number of completed contacts with the interpreter and TTY divided by the number of attempted contacts. Completed contact with an interpreter is defined as establishing contact with an interpreter and confirming that the customer service representative can answer questions about the plan's . . . benefit within eight minutes." AR86.

In addition, CMS publishes annually a memorandum providing further guidance on how CMS monitors call center performance and how MAOs can prepare for the monitoring study. AR38-47. For the year in question, the memorandum explained that the foreign languages being tested in 2024 were unchanged from the prior year and would include Spanish, Cantonese, Mandarin, Vietnamese, French, and Tagalog. AR39. The memorandum reiterated that "[i]nterpreter availability is defined as the ability of a caller to communicate with someone and receive answers to questions in the caller's language," and that "[i]nterpreters must be able to communicate responses to the call surveyor in the call center's non-primary language about the plan sponsor's Medicare or Medicare-

Medicaid benefits." AR34. The memorandum also notifies MAOs that "[i]n the event that an organization believes that CMS may have miscalculated its call center results . . . , it may bring the relevant information to CMS' attention and ask for a review of the results." AR39.

## D.    Appeals Process for Star Ratings

CMS provides for two plan preview periods before the annual release of each Star Ratings in October. *See* 42 C.F.R. § 422.166(h)(2). During the first plan preview in August, CMS asks Part C and D plan sponsors to closely review the Star Ratings methodology and their posted numeric data for each measure. The second plan preview in September includes any revisions made as a result of the first plan preview and provides a preview of the preliminary Star Ratings for each measure, domain, summary rating, and overall rating. During the second plan preview, CMS asks Part C and D sponsors again to closely review the methodology and their posted data for each measure, as well as their preliminary Star Rating assignments. This is an informal administrative process in which MAOs send any comments or questions to CMS by email and CMS responds in kind.

CMS regulations also provide for a formal appeal process after the Star Ratings have been published that allows MAOs to "appeal quality bonus payment status determinations." 42 C.F.R. § 422.260(a). An MAO must first seek reconsideration "by providing written notice to CMS within 10 business days of the release of its [quality bonus payment] status." *Id*. § 422.260(c)(1)(i). The MAO may appeal an adverse decision by the reconsideration official via an informal hearing request. *Id*. § 422.260(c)(2). A hearing officer then issues a decision to the MAO. *Id*. § 422.260(c)(2)(vi). The hearing

officer's decision is then subject to review and modification by the CMS Administrator within 10 business days of issuance. *Id*. § 422.260(c)(2)(vii). If the Administrator does not review and issue a decision within 10 business days, the hearing officer's decision is final and binding. *Id*.

**E.    The Test Calls**

Like all MAOs, Humana received test calls under the Part C & D Call Center Monitoring Accuracy and Accessibility Study between February and June, 2024. During the September 2024 plan preview, Humana challenged four foreign-language calls that it said had been incorrectly deemed "unsuccessful." AR1, AR15-16.

**1.    The So-Called "Silent Hold" Call**

In one of the challenged calls, CMS's contemporaneous data showed that the test caller was placed on a silent hold and the call disconnected after about five-and-a-half minutes. AR1.[4] AR469. Humana alleged that "[t]he CMS caller remained silent throughout the duration of the call," and Humana stated its opinion for why the call should not count: "We do not believe this call should be considered connected." AR1.

**2.    The Three Disconnected Calls**

In the three remaining calls, a customer service representative ("CSR") put the test caller on hold to get an interpreter, but the call center terminated the call before an interpreter joined. AR15-16.

---

[4] The data is included in the Excel spreadsheet named "05.A Attachment SII_RawCallLog_2024_Full_H1019-H0028.xlsx."

Humana "agrees that dropped calls pose a risk to beneficiary access" but nonetheless urged CMS to exclude the calls from the study because, Humana speculated, it would have been able to complete the measure had it been permitted to call the test caller back. AR16-17. There is no evidence in the record that Humana attempted a callback in any of these instances.

### F.    Humana Challenges CMS's Classification of the Test Calls

During the Plan Preview Period, CMS denied Humana's requests to reclassify all four calls. With respect to the silent-hold call, CMS reviewed the call log and confirmed that (1) the test caller dialed the proper number, and (2) the call was answered by the call center's Interactive Voice Response system. AR12. The data also showed that the call disconnected and that the caller did not initiate the disconnect. *Id.* With respect to the three disconnections, CMS explained that it "does not allow callbacks from the plan as all questions should be answered in a single call." AR33. For those three calls, CMS's review of the data showed that the test caller did not initiate the disconnect. *Id.* CMS further noted that its guidance did not permit revisions based on challenges to the methodology. *Id.*

In early October, shortly before the Star Ratings were due to be published, Humana escalated its complaints within CMS during the plan preview process. The Deputy Group Director of the Medicare Drug Benefit and C& D Data Group considered and declined Humana's request to change the Star Ratings. With respect to the silent-hold call, he explained that "[t]he data CMS has provided shows that the interviewer believed they were in a silent hold as they didn't hear anything, and the plan initiated the

disconnect." AR244. He also reiterated that "CMS has explained that for the study all answers are required to be given on the single call." *Id.* The then-Director of the Center for Medicare told Humana via email on October 7, 2024 that CMS would "not be making any changes that would impact the Stars that will [be] released on or around 10/10." AR246. She also "reiterate[d] that the quality bonus payment appeals process is available to you, which gives you the opportunity to lay out all the information." *Id.*

## G.    Procedural Context

Plaintiffs filed their original Complaint on October 18, 2024. Compl., ECF No. 1. The Complaint challenged three of the four calls that Humana had challenged during the plan preview period. The parties jointly moved for this Court to adopt an agreed-upon briefing schedule on November 7, 2024. Joint Mot. to Establish a Briefing Schedule, ECF No. 17. The Court granted the motion and established a joint briefing schedule. Order, ECF No. 18. After Defendants filed the administrative record (four days before the deadline in the briefing schedule), Plaintiffs filed an expedited motion to complete the administrative record (ECF No. 22) and an amended complaint (ECF No. 21). In their motion to complete the administrative record, Plaintiffs alleged that they could not "brief summary judgment on Count I of the complaint" without further materials. ECF No. 22 at 1. Less than a week after filing the amended complaint, Humana filed a Quality Bonus Payment appeal with the Agency seeking to overturn CMS's classification of the same

three calls at issue in this litigation.[5] App. 1-5 (Defs.' Ex. A). CMS responded with a

Technical Report submitted to the Reconsideration Official. App. 6-31 (Defs.' Ex. B). On

January 31, 2025, the CMS Reconsideration Official issued a Decision Letter that upheld

Humana's Quality Bonus Payment status (i.e., declined to invalidate any of the contested

calls). App. 32-33. (Defs.' Ex. C).

This Court on December 12 granted Plaintiffs' request—made in response to the

Government's motion to strike the amended complaint—for leave to file an amended

complaint. ECF No. 29. Four days later, the parties filed a joint motion to amend the

briefing schedule under which Defendants agreed to file an amended administrative

record and certified index on or before January 10, 2025. ECF No. 30 at 1. Defendants

filed the amended administrative record on January 10. ECF No. 32. On January 21,

Plaintiffs filed a Motion for Summary Judgment on Counts II-V and "elected not to seek

summary judgment on Count I of the Amended Complaint." ECF No. 34 at 1.

### III.    Legal Standards

### A.    Legal Standard for a Motion to Dismiss

"Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow

a party to challenge the subject matter jurisdiction of the court to hear a case." *Ramming*

*v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). The plaintiff has the burden of proof

to show that jurisdiction exists. *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511

---

[5] "App." citations refer to the materials in the appendix submitted with this pleading. The consideration of materials from outside the pleadings is appropriate when considering the jurisdictional issue presented by this motion. *See Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir. 1981).

(5th Cir. 1980). In deciding a motion to dismiss under Rule 12(b)(1), a court may consider material outside the pleadings when determining whether jurisdiction exists. *See Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir. 1981).

## B.    Legal Standard for an APA Challenge of an Agency's Fact Finding

"Summary judgment is [the] appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record, even though the Court does not employ the standard of review set forth in the rule governing summary judgment motions." *Larson v. Geren*, No. SA-08-CA-722, 2010 WL 11542078, at *4 (W.D. Tex. Apr. 14, 2010) (internal quotation marks omitted), *aff'd*, 432 F. App'x 356 (5th Cir. 2011). The Fifth Circuit has "consistently upheld, without comment, the use of summary judgment as a mechanism for review of agency decisions." *Girling Health Care, Inc. v. Shalala*, 85 F.3d 211, 214 (5th Cir. 1996). "Judicial review has the function of determining whether the administrative action is consistent with the law—that and no more." *Id.* (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2733 (1983)).

In this action challenging CMS's fact finding, judicial review is governed by the standards of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The APA allows a federal court to overturn an agency's fact finding if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Where, as is the case here, the parties' disagreement comes down to a dispute over the agency's fact

finding, courts traditionally apply the deferential standard from *Motor Vehicle Mfrs.*

*Ass'n v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983):

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."

The *State Farm* standard is satisfied if the final agency finding is supported by "such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619–20 (1966) (internal

quotation marks and citation omitted). The standard "is something less than the weight of

the evidence, and the possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's finding from being supported by

substantial evidence." *Id.* at 620.

## IV.    Argument and Authorities

### A.    This Court Should Dismiss the Claims that Humana Has Raised, and Has Not Yet Exhausted, Through the Agency QBP Appeals Process.

Congress has broadly divested courts of subject-matter jurisdiction (including

under the general federal-question jurisdiction statute) "on any claim arising under" the

Medicare statute, except as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 405(h); *id.*

§ 1395ii (incorporating 42 U.S.C. § 405(h) into the Medicare statute); *Heckler v. Ringer*,

466 U.S. 602, 614–15 (1984) (noting that § 405(g) is the "sole avenue for judicial review

for all 'claim[s] arising under'" the Medicare statute). The authorization of judicial

review under 42 U.S.C. § 405(g) "contains two separate elements: first, a 'jurisdictional'

requirement that claims be presented to the agency, and second, a 'waivable . . . requirement that the administrative remedies prescribed by the Secretary be exhausted.'" *Smith v. Berryhill*, 587 U.S. 471, 478 (2019) (ellipsis in original) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976)). A plaintiff does not satisfy the jurisdictional prerequisite of "presenting" a claim within the meaning of Section 405(g) unless the plaintiff lodges the claim with the agency through one of the established avenues for administrative review—such as by raising the challenge in the administrative process that applies to appeals of QBP status determinations. *See* 42 C.F.R. § 422.260.

So, for example, in *Shalala v. Illinois Council on Long Term Care, Inc*., an association of nursing homes sought to challenge Medicare regulations that govern the sanctions or remedies imposed upon nursing homes that fail to comply with Medicare's statutory and regulatory requirements. 529 U.S. 1, 4–6 (2000). There, the Supreme Court explained that 42 U.S.C. § 405(g) and (h) channel "most, if not all, Medicare claims through this special review system," including "virtually all legal attacks" on Medicare-related regulatory obligations. *Ill. Council*, 529 U.S. at 8, 13. The Court thus held that these provisions require channeling regardless of the "'potential future' versus 'actual present' nature of the claim, the 'general legal' versus the 'fact-specific' nature of the challenge, the 'collateral' versus the 'noncollateral' nature of the issues, or the 'declaratory' versus 'injunctive' nature of the relief sought." *Id.* at 14. Thus, a claim arises under the Medicare statute if that statute "provides both the standing and the substantive basis for" the claim—regardless of whether the claim can be characterized as also arising under other statutes or constitutional guarantees. *Id.* at 11; *accord*

*Weinberger v. Salfi*, 422 U.S. 749, 760–61 (1975) (rejecting an attempt to circumvent Section 405(h)).

Less than a week after filing an amended complaint in this matter, Humana sought administrative reconsideration of its 2026 Quality Bonus Payment determination (which is based on its 2025 Star Ratings) for twenty-nine contracts. App. at 1-5 (Defs.' Ex. A). Humana's QBP Reconsideration Request challenges the same three calls at issue here on the same grounds and seeks the same relief:

- Humana's Reconsideration Request contends that calls D1100955 and D0900533 are like the TTY call that the CMS Reconsideration Official invalidated in the Elevance matter and attacks CMS's no-callback rule as an "unwritten practice." *Id.*

- Humana's Reconsideration Request challenges call C0701002 on the theory that the test caller is at fault. *Id.*

- For relief, "Humana respectfully requests that CMS adjust the Star Ratings and reconsider the 2026 QBP Ratings assigned to the Impacted Contracts." *Id.*

Humana's Reconsideration Request is, in other words, seeking identical relief (reclassification of calls, recalculation of Star Ratings, and increased Quality Bonus Payments) from CMS and from this Court simultaneously.

In a typical *Illinois Council* case, a plaintiff attempts to bypass the "special review channel that the Medicare statutes create," and proceed directly to court, arguing that the channeling exception does not apply. *See, e.g.*, *Illinois Council,* 529 U.S. at 5; *see also, e.g., Indeplus Grp. of Cos., Inc. v. Sebelius*, No. 3:10-CV-0557-O, 2010 WL 1372488, at *3 (N.D. Tex. Apr. 7, 2010) ("[S]ince the Plaintiffs have yet to proceed through the administrative appeals process provided by the Medicare Act their complaint in this

Court is premature and the Court is without subject-matter jurisdiction to hear it."). Like the plaintiffs in *Illinois Council*, Humana's suit is premature. Humana has opted to proceed in two forums simultaneously, thereby acknowledging that its claims before this Court *can* be channeled through the Medicare statute's "special review channel." And that process has not yet culminated with a "final and binding" decision by the Agency. 42 C.F.R. § 422.260(c)(2)(vii). This Court therefore lacks jurisdiction over Plaintiffs' claims, which should be dismissed.

Even if this Court does not dismiss the case, it should exercise its inherent power to "stay an action, pending resolution of independent proceedings which bear upon the case, regardless of whether the parallel proceedings are 'judicial, administrative, or arbitral in character.'" *Dresser v. Ohio Hempery, Inc.*, No. 98-2425, 2010 WL 3720420, at *2 (E.D. La. Sept. 13, 2010) (quoting *Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1465 (9th Cir. 1983)). Doing so would be "in the interests of justice and economy of time and effort for itself, for counsel and for litigants." *Id.* (quotation omitted). Any claims on which Humana prevails before the Agency would become moot in this Court. The possibility of prevailing before the Agency is a real one, as demonstrated by another MAO's (Elevance's) success in persuading the Reconsideration Official to alter CMS's initial classification of its challenged call. App. 22 (Defs.' Ex. B). Finally, it hardly promotes judicial or administrative economy to have two actions proceeding simultaneously in two different forums seeking the same relief. A stay is therefore warranted if this Court declines to dismiss for lack of jurisdiction.

**B.    CMS's Decisions on the Challenged Calls During the Plan Preview Period Were Not Arbitrary and Capricious.**

Everyone agrees that the CMS test caller in each of the three calls at issue was unable to pose a question, through a foreign-language interpreter, to a customer service representative. The calls were quite obviously "unsuccessful" in that regard: Humana's call center failed in its core function of ensuring that callers could obtain assistance. Humana agrees that "dropped calls pose risks to beneficiary access." AR25. Humana nonetheless urges this Court to hold that the unsuccessful calls should be "invalidated"—*i.e.*, removed from the dataset altogether. Humana's arguments are based on faulty analogies to other test calls. Humana does not meet its burden of demonstrating that CMS acted arbitrarily or capriciously when classifying the calls as "unsuccessful."

**1.    CMS Properly Categorized the Disconnected Calls as "Unsuccessful," and Plaintiffs' Methodological Challenges are Meritless.**

**a.    CMS treated like calls alike; the call Humana analogizes to is dissimilar.**

Start, as Humana does, with the two disconnected calls (D1100955 and D0900533). Humana bases its argument that these calls should have been invalidated on a comparison with a single other call (the "Elevance call"), which was a teletypewriter ("TTY") call that a CMS Reconsideration Official invalidated in 2024. *See* 42 C.F.R. § 422.260(c)(1)(ii); *see also* App. 23-23 (Defs.' Ex. B). Humana's disputed calls—unlike the Elevance call—involve foreign-language interpretation, not TTY. That difference matters because TTY, unlike foreign-language interpretation, involves a third party between the caller and the call center. In the Elevance matter, the CMS caller attempted

to access the Elevance call center via a TTY exchange operator through the nationwide

711 service. App. 22 (Defs.' Ex. B). The test caller's dial window closed *before* the TTY

operator dialed the plan, meaning the record showed that the disconnect occurred

between CMS and the TTY relay, not within Elevance's call center or even between

Elevance and the relay. *Id.* The disconnection was *completely* outside of Elevance's

system.

The facts here are starkly different. For call D1100955, the customer service

representative "put [the test caller] on hold to get an interpreter with music playing in the

background when the line unexpectedly disconnected by the plan." AR24. The data for

the call confirms this. AR469.[6] For call D0900533, the customer service representative

"put [the test caller] on hold for interpreter. Called person hung up while hold music

played." Once again, the underlying data confirms this. AR469.[7] Humana ignores the

evidence in the administrative record that the error occurred *within Humana's call center*,

insisting that the technical errors were "[unidentified]"—a word that is notably absent

from the Administrative Record itself. Mem. In Supp. of Mot. for Summ. J. ("Pls.' Br.")

22, ECF No. 35. In sum, unlike Elevance, Humana presented no evidence to CMS—or to

this Court—that the errors occurred outside of its own system.

---

[6] The data for this call is included in an Excel spreadsheet with the file name "O5.Attachment SII_RawCallLog_2024_Full_H1019-H0028.xlsx."

[7] The data for this call is included in an Excel spreadsheet with the file name "O5.Attachment SII_RawCallLog_2024_Full_H1019-H0028.xlsx."

By contrast, the record here shows that Humana's call center terminated its connection to a test caller while a customer service representative was attempting to connect to a foreign-language interpreter. CMS uses test callers and includes call center performance as a component of the Star Ratings to create incentives for MAOs to avoid *exactly this occurrence.* Yet Humana insists that this error should not affect the portion of its Star Ratings concerning "Foreign Language Interpreter and TTY Availability." Under its view, unless CMS (which does not maintain or access MAOs' call center logs) can describe in detail *how* a call center terminated a call, a MAO should not be held responsible for failing to satisfy the criteria for a successful call. There is no support in statute or regulation for this untenable proposition, nor is it consistent with the record concerning the Elevance call. CMS's decision during the plan preview process to keep the call classified as "unsuccessful" was supported by substantial evidence and neither arbitrary nor capricious.

> **b.    The record does not support Humana's "no callback" argument.**

Humana next contends that it "could have completed Phase 3 of the Accuracy & Accessibility Study" (i.e., answered the initial question through an interpreter) had it been allowed to call the test caller back after a dropped call. Pls. Br. at 23. Once again, there is nothing in the record to support this assertion. Humana does not, for example, suggest that it attempted to call the test callers back. If the company's "standard calling system and process for prospective members allows for Humana to call a prospective member

back in the event of a dropped call,"[8] then Humana should presumably have some evidence indicating that it followed its own process for these calls. But there is no evidence that Humana attempted a callback. Humana *might* have a more forceful argument for reclassifying the call had it presented evidence that it followed its own policy and called back following the disconnection. Although Human contends that "[t]he only condition to successfully complete the foreign-language-interpreter is (1) an initial connection with a CSR and (2) obtaining an answer to a question about the plan's benefits 'within 8 minutes' of the connection,"[9] Humana overlooks that it indisputably failed that one condition here. And Humana's theory that the failure is attributable to the "no-callback policy" is nothing more than *ipse dixit* given that Humana offers no evidence that it even attempted a callback.

Humana's argument that the two disconnected calls failed because of the no-callback policy rests on mutually incompatible premises. If, as Humana says, it could have successfully completed the interpreter availability measure via a callback (its purported "standard calling system and process"), then why did it not attempt a callback for either of the unsuccessful calls here? If, on the other hand, Humana knew in advance that a callback would be futile because of the no-callback policy (which further implies that Humana somehow knew the call at issue was a test call and declined on that basis to attempt a callback), then how can Humana claim that the no-callback policy is extra-

---

[8] AR16.

[9] Pls. Br. at 24.

regulatory? Either Humana knew about the no-callback policy in advance and its ignorance is manufactured, or Humana sincerely believed that it could complete the measure via a callback and inexplicably did not attempt to do so in this instance. Neither option supports Humana's preferred remedy of invalidating the call. Humana points to little more than its "historically strong performance/high pass rates within the Interpreter availability component of this measure,"[10] in support of its claim for what amounts to a free pass. This is akin to a student asking for an A on an exam that scored a C because he has gotten A's in the past.

CMS guidance in the form of the Technical Notes and the Call Center Monitoring Memo is quite clear in requiring accomplishing the measure in a single call (consistent with the idea of testing real-world beneficiary experience). "Whichever type of call was scheduled . . . will be scored as unsuccessful if we are not able to connect to a live CSR at the plan *during that scheduled call . . .*" AR81 (Technical Notes) (emphasis added). "A call is classified as unsuccessful for any of the following reasons: . . . [s]urvey could not continue; Call Center disconnected call (including hanging up)." AR84 (Technical Notes). "Callers . . . need to be able to communicate with a live person when they call from 8:00 a.m. to 8:00 p.m. Messages that ask a caller to leave their telephone number are not appropriate and will not be counted as a successful call." AR42 (Call Center Monitoring Memo). There is no doubt here that neither test caller was able to "communicate with a live person." Similarly, plans are required to "[e]nsure callers with

---

[10] AR17.

a private number are able to connect to your plan's customer service telephone numbers." AR43 (Call Center Monitoring Memo). Humana's claimed policy regarding callbacks would not function for callers with a private number, in violation of the guidance. CMS also explained in a Frequently Asked Questions document that "Sometimes the interpreter joins but then the interpreter gets disconnected . . . [I]n this scenario, a CSR could have a second interpreter join and answer the introductory question. As long as that happens within eight minutes, we could still have a completed outcome." AR94 (Technical Notes). Someone reading that portion of the guidance might reasonably expect that the absence of any discussion of a callback option to assume, reasonably, that there is none. To be sure, CMS guidance does not use the magic words "on a single call." Nor, for that matter, does it forbid plans from attempting to resolve disconnections by SMS text, email, or carrier pigeon. "The subject matter of a rule may be so specialized and varying in nature as to be impossible—or at any rate, impracticable—to capture in its every detail." *Kisor v. Wilkie*, 588 U.S. 558, 566 (2019) (internal quotation marks omitted). CMS cannot reasonably be expected to anticipate—and respond to— hypothetical concerns about how a call center might drop a call and what hypothetical remedial action the call center might take. Humana offers no evidence that it or any other MAO raised an issue about callbacks with CMS before disqualification of these calls.

### c. Plaintiffs' notice-and-comment argument rests on a misreading of the statute.

Plaintiffs would have this Court hold that the no-callback policy does not apply because of a supposed absence of notice-and-comment rulemaking in violation of 42 U.S.C. § 1395hh(a). They are wrong.

Plaintiffs cleverly use quotation interspersed with their own text, to urge this court to apply section 1395hh(a) and the Supreme Court's *Allina* decision interpreting it. *See* Pls. Br. at 25 (citing *Azar v. Allina Health Servs.*, 587 U.S. 566 (2019)). But section 1395hh(a)(2)'s text does not support Plaintiffs' argument:

> No rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing *the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter* shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1).

42 U.S.C. § 1395hh(a)(2) (emphasis added). The MAO call center guidance itself does not establish or change substantive legal standards governing "the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter." MAOs are not providers of services, and insurance coverage is not a service. *See, e.g.*, 42 U.S.C. §§ 1395x(q) ("defining the term "physicians' services"); 1395x(s) (defining the term "medical and other health services"); 1395(u) (defining the term "provider of services"). Nor do Star Ratings generally or quality bonus payments specifically govern "the scope of benefits." Therefore, section 1395hh(a)(2) does not apply to the Star Ratings measure specifications.

Further indication that section 1395hh(a)(2) does not apply to Agency communication about the Star Ratings methodology is found in a more specific statute, in which Congress instructed CMS on how to convey information about the Medicare Advantage program to "interested parties." 42 U.S.C. § 1395w-23(b). That statute contains its own notice-and-comment provision. *See id.* § 1395w-23(b)(2). In a 2018 rulemaking, CMS described how it had historically "used the draft and final Call Letter, which are attachments to the Advance Notice and final Rate Announcement respectively, to propose for comment and finalize changes to the quality Star Ratings system." 83 Fed. Reg. 16,440, 16,524 (Apr. 16, 2018) (footnote omitted). CMS finalized its proposals— which relied heavily on section 1395w-23(b)(2)—to modify Star Ratings measures either via rulemaking (for new measures and substantive changes to existing measures) or via the Advance Notice and Rate Announcement process (for non-substantive changes). 83 Fed. Reg. at 16,533, 16,537; *see also* 42 C.F.R. § 422.164. That is what CMS has done. MAOs can and do participate in the Advance Notice and Rate Announcement process, and Humana offers no evidence that it—or, for that matter, any plan—has ever raised concerns during that process about its inability to satisfy the foreign-language interpreter availability measure via a callback.

> **d.    CMS's no-callback policy is rationally connected to the purpose of the Star Ratings.**

The no-callback policy is rationally connected to the goals of the Star Ratings. The Call Center Measures are part of the "Customer Service" domains of the Star Ratings. *See* AR337 (Health Plan Customer Service) & AR342 (Drug Plan Customer Service).

Customer Service measures are meant to measure a Plan's ability to provide help to beneficiaries who need it. Anyone who has called a customer service phone line, been abruptly disconnected, and later received a call (perhaps at an inconvenient time) from an unknown number only to hear not a human voice but an automated menu of options would likely agree that a call center that does not drop calls and provides answers on a single call provides better customer service. And, of course, for anyone who uses a private number, an automated callback system is useless. Far from being irrational, the Call Center Measures test a plan's ability to provide a service that is important to Medicare beneficiaries.

Plaintiffs are also wrong about the Agency allegedly double-counting calls. Pls. Br. at 27. As Plaintiffs correctly note, "The Timeliness Study measures Part C and Part D *current enrollee* call center telephone lines and pharmacy technical help desk telephone lines to determine average hold times and disconnect rates." AR38 (emphasis in original); *see* Pls. Br. at 27. But Plaintiffs overlook the fact that "[t]he Accuracy & Accessibility Study measures Part C and D *prospective beneficiary* call center telephone lines to determine (1) the availability of interpreters for individuals . . ." *Id.* (emphasis in original). There is no double-counting because the two studies track services provided to non-overlapping categories of consumer: current beneficiaries and prospective beneficiaries.

* * *

In sum, for then two challenged test calls that disconnected, Humana's call center failed to perform a core function: connecting foreign-language callers with interpreters

who could assist them in answering questions. Humana casts about for a way to blame CMS for Humana's own failures. None has merit. Humana knew the standards that would be applied to it, and it indisputably failed to meet those standards. CMS's decision to apply the standards and classify the calls as "unsuccessful" was neither arbitrary nor capricious.

> **2.      CMS's Decision to Classify the So-Called "Silent Call" as "Unsuccessful" was Neither Arbitrary nor Capricious.**

Humana separately challenges what it calls a "silent call" (C0701002), which CMS categorized as "unsuccessful" and which Humana seeks to have invalidated. Pls. Br. at 32. The only "evidence" the call was silent is Humana's say-so, which is not evidence at all. AR1. Unlike the plaintiff in what Humana insists is a case presenting "analytically identical facts,"[11] Humana did not provide a recording of the call to CMS to support its challenge. *Compare UnitedHealthcare Benefits of Tex., Inc. v. Ctrs. for Medicare & Medicaid Servs.*, No. 6:24-cv-357, 2024 WL 4870771, at *2 (E.D. Tex. Nov. 22, 2024) (describing call audio).

The differences do not end there. In the *UnitedHealthcare* case, the audio indicates that a voice could be heard "before being cut off immediately." *Id.* "The test caller remain[ed] on the line until the CSR terminate[d] the call after approximately eight minutes." *Id.*

---

[11] Pls. Br. at 34.

Those facts—none of which are present in the call Humana challenged—were critical to the *UnitedHealthcare* court's decision to order CMS to calculate the plaintiff's Star Ratings without consideration of the disputed call at issue. "The record evidence demonstrates that the call 'connected,' the call lasted more than eight minutes, and the test caller never asked the introductory question contemplated at phase three of the call. Thus, the call should not have been marked as 'unsuccessful' according to the guidelines." *Id.* at *4.

Humana's position here, by contrast, is that "the call never connected within the meaning of the guidelines, and the caller never reached the CSR within the meaning of the regulations." Pls. Br. at 34. Humana nowhere explains why it demands a different result (a judicial ruling that there was no connection, compared to the *UnitedHealthcare* court's conclusion that there *was* a connection) despite what it says are "analytically identical facts." Pls. Br. at 34.

Assume that Humana is correct that "the call accordingly never connected within the meaning of the guidelines." Pls. Br. at 34. The record is clear that the failure to connect was Humana's fault. The test caller dialed the correct number and reached Humana's Interactive Voice Response. AR469.[12] CMS's call log indicates that the test caller spent 71 seconds on the Interactive Voice Response system and did not make a selection. AR469.[13] The caller's action is consistent with Tagalog not being an option in

---

[12] The data for this call is contained in an Excel spreadsheet with the file name "03.A Attachment SII_RawCallLog_2024_Full_C0701002." The corresponding column is BY.

[13] *Id.* The corresponding columns are AX and BZ.

the Interactive Voice Response menu. CMS guidance says that plans should "[e]nsure [Interactive Voice Response] systems default to a live CSR/operator if the caller does not push any buttons or make a verbal selection from an options menu." AR43. Instead of having a live CSR answer the call, the CMS test caller heard silence, leading to a reasonable belief that he or she was on a silent hold for four minutes and seventeen seconds, at which point the call was terminated by the call center. AR469.[14]

If, as Humana insists, the call never connected, Humana has *still* failed to explain why the call should be invalidated instead of marked "unsuccessful" in accordance with the Technical Notes. The Technical Notes explain that calls are classified as "unsuccessful" if the call center hangs up on a caller: "A call is classified as unsuccessful for any of the following reasons . . . [s]urvey could not continue, Call Center disconnected call (including hanging up)." AR84. And, as discussed elsewhere, changes to the Technical Notes from prior years would have been part of the Advance Notice and Rate Announcement process or notice-and-comment rulemaking. 83 Fed. Reg. at 16,533, 16,537; *see also* 42 C.F.R. § 422.164. Humana does not dispute that its call center disconnected the call. And, again, the call is different from the one at issue in *UnitedHealthcare* in that the disconnection happened well before the eight-minute mark, which is the deadline for a call center to complete the measure.

---

[14] *Id.* The corresponding columns are H, I, and AY.

As with the disconnected calls, Humana cannot demonstrate entitlement to the relief it seeks. It asks this Court to order CMS to invalidate (i.e., exclude from the dataset) a call in which the undisputed record evidence shows was answered by Humana's Interactive Voice Response and subsequently terminated by Humana's call center, with no communication between the caller and anyone working at the call center. Humana's systems failed at their most basic function: they hung up on a caller without ever connecting to a live human being, much less actually fulfilling the study goal of answering a question through a live interpreter. Despite this failure, Humana insists that "[i]t is irrational for an agency to hold an MAO to task for not making an interpreter available to a caller who has not established contact by speaking while speaking in a foreign language." Pls. Br. at 34. In Humana's view, if its systems fail so abjectly that there is no one on the line to whom a prospective caller can even *attempt* to speak in a foreign language, its Star Ratings should be unaffected by its poor performance (and, in fact, it should receive additional bonus payments reflecting high-quality service). This would be an absurd result.

Humana's failure to provide any evidence supporting its position, either to the Agency or to this Court, is fatal to its claim under the substantial-evidence standard. To be sure, Humana repeatedly says that the caller was "mistaken" in believing he or she was on a silent hold. Pls. Br. at 18, 32, 34. But there is no evidence in the record the caller was mistaken because there is no evidence Humana's representative was ever present. Humana could have offered something to show that the error was not its own— e.g., a recording of the call or its own call log showing that the caller was not in fact in a

hold status—to CMS during the Plan Preview process, much as Elevance and UnitedHealthcare did in their challenges to CMS call classifications.

Humana ignores the portions of the record that are unhelpful to it. Plaintiffs repeatedly cite an email in which the then-Director of the Center for Medicare states in part "we will not be making any changes that would impact the Stars that will be released on around 10/10." AR246; *see* Pls. Br. at 19, 37 (citing the email as CMS's "only" statement in response to Humana's argument); *see also id.* at 31, 34. But the then-Director's response was part of a longer email chain among CMS employees and Humana employees in which CMS also explained, "[t]he data CMS has provided shows that the interviewer believed they were in a silent hold as they didn't hear anything, and the plan initiated the disconnect." AR251. In light of the statement in the Technical Notes that a call will be classified as unsuccessful if the "[s]urvey could not continue, Call Center disconnected call (including hanging up)," AR 84, CMS's explanation amply supports the result it reached and is fully supported by the data in the record.

### C.    CMS Did Not Unlawfully Subdelegate Its Authority to Contractors.

#### 1.    Dismissal Is Appropriate, and Prudential Concerns Justify Awaiting Supreme Court Guidance.

As discussed above, this Court lacks jurisdiction over Humana's claims for reclassification of the challenged calls, changes to its Star Ratings, and increased Quality Bonus Payments because those challenges can be channeled through the administrative

review process—and indeed, are the subject of active proceedings at the Agency level.[15]

Because Plaintiffs seek only declaratory relief with respect to "the policies challenged in

this case, including the delegation of regulatory power to a private third party," this Court

lacks jurisdiction over that claim unless it has subject-matter jurisdiction over the

underlying claim. *See Schilling v. Rogers*, 363 U.S. 666, 677 (1960) ("[T]he Declaratory

Judgments Act is not an independent source of federal jurisdiction.").

Even if this Court declines to dismiss the Declaratory Judgments Act claims, it

should await further guidance from the Supreme Court before deciding Plaintiffs'

unlawful subdelegation claim. When arguing that the Agency action here was

unconstitutional, Plaintiffs rely almost entirely on *Consumers' Research v. FCC*, 109

F.4th 743 (5th Cir. 2024) (en banc), *cert. granted*, 2024 WL 4864036 (Nov. 22, 2024),

and the *UnitedHealthcare* district court case applying *Consumers' Research*. *See* Pls. Br.

at 28-31, 36. But the Supreme Court has granted certiorari in *Consumers' Research*,

making it likely that the governing standard will soon be different from the one described

in Plaintiffs' brief. In light of the distinct possibility that further proceedings may be

necessary after the Supreme Court decision, it is in the interest of judicial economy for

this Court to refrain from applying *Consumers' Research* until the Supreme Court weighs

in.

---

[15] *See supra* Part IV(A).

## 2.    Even *Consumers' Research* Does Not Support Humana's Position.

Humana argues with respect to all three calls that CMS unconstitutionally subdelegated its authority to the contractors who operate the call center study (AIR and Hendall). The record does not support this claim. When Humana first challenged the calls during the plan preview period, CMS asked its contractors to review Humana's claims. *See* AR3, AR19. The contractors provided recommendations to CMS. *Id.* at 6, 23. CMS agreed with the recommendations and informed Humana of the initial decisions. *Id.* at 9, 33. Humana pursued the matter further. *See* AR242-43. CMS, this time with no further input from its contractors, affirmed and explained its decisions. AR244.

Under Humana's view, any time a contractor makes a recommendation to an agency and the agency agrees with that recommendation, an unlawful subdelegation occurs. Unsurprisingly, the law does not support this result. *Consumers' Research* concerned an alleged violation of the Legislative Vesting Clause in Article I of the Constitution. 109 F.4th at 756. In that case, the court held that the FCC had subdelegated "its taxing power," (i.e., a legislative power) because "FCC regulations provide that [the private entity's] projections take legal effect without formal FCC approval." *Id.* at 771. As the Fifth Circuit made clear, "while FCC may solicit advice from [private entities], it must affirmatively act to give legal effect to that advice because it alone has constitutional authority to execute" the statute. *Id.* Moreover, the Fifth Circuit specifically avoided resolving the question involving subdelegation to private parties, concluding instead that "*the combination* of Congress's sweeping delegation to FCC and FCC's unauthorized subdelegation to USAC violates the Legislative Vesting Clause in Article

I." *Id.* at 778. Humana makes no allegation of any violation of Article I here. Instead, Humana contends that *Consumer's Research* mandates a result, despite the Fifth Circuit's explicit avoidance of any holding on the private subdelegation issue in isolation.

This is an ordinary case where a federal agency hired a contractor to perform a function: here, making TTY and foreign-language test calls to MAOs. As part of that function, the contractor provided recommendations to CMS when a MAO (here, Humana) challenged decisions about certain calls. CMS agreed with those recommendations, and it "affirmatively acted" (here, by emailing Humana) "to give legal effect to that advice." *Id.* at 778. And it continued to "affirmatively act" in subsequent communications with Humana stating that it would not modify the call outcomes. Humana seems to believe that any time a federal agency agrees with a contractor recommendation, it is "rubber-stamping" it. It is unclear, under this standard, how an agency that employs contractors could agree with any recommendation they make—no matter how trivial—without running afoul of such a law. Humana ignores the statements by CMS officials in the record explaining the decision not to change the classification of Humana's calls. *See* AR244. This is evidence of CMS "appl[ying] its independent judgment." *Consumers' Research*, 109 F.4th at 771. Humana clearly disagrees with CMS's decision and explanation—but Humana cannot pretend the explanation does not exist in seeking to label the Agency's decision an improper product of subdelegation.

Humana is also wrong to say that the contractor established "its own substantive rules for the study—the no-callback rule." Pls. Br. at 30. As the Government has

explained, the no-callback policy is plain from CMS guidance provided to MAOs.[16] And the Government has further explained that Humana's behavior here is inconsistent with a belief that it could have called the test caller back.[17] Again, if Humana truly believed it could do so—why does the record contain *not a shred of evidence* that Humana attempted a callback?

This Court does not need to—and should not—address Plaintiffs' subdelegation claim at all. But if it does, it should rule for the Defendants because the record does not contain evidence of unlawful delegation.

**D.      This Court Should Grant Summary Judgment on Count I to the Government.**

In the Fifth Circuit, a party's "failure to pursue [a] claim beyond [its] complaint constitute[s] abandonment." *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006). Plaintiffs have "elected not to seek summary judgment on Count I of the Amended Complaint." Pls. Br. at 37 n.2. Plaintiffs' decision not to pursue Count I is an abandonment of that Count. The parties' briefing schedules did not envision multiple motions for summary judgment, which are not permitted in this District by the Local Rules unless the Court directs otherwise. *See* N.D. Tex. Civ. L.R. 56.2(a). Plaintiffs had all the information they needed to brief Count I and chose not to proceed.

Summary judgment in favor of Defendants on Count I is likewise appropriate because the record shows that the Star Ratings calculations "are thoroughly validated

---

[16] *See supra* Part IV(B)(1)(b).

[17] *See Supra* Part IV(B)(1)(b).

internally and externally before publication." AR216. "CMS has in no way limited Humana's ability to evaluate any suspected errors or to validate its stars performance, and other contracts have successfully validated their data and our calculations." *Id.* The Government provided all the data the parties agreed would be provided to Humana in its amended administrative record in response to the Amended Complaint, and Humana has filed no objections to that data. There is thus no evidence or argument that there are any errors in the calculation of the cut points.

## V.   Conclusion

For the reasons described above, Defendants respectfully request that this Court dismiss Plaintiffs' amended complaint for lack of jurisdiction, pursuant to Rule 12(b)(1). In the alternative, Defendants respectfully request that this Court deny Plaintiffs' summary-judgment motion and grant summary judgment to Defendants on all counts, pursuant to Rule 56.

<div style="margin-left:40%">

CHAD E. MEACHAM
ACTING UNITED STATES ATTORNEY

*/s/ Andrea Hyatt*
Andrea Hyatt
Assistant United States Attorney
Texas Bar No. 24007419
Burnett Plaza, Suite 1700
801 Cherry Street, Unit #4
Fort Worth, Texas 76102-6882
Telephone: 817.252.5230
Fax: 817.252.5458
Andrea.Hyatt@usdoj.gov

*Attorneys for Defendants*

</div>

## Certificate of Service

On February 7, 2025, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Andrea Hyatt*
Andrea Hyatt
Assistant United States Attorney