**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

|  |  |
|---|---|
| HUMANA INC. *and* AMERICANS FOR BENEFICIARY CHOICE, | |
| *Plaintiffs*, | Case No. 24-cv-01004-O |
| *v.* | |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | |
| *Defendants*. | |

**PLAINTIFFS' CONSOLIDATED REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS AND CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Table of Authorities ...................................................................................... ii

Introduction ................................................................................................. 1

Argument ..................................................................................................... 4

I.   CMS's exhaustion argument, which it has never before raised in any prior
     Star Ratings lawsuit, is plainly meritless ................................................. 4

     A.   Section 405 does not apply to Star Ratings challenges ....................... 4

     B.   The APA expressly authorizes challenges to final agency actions without
          requiring exhaustion of optional administrative review procedures, and a
          stay would not be appropriate ......................................................... 10

II.  CMS's merits arguments are not persuasive ........................................... 13

     A.   Calls D1100955 and D0900533 should have been invalidated ........................ 13

          1.   Humana's injury is traceable to the no-callback rule ................................. 13

          2.   Because the no-callback policy was not adopted through notice and
               comment, it cannot stand ........................................................... 18

          3.   The no-callback policy also is arbitrary and capricious .............................. 22

          4.   The agency has not treated like cases alike ................................. 24

     B.   CMS's determination with respect to call C0701002 also was unlawful ........... 26

     C.   Across the board, CMS unlawfully delegated its authority to resolve plan
          objections to call determinations to a non-governmental third party ................ 30

          1.   The Court should not hold the case in abeyance ......................... 31

          2.   CMS's administration of the 2025 Star Ratings system violated the
               non-delegation doctrine ......................................................... 33

Conclusion ................................................................................................... 36

# TABLE OF AUTHORITIES

**Cases**

*Azar v. Allina Health Service,*
    587 U.S. 566 (2019) ................................................................. 22

*Bennett v. Spear,*
    520 U.S. 154 (1997)................................................................. 10

*Bowen v. Galbreath,*
    485 U.S. 74 (1988).................................................................. 4

*Bowen v. Michigan Academy of Family Physicians,*
    476 U.S. 667 (1986) ............................................................ 6, 7

*California v. Texas,*
    593 U.S. 659 (2021) ............................................................... 14

*Clarke v. CFTC,*
    74 F.4th 627 (5th Cir. 2023).................................................. 29

*Consumers' Research v. FCC,*
    109 F.4th 743 (5th Cir. 2024)............................................*passim*

*Corner Post v. Federal Reserve,*
    603 U.S. 799 (2024) ............................................................... 10

*D&G Holdings LLC v. Becerra,*
    22 F.4th 470 (5th Cir. 2022)........................................... 5, 6, 9

*Data Marketing Partnership v. U.S. Department of Labor,*
    45 F.4th 846 (5th Cir. 2022).................................................. 25

*Elevance Health, Inc. v. Becerra,*
    736 F. Supp. 3d 1 (D.D.C. 2024) .......................................11, 25

*Global Rescue Jets, LLC v. Kaiser Foundation Health Plan, Inc.,*
    30 F.4th 905 (9th Cir. 2022) ................................................. 6

*Hull v. Kapstone Container Corp.,*
    2018 WL 4409798 (N.D. Tex. 2018) ..................................... 33

*Louisiana v. U.S. Department of Energy,*
    90 F.4th 461 (5th Cir. 2024)................................................. 30

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ............................................................... 13

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ............................................................... 15

**Cases—continued**

*National Association of Manufacturers v. SEC,*
    105 F.4th 802 (5th Cir. 2024) ................................................................. 23

*NEDC v. Bonneville Power Administration,*
    117 F.3d 1520 (9th Cir. 1997) ................................................................ 15

*Shalala v. Illinois Council on Long Term Care,*
    529 U.S. 1 (2000) ............................................................................... 5, 8

*Smith v. Berryhill,*
    587 U.S. 471 (2019) .............................................................................. 5

*St. Joseph Abbey v. Castille,*
    700 F.3d 154 (5th Cir. 2012) ................................................................. 31

*Texas v. Biden,*
    2021 WL 4552547 (N.D. Tex. 2021) ...................................................... 15

*Texas v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,*
    737 F. Supp. 3d 426 (N.D. Tex. 2024) ................................................... 15

*Texas v. EPA,*
    91 F.4th 280 (5th Cir. 2024) ................................................................. 18

*Theodore Roosevelt Conservation Partnership v. Salazar,*
    616 F.3d 497 (D.C. Cir. 2010) ............................................................... 15

*UnitedHealthcare Benefits of Texas, Inc. v. CMS,*
    2024 WL 4870771 (E.D. Tex. 2024) ............................................*passim*

*University of Texas M.D. Anderson Cancer Center v. HHS,*
    985 F.3d 472 (5th Cir. 2021) ................................................................. 25

**Statutes and regulations**

5 U.S.C. § 704 ............................................................................... 10, 11, 12

42 U.S.C.
    § 405(b)(1) ........................................................................................... 4
    § 405(g) ................................................................................................ 4
    § 405(h) ............................................................................................ 5, 6
    § 1302 .................................................................................................. 9
    § 1306 .................................................................................................. 9
    § 1320c-4 ............................................................................................. 7
    § 1395cc(h)(1)(A) ................................................................................. 7
    § 1395hh ......................................................................... 9, 19, 20, 22
    § 1395hh(a) ....................................................................................... 19
    § 1395hh(a)(2) ................................................................................... 22
    § 1395hh(b)(1) ................................................................................... 22

**Statutes and regulations—continued**

42 U.S.C.

§ 1395ii ........................................................................................................... 8
§ 1395ii(a)(1) .................................................................................................... 6
§ 1395ii(b)(1)(A) .............................................................................................. 6
§ 1395oo ........................................................................................................... 8
§ 1395oo(f)(1) ................................................................................................... 8
§ 1395w-21 ....................................................................................................... 9
§ 1395w-22(g)(5) .............................................................................................. 6
§ 1395w-23(a)(1)(B)(i) .................................................................................... 20
§ 1395w-23(a)(1)(E) ........................................................................................ 20
§ 1395w-23(b) .................................................................................................. 21
§ 1395w-23(o)(1) ..............................................................................................11
§ 1395w-23(o)(3)(A) .........................................................................................11
§ 1395w-24(b)(1)(C) ........................................................................................ 20
§ 1395w-24(b)(1)(C)(v) ....................................................................................11
§ 1395w-26(b)(1) ............................................................................................. 22
§ 1395w-26(c)(3)(iii) ....................................................................................... 21
§ 1396i(b)(2) ..................................................................................................... 7

20 C.F.R.

§ 416.1400(a)(3) ................................................................................................ 4
§ 416.1402 ........................................................................................................ 4

42 C.F.R.

§ 405.1877 ........................................................................................................ 8
§ 422.62(b)(15) ...........................................................................................11, 20
§ 422.111(h)(1) ................................................................................................ 21
§ 422.111(h)(1)(ii)(C) ..................................................................................... 24
§ 422.111(h)(1)(iii) ............................................................................ 16, 18, 19
§ 422.260 ...............................................................................................7, 9, 11
§ 422.260(c)(1)(ii) ........................................................................................... 12
§ 422.260(c)(2)(vii) ......................................................................................... 12
§ 422.260(c)(3)(i) .............................................................................................. 9
§ 422.260(c)(3)(ii) .....................................................................................10, 12
§ 422.266(a)(2)(ii) ............................................................................................11
§ 422.502(b)(1)(i)(D) ...................................................................................... 20
§ 422.510(a)(4)(xi) ...........................................................................................11
§ 422.560 ........................................................................................................... 6
§ 422.612 ........................................................................................................... 9
§ 423.128(d)(1)(iii ........................................................................................... 18
§ 423.128(d)(1)(ii)(C) ..................................................................................... 24
§ 423.128(d)(1)(iii) .....................................................................................16, 19
§ 423.503(b)(1)(i)(D) ...................................................................................... 20

**Statutes and regulations—continued**

76 Fed. Reg. 21432 (April 15, 2011) .......................................................................19, 21

83 Fed. Reg. 16440 (Apr. 16, 2018)......................................................................*passim*

86 Fed. Reg. 5864 (Jan. 19, 2021).......................................................................... 20, 21

## INTRODUCTION

The Center for Medicare and Medicaid Service's (CMS's) response brief is more notable for what it does *not* say than for what it *does*. First, the agency does not dispute that the no-callback rule categorically forbids Medicare Advantage (MA) plans from using a callback following a disconnection to connect a test caller with an interpreter within the regulatory eight-minute time limit. It thus does not deny that the rule adds an inflexible "single call" requirement to CMS's already detailed regulations. It does not dispute that notice-and-comment rulemaking is required for such regulatory changes or deny that it has never subjected the no-callback rule to those required procedures.

Second, CMS does not disagree that its guidelines for foreign-language test calls require secret shoppers to establish a connection in a foreign-language (starting the eight-minute clock) and to pose an introductory question in that language (triggering the requirement to bring an interpreter on the line within the time limit). Nor does CMS deny that the secret shopper in call C0701002 failed to take either of those steps, instead remaining silent for longer than four minutes before the call ended. CMS does not disagree that the District Court for the Eastern District of Texas recently invalidated a call scored "unsuccessful" under the same analytical circumstances, or that if the Eastern District's analysis is correct, the same outcome is warranted here.

Finally, CMS does not meaningfully dispute that it has unconstitutionally delegated its regulatory authority to administer the Accuracy & Accessibility Study to a private third party. In particular, it does not deny that, although an agency's delegation of authority to a private party without congressional authorization may not involve anything other than ministerial tasks, its delegation here involved many core tasks involving discretion and judgment—including the evaluation of test calls for regulatory compliance, the deter-

1

mination of when calls should be invalidated, and the resolution of plans' objections to those decisions at later stages of review. CMS thus makes no real effort to defend the 2025 Star Ratings from invalidation under the non-delegation doctrine.

Against this background, what CMS *does* say in its response brief is largely irrelevant and entirely unpersuasive. Perhaps appreciating the weakness of its merits arguments, the agency's first instinct is to dodge the merits altogether. To that end, it interposes a defense that it has never raised in any previous Star Ratings lawsuit: failure to exhaust. The fact that CMS overlooked this argument in every other Star Ratings challenge should come as no surprise, because it has no basis in law. That is especially so because the administrative review process that CMS cites—one that does not implicate 42 U.S.C. § 405 on any theory—is entirely voluntary for both MA organizations (MAOs) and the agency itself, and it allows challenges only to calculations and not methodology. An agency cannot stave off judicial review by pointing to an administrative review process that regulated entities have no obligation to pursue, the agency has no obligation to entertain, and are not an avenue for bringing the same kinds of claims in any event.

On the substance of plaintiffs' claims, CMS's arguments are equally ineffectual. Concerning the no-callback rule, the agency attempts yet another dodge, first asserting that there is no evidence establishing the traceability of plaintiffs' injuries to the challenged policy. That is wrong on its own terms, and it is belied either way by the standing declaration appended to this brief. CMS also contends that we have cited the wrong statutory provision for the agency's notice-and-comment obligation, insisting that it arises under Section 1395w-26(b)(2) rather than Section 1395hh(a). But given that CMS has not pursued notice-and-comment under either statute, that contention is hardly a help. Anyway,

Section 1395w-26(b)(2) is plainly inapplicable; CMS itself has cited Section 1395hh(a) as the relevant authority in prior rulemakings.

Concerning the mute secret shopper on call C0701002, CMS attempts to shift responsibility to Humana Inc. (Humana), blaming its customer service representative (CSR) for remaining silent, rather than the other way around. But under longstanding CMS guidance, it is the test caller who bears the responsibility to establish a connection in a foreign-language and pose an introductory question in that language. A CSR assumes a duty to bring an interpreter on the line within eight minutes of the connection only after having been presented with those predefined cues. Aware of this basic point, CMS takes the stunning position that there is no evidence that the CSR was ever actually present on the call at all—an assertion CMS never raised below and Humana was never given an opportunity to refute (which it easily could have). Because this argument is nothing more than post hoc speculation and litigation posturing, the Court cannot consider it.

With respect to the non-delegation claim, CMS once more attempts a procedural side-step, asking the Court to hold the case in abeyance while the Supreme Court reviews the Fifth Circuit's decision in *Consumers' Research v. FCC*, 109 F.4th 743 (5th Cir. 2024). For a range of reasons, no abeyance is warranted, including that the Court can and should resolve this case in plaintiffs' favor without reaching the constitutional claim at all; and the questions presented to the Supreme Court in *Consumers' Research* implicate unrelated legal issues that will not impact this case. On the merits of the claim, CMS has next to nothing to say. It does not even mention, let alone address, a recent decision of the Eastern District of Texas upholding an identical non-delegation claim—a decision that the agency notably has chosen not to appeal. Vacatur is thus manifestly warranted.

3

**ARGUMENT**

I.  **CMS'S EXHAUSTION ARGUMENT, WHICH IT HAS NEVER BEFORE RAISED IN ANY PRIOR STAR RATINGS LAWSUIT, IS PLAINLY MERITLESS**

In support of its newly discovered exhaustion argument—one that it never before has raised in any prior Star Ratings case—CMS points to 42 U.S.C. § 405(g) and (h). Those provisions apply only to discrete categories of Medicare claims made reviewable by an administrative law judge (ALJ) under Section 405(b). Congress has not made challenges to Star Ratings reviewable under Section 405(b). CMS does not argue otherwise—it simply asserts (or at least implies) that paragraphs (g) and (h) apply as a matter of free-floating policy any time CMS establishes a voluntary administrative review scheme. That argument flouts the plain text of at least three federal statutes, and the Court must reject it.

A.  **Section 405 does not apply to Star Ratings challenges**

**1.** Section 405 is a provision of the Social Security Act. *See Bowen v. Galbreath*, 485 U.S. 74, 75 (1988). When an individual seeks Social Security benefits, Section 405 "direct[s]" the Commissioner of Social Security "to make findings of fact, and decisions as to the rights of any individual applying for a payment." 42 U.S.C. § 405(b)(1). The Section 405(b) decisional process begins with an "initial determination" by the Commissioner. An applicant may seek reconsideration of an adverse initial determination and, failing that, a Section 405(b) hearing before an ALJ. *See* 20 C.F.R. § 416.1400(a)(3).

A final decision issued by an ALJ following a Section 405(b) hearing is subject to judicial review. *See* 42 U.S.C. § 405(g). In particular, Section 405(g) specifies that "[a]ny individual, after any final decision of the Commissioner of Social Security made after a [Section 405(b)] hearing to which he was a party, . . . may obtain a review of such decision by a civil action" in federal district court within 60 days. *Id.* Section 405(h), in turn, makes

review under Section 405(g) exclusive: "The findings and decision of the [agency] after a [Section 405(b)] hearing" are "binding upon all individuals who were parties to such hearing" and may not be reviewed judicially except as provided under Section 405(g). *See also Shalala v. Illinois Council on Long Term Care*, 529 U.S. 1, 20 (2000) (making clear, among other things, that Section 405(g)'s reference to a "hearing" means a hearing held pursuant to Section 405(b)).

Section 405(g) has thus been interpreted to establish an exhaustion requirement for claims for Social Security benefits: To obtain Section 405(g) judicial review of a claim subject to determination under Section 405(b), the claimant must first present a claim to the agency and obtain a final decision by an ALJ following a hearing. *See Smith v. Berryhill*, 587 U.S. 471, 478 (2019). But Section 405's exhaustion requirement applies only to claims that can (must) initially be presented to the agency through Section 405(b), and thus subsequently channeled to federal court through Sections 405(g) and (h). In other words, paragraphs (g) and (h) are meant to channel "review [of such claims] through the agency" before they may be raised in a judicial proceeding. *Illinois Council*, 529 U.S. at 18. That Section 405(g) "authorizes judicial review of 'any final decision of the Secretary made after a [Section] 405(b) hearing'" means that Section 405(g)'s exhaustion requirement applies only to claims that *can be* so resolved. *Id.* (alteration incorporated).

**2.** Although "Section 405 is found in the Social Security Act," its relevant provisions are "incorporated into the Medicare Act" at various points. *D&G Holdings LLC v. Becerra*, 22 F.4th 470, 474 n.4 (5th Cir. 2022). In particular, "Section 1395ii makes [Section] 405(h) applicable to the Medicare Act 'to the same extent' as it is applicable in the Social Security Act." *Id.* Section 1395ii does not, however, provide for blanket incorporation of Section 405(b) or (g) to claims under the Medicare statute. Those provisions,

which are logical prerequisites to application of Section 405(h), are instead incorporated at discrete points, for limited purposes, throughout the Medicare statute.

For instance, Section 1395ff(b)(1)(A) incorporates Section 405(b) and (g), but only for purposes of obtaining agency "reconsideration" of an "initial determination" of benefits with respect to traditional Medicare. *See* 42 U.S.C. §§ 1395ii(a)(1), (b)(1)(A); *see generally Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 674 (1986). As the Fifth Circuit has explained, "[a]gency actions that are not 'initial determinations'" of benefits within the meaning of Section 1395ff(a)(1) are "not eligible for § 405(g) judicial review under § 1395ff(b)(1)(A)" and therefore need not be (indeed, cannot be) exhausted first via Section 405(b). *D&G Holdings*, 22 F.4th at 474 n.4.

Congress has also made disputes over denials of Medicare Advantage benefits by MAOs subject to review under Section 405(b). *See* 42 U.S.C. § 1395w-22(g)(5). The administrative appeals process established under this provision includes reconsideration first by the MAO and then by an independent third-party entity, a Section 405(b) hearing before an ALJ, and finally review by the Medicare Appeals Council. *See* 42 C.F.R. §§ 422.560-422.622; *Global Rescue Jets v. Kaiser Foundation Health Plan*, 30 F.4th 905, 913 (9th Cir. 2022). When certain amount-in-controversy requirements are met, an aggrieved enrollee or MAO is thereafter "entitled to judicial review of the [agency's] final decision as provided in section 405(g)." 42 U.S.C. § 1395w-22(g)(5).

Elsewhere, Congress has made certain determinations concerning provider eligibility to participate in the Medicare program subject to review under Section 405(b). *See* 42 U.S.C. §§ 1395cc(h)(1)(A), 1396i(b)(2). It also has made adverse determinations of contracting quality improvement organizations subject to Section 405(b) review by both enrollees and providers. *See* 42 U.S.C. § 1320c-4.

6

As to any such claims channeled by the Medicare statute through Section 405(b), an aggrieved party must exhaust his, her, or its claim in a hearing before an ALJ under Section 405(b) before seeking judicial review under Section 405(g). But as to all other claims that may touch the Medicare statute—those for which a Section 405(b) hearing before an ALJ is *not* provided by statute—Section 405(g) cannot and does not apply.

To conclude otherwise—to say that Congress meant to condition 405(g) judicial review on a 405(b) "hearing" that is not authorized by statute to take place—would mean that Congress "intended no review at all of substantial statutory and constitutional challenges to the Secretary's administration of . . . the Medicare program," a proposition long ago rejected as atextual and "extreme." *Michigan Academy*, 476 U.S. at 680.

**3.** A claim challenging CMS's calculation of an MAO's Star Ratings is not made reviewable under Section 405(b) by any provision of law. It therefore is not a claim subject to the channeling requirements of Section 405(g) and (h).

CMS, for its part, does not assert that Section 405(b) applies in these circumstances, because it cannot. It instead takes the ungrounded position (at 19) that every time CMS establishes any kind of "avenue[] for administrative review," Section 405(g) applies. It thus asserts that the optional review procedures established by 42 C.F.R. § 422.260 trigger Section 405(g). On that view, jurisdiction is lacking in this court unless and until a claim is first presented to and resolved by the Secretary under Section 422.260.

That is wrong for a host of reasons. *First*, the only authority that CMS appears to cite for its assertion that Section 405(g) applies to plaintiffs' Star Ratings claims is 42 U.S.C. § 1395ii, which it invokes on page 18 of its brief. *But Section 1395ii does not incorporate Section 405(g) into the Medicare statute at all*—it incorporates only paragraphs (a), (d), (e), (h), (i), (j), (k), and (l). As we have just shown, Congress elsewhere has made

Section 405(g) applicable, but only to the discrete categories of claims described in Sections 1320c-4, 1395w-22, 1395ff, 1395cc, and 1396i. None of those sections makes Section 405(g) applicable to Star Ratings determinations.

*Second*, even if there were some textual basis for asserting that Section 405(g) in theory applies in these circumstances (there is not), CMS still would have to show that challenges to Star Ratings determinations may be resolved through ALJ hearings under Section 405(b), which is the particular form of exhaustion that Section 405(g) requires. *See Illinois Council*, 529 U.S. at 20. It cannot make that showing either. Congress knows how to make particular claims under the Medicare Act subject to ALJ review under Section 405(b), and it did not do so with respect to Star Ratings challenges.

*Third*, even outside the Section 405 context, statutory exhaustion requirements use mandatory language explicitly requiring exhaustion before judicial review may take place. Section 1395oo, for example, mandates that hospital providers challenging Part A reimbursement determinations first obtain a decision from the Provider Reimbursement Review Board before asserting their claims in district court. *See* 42 U.S.C. § 1395oo. The statute then expressly provides that hospitals "shall have the right to obtain judicial review of any final decision of the Board" after review is complete. *Id.* § 1395oo(f)(1). The implementing regulations further specify the circumstances under which a "Board decision is final and [thus] subject to judicial review." 42 C.F.R. § 405.1877.

There is nothing like that with respect to Star Ratings determinations. The administrative review provision on which CMS relies, 42 C.F.R. § 422.260, is purely optional for MAOs. *See* 42 C.F.R. § 422.260(c)(1) ("An MA organization *may* request reconsideration of its QBP [quality bonus payments] status.") (emphasis added). Neither the Medicare statute nor 42 C.F.R. § 422.260 mentions mandatory exhaustion or any other condition for

judicial review of Star Ratings determinations. In fact, the administrative review process is not mandatory even for CMS, which may simply refuse to entertain an MAO's claims whenever it likes. *Id.* § 422.260(c)(3)(i).

The underlying statutory provisions confirm that Section 422.260 is not mandatory and does not implicate Section 405. CMS promulgated 42 C.F.R. § 422.260 under the authority of 42 U.S.C. §§ 1302, 1306, 1395w-21 through 1395w-28, and 1395hh. Among those provisions, only Section 1395w-22(g)(5) makes reference to Section 405 at all—but, again, that provision governs claims for benefits by beneficiaries and does not apply to Star Ratings challenges. *D&G Holdings*, 22 F.4th at 474 n.4. And in contrast with 42 C.F.R. § 422.260, the regulation that implements Section 1395w-22(g)(5) expressly references Section 405(g) and specifies an entitlement to seek judicial review of the agency's final decision only at the conclusion of administrative review. *See* 42 C.F.R. § 422.612.

The Star Ratings system has existed since Congress established the MA program in 2003. In the decades since, CMS has never before suggested that Star Ratings review must be channeled through Section 405 or otherwise exhausted under Section 422.260 prior to judicial review. That is perhaps unsurprising, given that there is no statutory basis for either notion. CMS's exhaustion argument accordingly must be rejected.[1]

---

[1]    Even if Section 405 were somehow applicable, Humana assuredly "presented" its claims challenging calls C0701002, D1100955, and D0900533 by identifying them as incorrectly scored and asking CMS to invalidate them. *See* AR1-2, 15-17. CMS itself has described plan preview periods as opportunities for MAOs to "raise any questions about their own plan's data prior to the public release of data for all plans," so that if there are any errors, "necessary corrections" can be made before the Star Ratings are announced to the public. *See Contract Year 2019 Changes to the Medicare Advantage and Medicare Prescription Drug Benefit Programs*, 83 Fed. Reg. 16440, 16588 (Apr. 16, 2018). *Accord* Defendants' Cross-Motion for Summary Judgment at 9, *UnitedHealthcare Benefits of Texas, Inc. v. CMS*, No. 2024 WL 4870771 (E.D. Tex. 2024).

**B.    The APA expressly authorizes challenges to final agency actions without requiring exhaustion of optional administrative review procedures, and a stay would not be appropriate**

**a.**    Like every other prior Star Ratings lawsuit, this case arises under the Administrative Procedure Act (APA) and not Section 405(g). Under the APA, review may be had of any "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. A "final" agency action is one that "marks the consummation of the agency's decisionmaking process and is one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Corner Post v. Federal Reserve*, 603 U.S. 799, 808 (2024) (cleaned up) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997)).

That describes the final Star Ratings published on October 10, 2024, and challenged in this suit. *See* Am. Compl. ¶¶ 109-116. To begin with, the 2025 Star Ratings are final, not tentative; they were published publicly on that date and have immediate effect. Nor does CMS require or even provide for administrative appeals of challenges to the Star Ratings methodology. *See* 42 C.F.R. § 422.260(c)(3)(ii). The plan preview periods are the last opportunity that an MAO may use to challenge administratively an adverse change in a contract's Star Ratings resulting from unlawful methodologies.

The Star Ratings published on October 10, 2024, also determine MAOs' legal rights and obligations, and legal consequences flow from them. For example, CMS may terminate a plan's MA contract if it has failed to achieve a Part C summary rating of at least three stars for three consecutive contract years. *Id*. § 422.510(a)(4)(xi). In addition, while plans are typically only allowed to accept new members during the Annual Enrollment Period, the regulations allow Medicare beneficiaries to switch plans outside of that period if the beneficiary is moving to a plan with a 5.0 Star Rating. *Id*. § 422.62(b)(15). Star Ratings also immediately affect an MA plan's benchmark amount and the percentage of the differ-

ence between the bid and benchmark that is returned as a rebate. 42 U.S.C. §§ 1395w-23(o)(1), (3)(A), 1395w-24(b)(1)(C)(v); 42 C.F.R. § 422.266(a)(2)(ii); *see also Elevance Health, Inc. v. Becerra*, 736 F. Supp. 3d 1, 6 (D.D.C. 2024) ("Under the Star Ratings program, high-scoring Medicare Advantage plans can receive important benefits, while low-scoring plans can suffer significant losses.").

CMS's optional administrative review process for quality bonus payments (QBP) appeals (42 C.F.R. § 422.260) does not alter those facts. To start, the APA specifies that an agency action meeting the requirements of finality "is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or . . . for an appeal to superior agency authority." 5 U.S.C. § 704. The only exception to that general rule is if the agency both "requires by rule" that the aggrieved party appeal administratively before the agency can reach a final decision and also "provides that the action meanwhile is inoperative." *Id.*

 Neither of those conditions is satisfied here. Again, CMS does not require an MAO to pursue a QBP appeal under 42 C.F.R. § 422.260 before Star Ratings take effect or before proceeding to court. And Americans for Beneficiary Choice (ABC)—which is not an MAO—could not have pursued such an appeal in any event. Nor does CMS render its Star Ratings determinations "inoperative" while QBP appeals are pending. Humana's Star Ratings are presently operative.

The provisions in CMS's regulations stating that intermediate administrative appeal decisions are "final and binding" unless additional appeal steps are taken (*see id.* § 422.260(c)(1)(ii), (c)(2)(vii)) support our position and not CMS's. Those provisions confirm that the appeal process is optional and not mandatory—MAOs *may* pursue appeals if they choose. But at each stage of review, there remains a "final and binding" agency

11

decision in force and effect, *no matter what*. An MAO therefore need not pursue an appeal, or follow an appeal through to completion once commenced, in order to challenge CMS's "final and binding" agency action under Section 704 of the APA.

CMS is simply wrong to say (at 21) that its review process "has not yet culminated with a 'final and binding' decision by the Agency." It has not shown that Humana's 2025 Star Ratings are presently tentative or otherwise inoperative while Humana's QBP appeal is pending. The precise opposite is true. There is accordingly no basis for staying these proceedings while the QBP appeal is pending. Review is proper under 5 U.S.C. § 704.

**b.** That is especially so because (1) ABC, which is also a plaintiff here, is not a party to Humana's QBP appeal proceeding; and (2) Humana does not—indeed, cannot—seek the same relief in the QBP appeal proceeding as it is seeking with ABC in this action.

There are crucial differences between the relief available in a judicial forum and in the QBP appeal process. Simply stated, an appeal of quality bonus payments is not the same thing as an appeal of the Star Ratings or the rules that govern their calculation. In a QBP appeal under 42 C.F.R. § 422.260, an MAO may contest only calculation errors bearing on its QBP status. Although QBP status depends in large measure on the outcome of CMS's Star Ratings determinations, 42 C.F.R. § 422.260(c)(3)(ii) is crystal clear that, "[a]n administrative review *cannot be requested*" in a QBP appeal for "the methodology for calculating the star ratings (including the calculation of the overall star ratings)" or for the "measures included in the star rating system" (emphasis added).

Here, Humana and ABC seek judicial declarations that CMS's no-callback policy and delegation of authority to a private contractor are unlawful. They also seek injunctive relief requiring CMS to abide by its own regulations. These are forms of relief—in substance, scope, and procedure—that cannot be obtained in Humana's QBP appeal.

## II.    CMS'S MERITS ARGUMENTS ARE NOT PERSUASIVE

Against this background, there is no doubting that there is jurisdiction under Section 1331 to hear plaintiffs' cause of action under the APA in this case—as every other court to hear a Star Ratings suit over the past several years has concluded. On the merits, moreover, the Court should declare that CMS's calculation of Humana's 2025 Star Ratings was predicated on multiple unlawful policies and vacate and remand the Ratings with instructions to recalculate them.

### A.    Calls D1100955 and D0900533 should have been invalidated

To start, CMS should have invalidated calls D1100955 and D0900533 under the Accuracy & Accessibility Study. If Humana had been allowed to make callbacks in those cases—as is its standard practice—it would have been able make foreign-language translators available within the regulatory time limit. CMS's rule forbidding callbacks was not adopted by notice-and-comment rulemaking, as required by the Medicare statute; and it is, in any event, arbitrary and capricious. Moreover, even if the policy could be defended in the abstract (it cannot), its application to calls D1100955 and D0900533 was arbitrary and capricious because the agency has treated similar cases differently.

#### 1.    *Humana's injury is traceable to the no-callback rule*

**a.**  We begin with Humana's standing to challenge the no-callback policy in this case. CMS does not dispute the concrete and particularized nature of plaintiffs' injury-in-fact. For Humana, the injury is CMS's classification of calls D1100955 and D0900533 as unsuccessful, leading to lower Star Ratings. For ABC, the injury is the denial to enrollees in Humana's plans of more generous benefits that otherwise would be available to them; and the denial to agents and brokers of data accurately reflecting MA plan quality. *See* Am. Compl. ¶¶ 109-116; *see generally Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

13

CMS does challenge, however, the traceability of the plaintiffs' injuries to the no-callback policy. *See California v. Texas*, 593 U.S. 659, 669 (2021) (a plaintiff who cannot show "that the injury [it has] suffered is 'fairly traceable' to the 'allegedly unlawful conduct' of which [it] complain[s]" lacks standing).

CMS's traceability argument lacks merit. The amended complaint alleges (at ¶ 130) that, if Humana's "customer service representative[s] [had] been permitted to call back" after calls D1100955 and D0900533 were disconnected, "the call surveyors would have received responses to their questions within eight minutes of initial contact." Humana explained to CMS in the plan preview period (AR16) that "Humana's standard calling system and process for prospective members allows for Humana to call a prospective member back in the event of a dropped call," noting that it "was unable" to make callbacks after calls D1100955 and D0900533 were disconnected because of the no-callback policy.

CMS rejoins (at 24) that "there is nothing in the record to support th[ese] assertion[s]." In its view (at 24-25), if Humana truly had a practice of calling back following a disconnection, "then Humana should presumably have some evidence indicating that it followed its own process for these calls." The agency concedes (at 25) that "Humana might have a more forceful argument for reclassifying the call[s] had it presented evidence that it followed its own policy and called back following the disconnection." "But," CMS concludes (*id.*), "there is no evidence that Humana attempted a callback" with respect to calls D1100955 and D0900533, and plaintiffs' "theory that the failure is attributable to the 'no-callback policy' is [thus] nothing more than *ipse dixit*."

That ignores the obvious: What would have been the point of attempting callbacks following the disconnections in calls D1100955 and D0900533, given that CMS does not allow them? Government policy often bars regulated entities from taking particular

14

measures; a regulated entity does not forfeit its right to challenge such policies in court by following their dictates in practice.

In any event, CMS's contractor acknowledged (AR23) that Humana's "procedure is to obtain the phone number of the prospective member and then to call them back if there is a disconnection." Humana, in turn, explained (AR25) that it "was unable to complete these calls" with callbacks "due to technical limitations imposed by the CMS study that do not exist when Humana CSRs engage with actual Medicare beneficiaries."

If that were not sufficient (it is), the declaration of Marla Sanders, attached as Exhibit A, demonstrates the traceability of Humana's injury to the no-callback policy beyond any doubt.[2] According to the Sanders declaration (at ¶ 3), "Humana's standard practice requires a customer service representative to attempt to call back a real-world caller if the call is unexpectedly disconnected." At the same time, CSRs are virtually always able to tell when a call to the center is *not* a "real-world call," but instead a CMS test call. "CMS test callers follow standard scripts that are readily identified." *Id.* ¶ 4(a). CMS itself instructs MA plans to train their customer service representatives to recognize these scripts and "to take specific, non-standard steps in response." *Id.* (citing AR43-44). Moreover, "CMS test callers typically place multiple test calls from the same phone

---

[2]    The Sanders declaration is attached to establish standing. "This type of evidence does not run afoul of the record rule because courts consider it 'not in order to supplement the administrative record on the merits, but rather to determine [their own] jurisdiction.'" *Texas v. Biden*, 2021 WL 4552547, at *2 (N.D. Tex. 2021) (quoting *NEDC v. Bonneville Power Administration*, 117 F.3d 1520, 1528 (9th Cir. 1997)). "Courts routinely rely on extra-record evidence to support standing in APA cases." *Id.* (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153-54 (2010) (relying on declarations to find that plaintiffs had Article III standing in an APA case); *Theodore Roosevelt Conservation Partnership v. Salazar*, 616 F.3d 497, 507 (D.C. Cir. 2010) (same)); *see also, e.g.*, *Texas v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 737 F. Supp. 3d 426, 434-439 (N.D. Tex. 2024) (relying at length on plaintiff declarations to establish standing in an APA case).

number," meaning that CSRs can generally identify CMS test calls using the caller-ID information. *Id.* ¶ 4(b). And because a CSR "speaking with a CMS test caller must deviate from Humana's standard sales script," they "will refrain from requesting callback information." *Id.* ¶ 5.

Perhaps more to the point, CMS's contractors block any callback attempts to CMS telephone numbers technologically, using an automated message stating that "your call cannot be completed at this time" in response to incoming calls. Sanders Decl. ¶ 6.

Thus, while it is true that Humana's CSRs "did not attempt callbacks after [calls D1100955 and D0900533] were disconnected," that is because "Humana's standard practice is not to attempt callbacks to CMS test callers." Sanders Decl. ¶ 8. And that is Humana's practice only because "callbacks are not permitted for CMS test calls" and "would be met with a 'your call cannot be completed' automated response." *Id.* But if "CMS or its contractors permitted callbacks rather than blocking them with automated responses, Humana would not exempt CMS test calls from its standard callback policy," in which case "the customer service representatives who handled calls D1100955 and D0900533 would have been required to attempt callbacks within the eight-minute time period established by 42 C.F.R. §§ 422.111(h)(1)(iii), 423.128(d)(1)(iii)." *Id.* ¶ 9.

That establishes the Article III requirement of traceability beyond debate. Humana requires callbacks following disconnections in all calls but CMS test calls. It exempts CMS test calls from its callback requirement because CMS does not permit—indeed, technologically blocks—callback attempts. If CMS permitted callbacks, Humana would require them for CMS test calls as well, and its CSRs would be able to connect dropped secret shopper calls with foreign-language interpreters within the eight-minute window.

There is, moreover, no doubt that the no-callback policy is the sole and independent basis upon which CMS (really, its third-party contractor) rejected Humana's objections during the plan preview period. When Humana complained that it should have been allowed to meet the regulatory requirements for foreign-interpreter availability by placing call-backs, the contractor responded succinctly: "we do not allow callbacks from the plan as all questions should be answered in a single call." AR23. With no analysis of its own, CMS "agree[d] with keeping" the calls "as is" (AR28), later stating that "CMS does not allow callbacks from the plan as all questions should be answered in a single call" (AR33).

**b.** CMS's remaining contentions likewise fall flat. First, it asks (at 25) "why did [Humana] not attempt a callback for either of the unsuccessful calls here," if it "could have successfully completed the interpreter availability measure via a callback." As we have just shown, Humana could not have successfully called back the CMS test callers—*but only because CMS blocks returned calls*, which CMS surely knows.

Next, it asks (*id.*) if "Humana knew in advance that a callback would be futile because of the no-callback policy," then "how can Humana claim that the no-callback policy is extra-regulatory?" CMS appears to be confused. Our position is not the that the no-callback policy is unlawful because it was secret; it is that it is unlawful because it is inconsistent with CMS's duly promulgated regulations, has effectively amended those regulations without notice-and-comment rulemaking, and is arbitrary and capricious on its own terms. *See* Opening Br. 23-27. Whether plaintiffs were aware of the policy "in advance" has nothing to do with those arguments. And with standing now established, it is to those arguments we now turn.

### 2. Because the no-callback policy was not adopted through notice and comment, it cannot stand

**a.** The opening brief established (at 23-24) that the no-callback policy is inconsistent with CMS's properly promulgated regulations for MAO call centers. Those standards require only that plans "[p]rovide[] interpreters for non-English speaking and limited English proficient (LEP) individuals," which "must be available for 80 percent of incoming calls requiring an interpreter *within 8 minutes* of reaching the customer service representative and be made available at no cost to the caller." 42 C.F.R. § 422.111(h)(1)(iii) (emphasis added); *see also id.* § 423.128(d)(1)(iii). On its face, that requirement calls for an interpreter to be made available within a *period of time* (within eight minutes of reaching the CSR), not for one to be made available within a single call.

Consistent with these regulations, CMS's Technical Notes describing the Accuracy & Accessibility Study provide that a foreign-language call is considered "completed" when the caller, having reached a CSR, "establish[es] contact with an interpreter and confirm[s] that the customer service representative can answer questions" about the plan's benefits "within eight minutes" of first connecting with the CSR. AR340; *see also* AR39, 86. CMS may not supplement these straightforward regulatory requirements with additional conditions omitted from the regulations' text. *Cf. Texas v. EPA*, 91 F.4th 280, 291 (5th Cir. 2024) ("In taking final action, an agency must comply with its own regulations.").

CMS offers no substantive response to our demonstration (Opening Br. 23-27) that the extra-regulatory single-call requirement unlawfully amends the regulations' narrower requirements, without notice-and-comment rulemaking. Instead, it strings together a number of stray statements from the Technical Notes and the Call Center Monitoring Memo

18

that it says are consistent with—but do not expressly state or explain—a single-call requirement. *See* CMS Br. 26-27.

The government's (questionable) proposition that these scattered clauses make a no-callback rule "quite clear" (Br. 26) is a red herring. CMS could have stated its no-callback policy in bold, capital letters, and it still would be unlawful. Under Section 1395hh(a), CMS may not amend the plain text of a regulation with additional policies that were not subjected to notice and comment. And CMS does not even try to argue that the single-call requirement is a product of the regulatory text.

**b.** As we explained in the opening brief (at 24-27), and CMS nowhere actually disputes, the agency cannot enforce a no-callback rule without adopting it through notice-and-comment rulemaking. The Medicare Act's specialized notice-and-comment requirements confirm this, and CMS's arguments otherwise are wrong.

We explained (Opening Br. 25-26) that 42 U.S.C. § 1395hh(a) requires any "substantive legal standard" governing eligibility of MAOs or beneficiaries "to furnish or receive services or [Part C or D] benefits," or to receive payments, to proceed through notice-and-comment. The rules for MA call centers codified at 42 C.F.R. §§ 422.111(h)(1)(iii) and 423.128(d)(1)(iii)—which are constituent rules within the Star Ratings system—do just that. That is why CMS itself has explicitly cited Section 1395hh as its authority for those regulations during the relevant rulemakings. *See, e.g.*, 76 Fed. Reg. 21432, 21561 (April 15, 2011) (stating that "[t]he authority citation for part 422 continues to" be "42 U.S.C. 1302 and 1395hh"); *id.* at 21502 ("explicitly codifying the requirement to provide interpreters for [non-English-speaking] callers in regulations" and adding Section 422.111(h)). *See also, e.g.*, 86 Fed. Reg. 5864, 6094 (Jan. 19, 2021) (reciting same authority); *id.* at 6107 (adding additional requirements to Section 422.111(h)).

19

CMS disagrees (at 28), but without meaningful explanation. It asserts (*id.*) that "MAOs are not providers of services, and insurance coverage is not a service." That is true, but beside the point. The Section 1395hh(a) rulemaking requirement applies to standards that govern an MAO's "eligibility . . . to furnish . . . benefits." The "benefits" provided under a Medicare Advantage policy of health insurance are not the medical services or products themselves that an enrollee might receive from providers; rather, they are the terms for an MA plan's payment *for*, or reimbursement *of*, the cost of covered medical services or products. When one says that she receives "health benefits" from her employer, for example, she does not mean that her employer itself provides her with medical services; she means, instead, that her employer provides her with insurance coverage *for* medical services provided by others. The coverage, not the service, is the "benefit." And needless to say, MA organizations provide coverage (MA benefits) to enrollees.

Moreover, a plan's Star Ratings govern its "eligibility . . . to furnish . . . benefits" by, among other things, determining whether it may enroll new participants outside of open enrollment (42 C.F.R. § 422.62(b)(15)) and, if its Ratings are too low, rendering it ineligible to participate in the MA and Part D programs at all (*id.* §§ 422.502(b)(1)(i)(D), 423.503(b)(1)(i)(D)). Star Ratings also affect MA plans' eligibility to receive quality bonus payments, which by law must be used to "furnish" further "benefits" to enrollees. 42 U.S.C. §§ 1395w-23(a)(1)(B)(i), (E), 1395w-24(b)(1)(C).

There is thus no doubting that substantive standards governing the Star Ratings program fall under Section 1395hh(a) and must be promulgated by notice-and-comment rulemaking. Again, the Court need not take our word for this—CMS itself has cited Section 1395hh as its statutory authority for promulgating regulations governing the substantive

requirements underlying the Star Ratings measures, including the foreign-language interpreter requirement. *See* 76 Fed. Reg. at 21561; 86 Fed. Reg. at 6094.

Before this Court, CMS nonetheless denies that its no-callback rule—which effectively amends 42 C.F.R. § 422.111(h)(1) with additional requirements—is covered by Section 1395hh(a). Its view (at 29) is that any expansion of the requirements set by its regulations is instead covered by "a more specific statute, in which Congress instructed CMS on how to convey information about the Medicare Advantage program to 'interested parties,'" namely 42 U.S.C. § 1395w-23(b). But that talks past our point, which is that CMS cannot simply "convey information" about new rules governing the Star Ratings performance measures without going through notice-and-comment rulemaking.

CMS does not improve its position when it observes that Section 1395w-26(b)(2) contains an informal notice procedure of its own, which it claims "it ha[s] historically used . . . to propose for comment and finalize changes to the quality Star Ratings system." CMS Br. 29 (quoting 83 Fed. Reg. at 16524). To start with, CMS has never announced or sought comment on its no-callback rule even under Section 1395w-26(b)(2), so it is unclear how that provision could be helpful to the agency.

Either way, Section 1395w-26(b)(2) is manifestly not the appropriate vehicle for conducting notice and comment on proposals to "modify Star Ratings measures . . . via rulemaking (for new measures and substantive changes to existing measures)." CMS Br. 29. By its terms, that provision applies to announcements of proposed changes to the agency's "risk adjustment methodology" (42 U.S.C. § 1395w-26(c)(3)(iii)) used for calculating "[t]he risk and other factors to be used in adjusting [capitation] rates under subsection (a)(1)(C)" (*id.* § 1395w-26(b)(1)). The Star Ratings have nothing whatsoever to do with MA risk adjudgment methodologies for calculating capitation rates.

21

At bottom, Section 1395hh specifies particular notice-and-comment procedures for "rule[s], requirement[s], or other statement[s] of policy" that establish or change "substantive legal standard[s]" that affect payments or benefits under the MA program. *Id.* § 1395hh(a)(2). Among other things, any such proposed rule must be published in the Federal Register, and the public must have "not less than 60 days" to "comment thereon." *Id.* § 1395hh(b)(1). CMS does not (cannot) deny that it failed to follow these requirements with respect to the no-callback rule. "Because affected members of the public received no advance warning and no chance to comment first, and because the government has not identified a lawful excuse for neglecting its statutory notice-and-comment obligations, . . . the [no callback] policy cannot stand." *Azar v. Allina Health Service*, 587 U.S. 566, 568 (2019) (applying Section 1395hh). The agency's dispositions of calls D1100955 and D0900533, which depended entirely on that policy, accordingly must be set aside.

### 3.    *The no-callback policy also is arbitrary and capricious*

For the reasons just given, the no-callback policy is unlawful and unenforceable, and the Court need not say anything more about it. It nonetheless bears repeating (*see* Opening Br. 27) that the rule is arbitrary and capricious on its own terms.

CMS previously has explained that "[t]he Accuracy & Accessibility Study," which includes testing of foreign-language interpreter availability, "is performed to (1) ascertain the accuracy of responses to plan benefit questions provided by customer service representatives when calling the call center in addition to (2) testing the availability of interpreters for Limited English Proficient callers and (3) testing TTY [teletypewriter] functionality." 83 Fed. Reg. at 16550. "Plan sponsors are required to provide an interpreter for any caller speaking a foreign language," and through the study, "CMS seeks to ensure that more vulnerable populations have equal access to interpreters." *Id.*

The no-callback rule does nothing to advance those objectives. Under the no-callback rule, a dropped call automatically results in an unsuccessful rating, even when a CSR could perform a callback and connect the caller with an interpreter in under eight minutes. But a dropped call does not necessarily mean that an interpreter is unavailable in the time required—and that is all foreign-language test calls are meant to measure. *See* AR38. By automatically penalizing MA plans for call disconnections in the Accuracy & Accessibility Study, the policy produces results that do not reflect the plan's performance with respect to the measure that the study is actually intended to assess.

CMS does not disagree. It instead asserts (at 29-30) that the no-callback rule is "connected to the goals of the Star Ratings" *generally*, and that "a call center that does not drop calls and provides answers on a single call provides better customer service." There are two problems with this response.

First, because CMS did not publish notice and take comment on the no-callback rule, it is left to rely on the rationalizations of its lawyers in a legal brief. But "[i]n reviewing an agency's action, [courts] may consider only the reasoning articulated by the agency itself" in the rulemaking process, not "*post hoc* rationalizations" by counsel. *National Association of Manufacturers v. SEC*, 105 F.4th 802, 814 (5th Cir. 2024) (quotations omitted).

Second, CMS has ignored the nub of our argument, which is that the Accuracy & Accessibility Study is not designed to evaluate call drops or general customer service. Rather, it is designed to evaluate the three specific criteria that CMS itself has identified: (1) the accuracy of responses to plan benefit questions provided by CSRs, (2) the availability of interpreters for non-English speakers, and (3) TTY functionality. *See* 83 Fed. Reg. at 16550. The no-callback rule interferes with, rather than advances, the evaluation of those criteria by introducing an irrelevant consideration (whether an interpreter is made available

in a single call, or instead in a callback) and irrationally preventing MA plans from meeting the regulatory requirements for interpreter availability after a disconnection.

The premise of CMS's post hoc rationalization is also wrong. Call disconnections sometimes happen; it is a fact of life. When they *do* happen, the better side of customer service is for the CSR to attempt an immediate, personal callback (Sanders Dec. ¶ 3), rather than to shrug her shoulders and let the disconnection stand. And while it is true that no disconnection is preferable to a disconnection followed by a callback, we explained (Opening Br. 27) that CMS already uses another measure—the Timeliness Study—to evaluate call disconnections. *See* 42 C.F.R. §§ 422.111(h)(1)(ii)(C), 423.128(d)(1)(ii)(C) (plans must "limit[] the disconnect rate of all incoming [customer service] calls to 5 percent").

It makes no difference that the Accuracy & Accessibility Study applies to calls from prospective enrollees, whereas the Timeliness Study applies to calls from current enrollees. *See* CMS Br. 30. The point is that the Timeliness Study factors CSR call disconnections into a plan's Star Ratings, deliberately and by design. To implement extra-regulatory rules applicable to unrelated measure studies like the Accuracy & Accessibility Study, so that they too penalize MA plans for call disconnections when that is not their purpose, is to overweigh (double-count) that factor.

Of course, all of this could have been brought to the agency's attention, if only it had held out the no-callback rule for notice-and-comment rulemaking, as required by Section 1395hh(a). Because it did not do so, the agency did not consider these problems. And in the meanwhile, it has been implementing a rule that is arbitrary and capricious.

### 4.  *The agency has not treated like cases alike*

Finally, even if CMS's application of the no-callback policy to rank Humana's calls unsuccessful might otherwise be lawful (it is not), it was still arbitrary and capricious to

count calls D1100955 and D0900533 against Humana in the Star Ratings. CMS does not deny that it must evaluate plans "fairly and equally" based only on matters that are "under the [plan's] control." 83 Fed. Reg. at 16560, 16584; *see also* AR81 (calls should be marked "unsuccessful" for "reasons caused by the plan"). And agencies must, as a general matter, "treat like cases alike" (*University of Texas M.D. Anderson Cancer Center v. HHS*, 985 F.3d 472, 479 (5th Cir. 2021)), and avoid "unexplained inconsistencies" (*Data Marketing Partnership v. U.S. Department of Labor*, 45 F.4th 846, 857 (5th Cir. 2022)).

In *Elevance*, CMS invalidated a call that disconnected during the Accuracy & Accessibility Study under circumstances much like those here. In particular, CMS in that case "found that there was no evidence the call at issue failed due to actions by Elevance," so it "should not have counted against Elevance." Am. Compl. ¶ 4 (Dkt. No. 13), *Elevance*, 736 F. Supp. 3d 1 (No. 1:23-cv-3902-RDM). CMS should have applied similar reasoning here.

As Humana informed CMS during the plan preview period, calls D1100955 and D0900533 "disconnected due to technical errors while Humana's CSRs were actively connecting with an interpreter to join the call." AR15-16. CMS did not then assert that Humana was responsible for the drops—that the call disconnections were the result of factors "under the [plan's] control." 83 Fed. Reg. at 16560, 16584. For instance, the call may have been dropped due to an ISP connectivity issue on the secret shopper's end; CMS does not (likely cannot) say. Nonetheless, CMS now insists (at 23) that "the error" causing the disconnect "occurred *within Humana's call center*," thus distinguishing it from the Elevance case where "[t]he disconnection was *completely* outside of Elevance's system."

That assertion is out of line with the explanation that the agency provided during the plan preview period. It is also wrong. As in *Elevance*, CMS has not cited any evidence that calls D1100955 and D0900533 disconnected for reasons that were within Humana's

control. The administrative record demonstrates only that the CMS test caller did not disconnect the call; nothing in the caller notes or any other evidence suggests that the call was disconnected because of facts or circumstances under Humana's control. A call might disconnect for any number of reasons outside the MA plan's control, like a power outage or an unreliable connection on the *caller*'s side. Without evidence that the call failed for a reason within Humana's control, CMS should have invalidated calls D1100955 and D0900533, as it did in *Elevance*.

### B.    CMS's determination with respect to call C0701002 also was unlawful

CMS's handling of call C0701002 also must be vacated. On this score, the agency refused to follow the plain terms of its regulations concerning interpreter availability and its longstanding guidance implementing those regulations. According to both (and to common sense), CMS cannot count as "unsuccessful" a call testing the availability of foreign-language interpreters if the test caller never says anything in a foreign language. Yet it did just that with respect to one of Humana's test calls during the 2024 Accuracy & Accessibility Study.

**1.**    As we underlined in the opening brief (at 34-35), if a CMS secret shopper never asks an introductory question, scoring the call as "unsuccessful" is contrary to the governing regulation and CMS's own guidance. The court in *UnitedHealthcare v. CMS* applied just that reasoning to hold that CMS unlawfully scored as "unsuccessful" a test call in which the introductory question in a foreign language was never asked. *See* 2024 WL 4870771, at*4 (E.D. Tex. 2024). As the *UnitedHealthcare* court explained, "[b]ecause the introductory question was not asked," the plaintiff's "call center did not fail to answer it." *Id.* In nevertheless scoring the call as "unsuccessful," CMS thus "acted inconsistently with its own guidelines," without explanation and in violation of the APA. *Id.*

It is undisputed that the test caller in call C0701002, like the caller in *UnitedHealth-care*, never asked the introductory question. Applying *UnitedHealthcare*'s reasoning, CMS's decision to score call C0701002 as "unsuccessful" instead of invalidating it was thus unlawful. Again, at the connect phase, secret shoppers must "determine if [they] can reach a live CSR at the plan who can assist [them] with [their] questions." *Id.* According to CMS guidance, "[a] call is considered connected *when the caller confirms that the call connects to the CSR*." AR87 (emphasis altered). CMS has thus explained that "the call is connected" if a secret shopper "establish[es] contact with your CSR *while speaking in a foreign language*." AR94 (emphasis added). That is consistent with the ordinary-language definition of the term "reach" (*see* Opening Br. 33), which CMS does not dispute.

Moreover, the secret shopper's verbal confirmation of a connection with the CSR must take place prior to, and is distinct from, the third evaluation phase, asking the initial question. *See* Opening Br. 14. And it is the initial question that triggers the regulatory duty to bring an interpreter into the call within eight minutes. AR82, 92-93.

**2.** We made all of these points in the opening brief (at 33-34), and CMS denies none of them. Nor does it deny that the caller in call C0701002 never verbally confirmed a connection or posed an introductory question in a foreign language.

Attempting to distinguish *UnitedHealthcare*, CMS instead points at two irrelevancies. First, it asserts (at 31) that there is no evidence that call C0701002 was completely silent. Not so. The test caller's notes in CMS's own call logs indicate that the caller not only mistakenly believed that he was on hold, but that the hold was "silent." AR469. Regardless, the analysis does not turn on whether the test caller maintains absolute silence; indeed, in *UnitedHealthcare*, the test caller said "Hello?" in English. *See* 2024 WL

27

4870771, at*2. The critical question is whether the test caller asks an introductory question in a foreign language, as required by CMS's test-caller protocols. He did not.

Second, CMS notes (at 33) that the "the call was terminated by the [Humana] call center" after just "four minutes and seventeen seconds" of silence, whereas in *United-Healthcare*, "the CSR terminate[d] the call after approximately eight minutes." *See* 2024 WL 4870771, at*2. That the Humana CSR disconnected the call "before the eight-minute mark" is relevant, CMS asserts (at 33), because that is "the deadline for a call center to complete the measure."

That distinction would be relevant only if the eight-minute clock actually had begun to run. But in call C0701002, it never did. That is because, by CMS's own guidance, the call is "connected," and the clock begins to run, only after the secret shopper "establish[es] contact with [a] CSR while speaking in a foreign language" (AR94), which did not happen here. Moreover, the obligation to bring a foreign-language interpreter on the line within eight minutes of the connection is triggered only after the secret shopper "ask[s] an introductory question." *Id*. All of that makes sense, for how could CMS fault Humana (or any other MA plan sponsor) for failing to make foreign-language interpreters available to test callers who never say anything in a foreign language?

The test caller here never established a connection or posed an introductory question in a foreign language, as required by CMS guidance. AR81-82; AR94. In such a case, the eight-minute clock is never triggered, and the call has not tested the substantive requirements it is supposed to evaluate. CMS has established a clear, step-wise approach to performing foreign-language secret shopper calls (*see* Opening Br. 14) precisely to ensure that the calls uniformly test the compliance they are designed to measure. That did not happen here—a clearcut fact that CMS never actually disputes.

28

**3.** CMS argues (at 33) that, regardless of when the call center disconnects the call, the mere fact of a disconnection by the call center *at any time* is enough, under CMS's guidance, to score call C0701002 as "unsuccessful."

In the first place, this proposition cannot be squared with *UnitedHealthcare*, where the court ruled that the agency's "unsuccessful" score had to be set aside despite that "the CSR terminat[ed] the call." 2024 WL 4870771, at*2. The *UnitedHealthcare* court correctly and sensibly declined to hold a disconnection by the call center against the MAO, since the disconnection was a reasonable response to a failure by the test caller to ask an introductory question. In the case of call C0701002, the CSR likewise reasonably disconnected the call after more than four minutes of silence.

CMS also asserts (at 34), for the first time in this Court, that call C0701002 was properly evaluated as "unsuccessful" because "there is no evidence Humana's representative was ever present" on the call at all. *Accord id.* (asserting "there [was] no one on the line" for Humana). But that is not the explanation that CMS gave Humana during the plan preview period. And if the agency had made that baseless and speculative assertion, Humana would have readily refuted it with evidence.[3]

As in the *UnitedHealthcare* case, "[t]he agency never said" during the plan preview period that "the CSR [must] engage a caller who has not asked an introductory question or

---

[3]   Humana uses call recording software that visualizes the stages of each call it receives, including the initial interactive virtual recording (IVR) and later stages when a CSR is on the line or the call is placed on hold. For call C0701002, the software shows that the CSR was on the line for the duration of the call and did not place the secret shopping on a hold. Nor would a hold have been silent in any event; music would have been playing. Again, CMS did not call into question Humana's assertion (AR1) that "a mistake was made by the CMS caller" and that, because the "CMS caller remained silent throughout the duration of the call" despite the CSR's presence, "there was no dialogue between the CMS caller and CSR." If it had done so, Humana would have made this evidence available to the agency.

that a caller may sit silently if he believes he's on hold." 2024 WL 4870771, at*5. "To the extent CMS now attempts to" make that argument in court, "it is foreclosed from doing so." *Id.* (citing *Louisiana v. U.S. Department of Energy*, 90 F.4th 461, 469 (5th Cir. 2024)). "The court can only consider the reasoning 'articulated by the agency itself,' and cannot consider 'post hoc rationalizations for agency action.'" *Clarke v. CFTC*, 74 F.4th 627, 641 (5th Cir. 2023)).

The explanation that CMS gave in the plan preview period was effectively the opposite: It conceded the secret shopper's choice to remain silent but attempted to justify that choice on the ground that it is "not unusual for the interviewer to remain silent" until an interpreter is on the line, because "they would not understand anything being presented in English." AR12. In other words, according to CMS, "this was a foreign language call, [and] the interviewers are trained to only respond when they hear something in their test language." AR243. But now, after receiving an adverse decision in *UnitedHealthcare*, the agency evidently has realized that that explanation is irreconcilable with own guidance. It therefore attempts a litigation-inspired shift before the Court, which it may not do.

The explanation that CMS actually gave to Humana in the plan preview period—the one that the Court must here evaluate—makes clear that call C0701002 cannot be scored as unsuccessful, because the caller remained silent and never posed an introductory question in a foreign language, as required. No more is required to grant relief on this point.

### C.     Across the board, CMS unlawfully delegated its authority to resolve plan objections to call determinations to a non-governmental third party

Finally, vacatur and remand is warranted because CMS unlawfully delegated review of Humana's objections during the Star Ratings plan preview period to a private third party, Hendall Inc., as well as its subcontractor, American Institutes for Research (AIR).

### 1.    The Court should not hold the case in abeyance

In another effort to dodge the merits of the improper delegation claim, CMS first asks (at 36) the Court to "await further guidance from the Supreme Court," which has granted certiorari in *Consumers' Research v. FCC*, 109 F.4th 743 (5th Cir. 2024).

No abeyance is warranted. First, the government's abeyance argument is necessarily a conditional one. If the Court agrees with all that we have argued to this point, it can and should grant the relief requested without proceeding to the constitutional non-delegation claim. *See St. Joseph Abbey v. Castille*, 700 F.3d 154, 165 (5th Cir. 2012) ("Under well-settled precedent, this Court must avoid deciding a constitutional issue 'if there is also present some other ground upon which the case may be disposed of.'").

Even if the Court thinks it necessary to reach the non-delegation claim to fully resolve the case, it should do so immediately. Plaintiffs have made clear from that start that expedited treatment of this litigation is necessary to stave off irreparable harms. *See* Joint Motion to Establish Briefing Schedule 2 (Dkt. 17); Joint Motion to Amend Briefing Schedule 2 (Dkt. 30). It was only upon CMS's consent to an expedited schedule, and an agreement that the Court should enter judgment by the first week of April 2025 (*id.*), that plaintiffs agreed with CMS that they would not file a motion for a preliminary injunction. Having induced plaintiffs to forego a motion for a preliminary injunction on that basis, CMS cannot now be heard to seek indefinite delay.

And decision by the first week of April 2025 remains essential. As alleged in the complaint (at ¶¶ 114-116), ABC's members count on the reliability and validity of the Star Ratings system to do their jobs, including the reasonable assumption that the system is actually being administered by CMS—not unaccountable, profit-driven third parties. ABC's members will be severely prejudiced if they must sit on their hands indefinitely,

waiting for a determination of whether a system on which they rely day-in-and-day-out is being unconstitutionally administered.

For its part, Humana faces irreparable harm if it has not obtained relief from this Court before CMS releases the Announcement of Calendar Year 2026 Medicare Advantage Capitation Rates and Part C and Part D Payment Policies. MAOs must submit plan bids to CMS by the first week of June 2025 to participate in the 2026 Medicare Advantage program. Plans' 2025 Star Ratings are critically important to the bids that MA plans must submit. It will be extremely difficult—bordering on impossible—to make the early June deadline without this Court requiring CMS to correct Humana's erroneous Star Ratings in April. CMS effectively has conceded these points by agreeing to expedited summary judgment proceedings. *See* Joint Motion to Establish Briefing Schedule 2 (Dkt. 17); Joint Motion to Amend Briefing Schedule 2 (Dkt. 30).

Even if it were otherwise, a stay still would not be appropriate. True, the opening brief cites *Consumers' Research*, but only because it is the latest Fifth Circuit precedent discussing nondelegation standards as a general matter. The non-delegation framework is well-established throughout decades of Supreme Court and Fifth Circuit precedent. *See* 109 F. 4th at 768-770, 774-776 (collecting sources). *Consumers' Research* broke no new ground on that front, at least not in any way relevant here.

In fact, the questions presented in *Consumers' Research* involve fundamentally different constitutional questions implicated by inter-branch delegation issues. The question there is whether *Congress* violated the non-delegation doctrine by extending *legislative* authority to executive officials, which turns on structural separation-of-powers concerns. This case, in contrast, involves an executive-to-private-party delegation question, which is about government officials simply doing their own jobs, rather than having others do it for

32

them; it is not about structural checks and balances. And even if there were some chance that the Supreme Court would say something that might alter the answer to the discrete question posed here, CMS will have ample opportunity to make its arguments to the Fifth Circuit, which is the normal course when the law advances in a material way while a case is pending on appeal.

But nothing the Court may say in *Consumers' Research* is likely to make a difference here. The non-delegation question in this case does not implicate any novel issues of law, and *UnitedHealthcare* has already resolved the issue against CMS (2024 WL 4870771, at *7)—in a judgment that CMS has conspicuously chosen not to appeal. For its part, CMS barely bothers to defend itself against the *UnitedHealthcare* decision. That is because it is not a close call, and a stay for *Consumers' Research* would accomplish nothing but prejudicial delay.

### 2. *CMS's administration of the 2025 Star Ratings system violated the non-delegation doctrine*

CMS all but concedes that its delegation of executive authority to private third parties is unlawful. It does not dispute—or even mention—that (1) Congress has not authorized the delegation and (2) the authority to resolve MAOs' objections during the plan preview period is not ministerial. That alone is sufficient to grant relief on the non-delegation claim. *See Hull v. Kapstone Container Corp.*, 2018 WL 4409798 at *2 (N.D. Tex. 2018) ("When a party fails to respond to an argument in the opposing party's motion for summary judgment, the party concedes that argument.").

As the opening brief explained (at 29-30), without Congressional authorization, an agency's delegation of authority to a private party may "involve[] no more than ministerial tasks." *Consumers' Research*, 109 F.4th at 775. That is because, although "*Congress may*

formalize [a limited] role [for] private parties in executing its laws, . . . agencies may not." *Id*. Neither the Medicare statute nor any other act of Congress authorizes CMS to delegate review of MAOs' compliance with Medicare standards for Star Ratings to private parties. *See UnitedHealthcare*, 2024 WL 4870771, at *8. CMS does not assert otherwise.

Nor is the power CMS delegated to Hendall purely ministerial. It includes not only the power to place test calls in the Accuracy & Accessibility Study, but to evaluate those calls for regulatory compliance (AR60), exercise judgment as to whether any calls should be invalidated (AR23), and review and resolve plans' objections to those decisions during the plan preview period (AR38). Each of these acts requires Hendall and AIR to exercise "discretion and judgment," and thus none is merely ministerial. *See UnitedHealthcare*, 2024 WL 4870771, at *7. Again, CMS does not argue otherwise.

Settled non-delegation principles compel the conclusion that CMS's private delegation here is unconstitutional. *UnitedHealthcare*, 2024 WL 4870771, at *7-*9. The government does not even cite *UnitedHealthcare* on this point, let alone does it offer any compelling reason to split from Judge Kernodle's reasoned opinion there.

CMS's only substantive response (at 36)—that it adequately reviewed its contractors' resolution of Humana's objections and "affirmatively acted . . . to give legal effect to [the contractors'] advice"—is both insufficient and wrong.

It is insufficient because, even supposing CMS retained and "actually exercised" final decision-making authority, it still is the case that Congress never authorized the delegation in the first place. Again, without statutory authorization, an agency may delegate nothing more than ministerial tasks. *See Consumers' Research*, 109 F. 4th at 744. CMS delegated much more than that here, so the agency's oversight—or lack thereof—is simply beside the point.

34

It is wrong because, as we explained (Opening Br. 31, 36-37), the record on its face shows that CMS did not meaningfully supervise its contractors, and it did not exercise independent judgment over the resolution of Humana's objections. When Humana objected, CMS simply forwarded to objections to Hendall and AIR. When those private parties then recommended keeping all calls "as is" (AR6, 23), CMS "reflexively rubber stamp[ed]" that recommendations. *See Consumers' Research*, 109 F.4th at 770. The record is devoid of any evidence that CMS "appl[ied] its independent judgment" and "actually exercise[d]" final decision-making authority. *See id.* at 770-771.

The government resists this conclusion, contending (at 38) that we "ignore[] the statements by CMS officials in the record explaining the decision not to change the classification of Humana's calls" and instead "pretend the explanation does not exist." But a glance at the record reveals precisely our point. For all three calls we challenge here, CMS merely repeated its contractors' recommendations back to Humana near verbatim. *Compare* AR23 *with* AR33 (the dropped calls); and AR3 *with* AR12. And it did not meaningfully elaborate in response to Humana's further inquiries.

According to CMS (at 38) our position has no logical end, and "[i]t is unclear . . . how an agency that employs contractors could agree with any recommendation they make—no matter how trivial—without running afoul of such a law." But the Court need not define the outer bounds of how an agency might adequately oversee a private contractor in every case, given that no delegation was authorized by Congress here and the agency's independent review was in any event so obviously lacking. CMS *entirely disregarded* Humana's arguments as to why the agency should invalidate each of the challenged calls in favor of adopting the contractors' recommendations nearly word-for-word. For example, Humana argued—as it argues here—that the no-callback policy is not rationally connected to the

Accuracy & Accessibility Study (AR16-17) and is inconsistent with regulations and guidance (*id.*), and that including the silent call in the study violated CMS guidance (AR1). And it repeated these arguments later in the plan preview period. AR242-243. Yet CMS never squarely addressed them.

That CMS delegated non-ministerial tasks to private parties without congressional authorization is enough to resolve this issue in plaintiffs' favor. But either way, the record belies the agency's insistence that it exercised meaningful independent review of its private contractors' judgments.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment, deny Defendants' cross-motion to dismiss and for summary judgment, set aside Humana's 2025 Star Ratings for all contracts adversely impacted by calls D0900533, D1100955, and C0701002, and remand the matter to CMS for recalculation of Humana's 2025 Star Ratings. The Court should further declare that the policies challenged in this case, including the no call-back rule and the delegation of regulatory power to private third parties, are unlawful and enjoin the agency from enforcing them unless and until the legal infirmities are corrected.

Dated: February 19, 2025

Respectfully submitted,

/s/ *Michael B. Kimberly*

Michael B. Kimberly* (D.C. No. 991549)
Kate McDonald* (D.C. No. 998233)
Caleb H. Yong* (D.C. No. 1780922)
Nicole E. Wittstein* (D.C. No. 1725217)
    McDermott Will & Emery LLP
    500 North Capitol Street NW
    Washington, D.C. 20001
    (202) 756-8901
    mkimberly@mwe.com
    kmcdonald@mwe.com
    cyong@mwe.com
    nwittstein@mwe.com

Richard Salgado (Texas No. 24060548)
    McDermott Will & Emery LLP
    2501 North Harwood Street, Suite 1900
    Dallas, TX 75201-1664
    (214) 210-2797
    richard.salgado@mwe.com

* *pro hac vice*

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

Undersigned counsel certifies that a true and correct copy of this document was served via CM/ECF on all counsel of record on February 19, 2025.

/s/ *Michael B. Kimberly*